**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| OHIO DEMOCRATIC PARTY; DEMOCRATIC PARTY OF CUYAHOGA COUNTY; MONTGOMERY COUNTY DEMOCRATIC PARTY; JORDAN ISERN; CAROL BIEHLE; and BRUCE BUTCHER <br><br> Plaintiffs, <br><br>  v. <br><br> JON HUSTED, in his official capacity as Secretary of State of the State of Ohio; and MIKE DEWINE, in his official capacity as Attorney General of the State of Ohio, <br><br> Defendants. | Case No. 2:15cv1802 <br><br> **JUDGE WATSON** <br><br> **MAGISTRATE JUDGE KING** |

---

**AMENDED COMPLAINT**

---

1.      Plaintiffs Ohio Democratic Party, Democratic Party of Cuyahoga County, Montgomery County Democratic Party, Jordan Isern, and Carol Biehle, and Bruce Butcher ("Plaintiffs") bring this lawsuit to secure declaratory and equitable relief for Defendants' unlawful infringement of Plaintiffs' and thousands of other Ohioans' rights, privileges, and immunities guaranteed by the First, Fourteenth, and Fifteenth Amendments to the Constitution, and violations of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

2.      Since the November 2012 elections, Ohio's Republican-controlled General Assembly and Republican Governor have enacted several changes to the state's voting laws that have the effect of burdening, abridging, and/or denying the voting rights of all of Ohio's citizens. These changes, moreover, were designed to and will disproportionately burden specific populations, in particular African-Americans, Latinos, and young people—each of which are, not coincidentally, core Democratic constituencies.  Ohio's Republican Secretary of State has

administered these changes in a fashion that compounds these disproportionate burdens on African-American, Latino, and young voters.

3.        For example, on February 21, 2014, Governor John R. Kasich signed into law Senate Bill 238 ("S.B. 238"), which contained various reductions to the period for early voting by absentee ballot in Ohio.[1]  Prior to S.B. 238, Ohio's citizens could cast absentee ballots up to 35 days before an election.  During the first seven days of this period, voters could register and vote on the same day.  S.B. 238 eliminated that seven-day period, known as "Golden Week," by reducing the early voting period from 35 to 28 days before Election Day.  Prior to S.B. 238, tens of thousands of Ohioans, including a disproportionate number of African Americans, had registered and/or voted during "Golden Week."

4.        After S.B. 238 was signed, Secretary of State Jon Husted (the "Secretary") issued several directives—Directives 2014-06, 2014-17, and 2014-30 (the "EIP Voting Directives")—that eliminated the discretion each county board of elections ("BOE") had to provide for early in-person absentee ("EIP") voting during evening hours and on most weekend days.  As a result of those directives, county BOEs were not permitted to offer evening early voting hours and they were permitted to offer weekend early voting only on the two Saturdays and the one Sunday before an election.

5.        In order to settle a lawsuit filed by various voting rights groups in Ohio, the Secretary recently agreed to reinstate some of the EIP voting opportunities eliminated by the EIP

---

[1] Since 2005, voters in Ohio have been able to cast early absentee ballots in one of two ways. They can either vote early in person at their county BOE headquarters (or other location designated for that purpose by the BOE), or they can mail in their absentee ballot.  *See* Ohio Rev. Code § 3509.01(B)(2)–(3).  Unless otherwise specified, references to "early voting" in this Amended Complaint include both the early in-person and mail-in types of absentee voting.

Voting Directives.[2]  Pursuant to this settlement agreement (the "Settlement Agreement"), every Ohio county will provide EIP voting on the final two Saturdays and Sundays before the presidential general election in November 2016, and evening EIP voting hours until 7 p.m. during the final week before the election.  However, the Settlement Agreement does not restore the discretion previously afforded to each county to set its own EIP voting schedule.  Instead, it imposes a uniform schedule that, like the EIP Voting Directives that preceded it, has the effect of leaving voters in more-populous counties with fewer EIP voting opportunities than those in less-populated counties.

6.      Ohio law limits each county to one EIP voting location.  *See* Ohio Rev. Code § 3501.10(C).  This limitation means that in more-populous counties, which have higher percentages of minority residents and Democratic voters, more voters must use a single EIP voting location than in less populous counties.  Prior to the imposition of the EIP Voting Directives and the Settlement Agreement, the discretion each BOE had to extend the days and times for EIP voting played an essential role in counteracting the inequitable distribution of early voting opportunities resulting from section 3501.10(C).  Now that this discretion has been eliminated, there is no way to remedy the discriminatory impact of the one-location-per-county rule.  As a result, to take an example, voters in Franklin County, which is home to Columbus and The Ohio State University and has approximately 800,000 registered voters, are limited to one EIP voting location, as are voters in Noble County, which has approximately 9,000 registered voters—an approximate ratio of 89 to 1.

---

[2] *See* Settlement Agreement, *NAACP v. Husted*, No. 2:14-cv-00404 (S.D. Ohio Apr. 17, 2015) (Dkt. No. 111-1).

7.    The Ohio General Assembly also enacted Senate Bill 200 ("S.B. 200"), which Governor Kasich signed on December 19, 2013.  S.B. 200 made various changes to the state's system for maintaining voter registration records, including requiring various state agencies to share with the Secretary information relevant to voter registration, requiring the Secretary to share this information with other states, and requiring the Secretary to remove certain voters from the registration rolls every year, as opposed to every other year, as under previous law.

8.    In addition, S.B. 200 reduced the number of direct recording electronic ("DRE") voting machines that a county must have if it uses those machines as its primary voting device. Under previous law, such counties were required to have a minimum of one DRE machine for every 175 "registered voters" in the county, with the number of registered voters being the higher of 1) the total number of registered voters as of the October deadline for voter registration for the last presidential election or 2) the average of the total number of registered voters in the county as of the October deadline for the last two presidential elections.  S.B. 200 changed this by requiring that the total number of absentee ballots cast and counted in the last presidential election be subtracted from the number of "registered voters."

9.    Moreover, to implement this part of S.B. 200, Secretary Husted issued Directive 2014-26, which permitted county BOEs to reduce further the number of "registered voters" from which to calculate the minimum number of DRE machines they must have by subtracting the number of voters who failed within 30 days to respond to a confirmation-of-residence notice sent out pursuant to the statewide voter records maintenance program, as well as the number who had requested an absentee ballot for the upcoming election.  The effect of S.B. 200 and Directive 2014-26 will be a reduction in the number of voting machines and a resulting increase in the length of lines at the polls.

4

10. Along with S.B. 238 and S.B. 200, the General Assembly passed Senate Bill 205 ("S.B. 205") and Senate Bill 216 ("S.B. 216"), which changed the laws governing absentee and provisional ballots. S.B. 205 made it more difficult to obtain, cast, and have counted an absentee ballot by prohibiting any public office, including county BOEs, county Boards of Commissioners, and city governments, from mailing unsolicited absentee ballot applications, prohibiting officials from including pre-paid postage for returning absentee ballots, prohibiting the Secretary from mailing unsolicited absentee ballot applications absent specific authorization from the General Assembly, and requiring voters to provide more information to have their absentee ballots counted.

11. Despite S.B. 205's general prohibition on mailing unsolicited absentee ballot applications, Secretary Husted was given authority to mail such applications ahead of the November 2014 election. However, pursuant to Directive 2014-15, Secretary Husted excluded from that mailing voters who did not respond to a confirmation notice sent as part of the state's voter records maintenance program and did not vote in either the 2010 or 2012 elections. As a result of this decision, more than a million registered voters did not receive absentee ballot applications as part of this mailing.

12. S.B. 216 imposed new restrictions on voters' ability to cast provisional ballots. In particular, it increased the categories of information a voter must provide on the provisional ballot affirmation form by requiring voters to provide their current address and date of birth, shortened from 10 to seven days the period in which a voter may cure a failure to provide proof of identity on Election Day, and prevented election officials from completing on a voter's behalf the information required on the provisional ballot affirmation form. The restrictions came on top of the fact that, unlike voters casting absentee ballots, a voter casting a provisional ballot is not

5

notified of deficiencies on the affirmation form or given an opportunity to correct such deficiencies after casting a provisional ballot on Election Day.

13.     S.B. 216 also created a system in which county BOEs have discretion to consolidate the poll books in multi-precinct polling locations.  Ohio law requires that ballots cast in the correct polling location but wrong precinct (i.e., "right church/wrong pew" votes) be rejected unless the mistake is the result of poll worker error (e.g., the poll worker did not inform the voter of the correct precinct.)  Even where poll worker error caused the mistake, a voter's ballot will be only partially counted for those contests in which the voter was otherwise eligible to vote.  Because the consolidation of poll books in multi-precinct polling locations effectively ensures that voters in the correct polling location will cast their ballots in the correct precinct, S.B. 216 protects voters in counties that choose to exercise their discretion to consolidate the poll books in multi-precinct locations from having their ballots rejected on the grounds that they were cast in the wrong precinct.  Yet S.B. 216 leaves voters in counties that do not consolidate their poll books open to the risk of disenfranchisement for getting in the wrong line.  Thus, S.B. 216 creates an arbitrary system in which the standards for accepting or rejecting a voter's ballot vary from county to county.

14.     The right to vote has long been recognized as "a fundamental political right, because [it is] preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  If the laws and procedures described above are not invalidated, hundreds of thousands of Ohioans will find it substantially more difficult to exercise this fundamental right.  Some of these voters will be completely disenfranchised because they are unable to wait in prohibitively long lines caused by these restrictive measures to cast their ballots or because they failed to satisfy the new stringent requirements that Ohio has imposed for counting provisional and absentee ballots.

Indeed, under the law as written, voters could successfully fill out all of the unnecessary and superfluous information now required to have a provisional or absentee ballot counted, but still have their ballots rejected because the accurate information that they provide does not match the voter information as recorded in the statewide voter database—even if the reason that the information does not match is that the State incorrectly entered the voter's information into that database.  Provisional voters are particularly at risk of total disenfranchisement, because the law provides those voters with no opportunity to cure any deficiency on their affirmation form other than the failure to provide an accepted form of identification.

15.     The effects of these provisions and procedures will be felt most keenly among African-American and Latino voters, causing them to have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, in clear violation of Section 2 of the Voting Rights Act.

16.     Young people and voters who tend to vote Democratic are also likely to be disproportionally and unconstitutionally impacted by these laws—a result intended by the Republican-controlled General Assembly, Governor Kasich, and Secretary Husted to bolster artificially the likelihood of success of Republican candidates in Ohio elections.  This targeting of certain members of the electorate because of how they are expected to vote is not only impermissible under established Supreme Court precedent, it threatens the very bedrock of our democracy, which relies on full and fair access to the ballot box by all eligible voters, whatever their demographic makeup or political beliefs.

17.     Specifically, Plaintiffs challenge 1) the elimination of "Golden Week"; 2) the rule limiting each county to a single location for EIP voting regardless of population; 3) the reductions in the number of DRE voting machines in counties that use them as their primary

voting device; 4) the increased restrictions on the ability of voters to cast and have counted absentee and provisional ballots; 5) Secretary Husted's policy of excluding "inactive" voters from the mailing of unsolicited absentee ballot applications; 6) inadequate opportunities to cure mistakes on provisional ballots; and 7) the arbitrary system for deciding whether votes cast in multi-precinct voting locations will be counted (collectively, the "Challenged Provisions").

18.     Plaintiffs request that this Honorable Court grant relief in the form of, *inter alia*, a declaratory judgment and preliminary and permanent injunctions preventing Defendants from implementing the challenged laws and procedures.  Absent such relief, Plaintiffs and thousands of other residents of Ohio will have their right to vote and/or related rights, such as the right to participate in voter registration and get-out-the-vote ("GOTV") activities, wrongfully burdened, abridged, and/or denied.

## I.     JURISDICTION AND VENUE

19.     This Court has jurisdiction to hear Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1357, and 42 U.S.C. §§ 1983 and 1988.

20.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

21.     Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims in this case occurred in this judicial district.

## II.     PARTIES

### A.     Plaintiffs

22.     Plaintiff Ohio Democratic Party ("ODP") is a political organization dedicated to electing candidates of the Democratic Party to public office throughout the State of Ohio.  ODP

has thousands of members from across the state who regularly support and vote for candidates associated with ODP. Many of these registered voters are likely to cast absentee ballots, either by EIP or by mail. ODP has also been, and will continue to be, extensively involved in voter registration drives and GOTV activities.

23. The provisions challenged in this Amended Complaint burden and abridge the rights and voting-related activities of ODP and its members. S.B. 238's elimination of Golden Week and the limitation of one EIP location per county burdens ODP's efforts to register voters and get them to the polls, particularly the poor, minority, and student voters who utilize EIP at high rates. The reductions in the number of DRE machines resulting from S.B. 200 and Directive 2014-26 will likewise burden ODP's efforts to turn out the vote in counties that use those machines and in which ODP has and will continue to organize GOTV drives. And, the long lines that will result from these provisions will cause ODP to divert resources that otherwise would have been put to other productive uses. Its efforts to persuade its members to vote early, including poor and minority voters, have also been burdened by the exclusion from the mailing of unsolicited absentee ballot applications of those voters who have received but not responded to a confirmation-of-residence notice. The laws challenged in this Amended Complaint harm ODP by disproportionately reducing the turnout of Democratic voters and decreasing the likelihood that ODP will be successful in its efforts to elect Democrats to office.

24. Plaintiff Democratic Party of Cuyahoga County ("DPCC") is a political organization dedicated to electing candidates of the Democratic Party to public office in Ohio. Cuyahoga County has a racially diverse population, with approximately 30 percent of its inhabitants being African American, compared to 12.5 percent for the rest of Ohio.

9

25.     DPCC has thousands of members who regularly support and vote for Democratic candidates.  Many of these registered voters are likely to cast absentee ballots, either by EIP or by mail.  CCDP has also been, and will continue to be, extensively involved in voter registration drives and GOTV activities.

26.     The provisions challenged in this Amended Complaint burden and abridge the rights and voting-related activities of DPCC and its members.  The elimination of Golden Week and the limitation of one EIP location per county burdens its voter-registration and GOTV efforts, particularly among the poor, minority, and student voters who utilize EIP at high rates. Its efforts to persuade its members to vote early, including poor and minority voters, have also been burdened by the exclusion from the mailing of unsolicited absentee ballot applications of those voters who have received but not responded to a confirmation-of-residence notice. Likewise, as a result of S.B. 205, DPCC will be forced to divert its resources to educate voters about absentee voting.  The laws challenged in this Amended Complaint harm DPCC by disproportionately reducing the turnout of Democratic voters and decreasing the likelihood that DPCC will be successful in its efforts to elect Democrats to office.

27.     Plaintiff Montgomery County Democratic Party ("MCDP") is a political organization dedicated to electing candidates of the Democratic Party to public office in Ohio. Montgomery County has a racially diverse population, with approximately 21 percent of its inhabitants being African American.  Montgomery County also uses DRE machines as its primary voting device.

28.     MCDP has thousands of members who regularly support and vote for Democratic candidates.  Many of these registered voters are likely to cast absentee ballots, either by EIP or

by mail.  MCDP has also been, and will continue to be, extensively involved in voter registration drives and GOTV activities.

29.     The provisions challenged in this Amended Complaint burden and abridge the rights and voting-related activities of MCDP and its members.  The elimination of Golden Week and the limitation of one EIP location per county burdens its voter-registration and GOTV efforts, particularly among the poor, minority, and student voters who utilize EIP at high rates. The long lines that will result from S.B. 200 and Directive 2014-26's reductions in the number of DRE machines will force MCDP to divert resources that otherwise would have been put to other productive uses.  Its efforts to persuade its members to vote early, including poor and minority voters, have also been burdened by the exclusion from the mailing of unsolicited absentee ballot applications of those voters who have received but not responded to a confirmation-of-residence notice.  Similarly, S.B. 205 burdens MCDP's efforts by forcing it to divert its resources to educate voters about absentee voting.  The laws challenged in this Amended Complaint harm MCDP by disproportionately reducing the turnout of Democratic voters and decreasing the likelihood that MCDP will be successful in its efforts to elect Democrats to office.

30.     Plaintiff Jordan Isern is a resident of Columbus, Ohio, which is in Franklin County, Ohio's second-most-populous county.  She is a United States citizen over the age of 18 years old and is registered to vote in Ohio.  Plaintiff Isern is a student at The Ohio State University who has been involved in GOTV and voter registration initiatives on campus since 2012.  In 2012, she voted early during evening hours and waited between 30 to 45 minutes to vote, and she was involved in mobilizing other students to vote, both early and on Election Day. In 2014, which was a non-presidential election year with a lower voter turnout, she voted on Election Day.  As a student, she moves frequently and thus incurs increased burdens in

11

maintaining up-to-date registration information.  She also is originally from California and has a California driver's license, and as a result she could not use her driver's license as proof of identification in 2014, but was forced to use an electronic copy of a utility bill she had on her phone.  Without this, she would not have been able to cast a regular ballot.

31.     Plaintiff Isern's right to vote and participate in GOTV efforts will be abridged, burdened, and possibly denied as a result of a number of the Challenged Provisions.  For example, without the enhanced EIP voting opportunities provided by Franklin County, which were necessary to meet the demands of its approximately 800,000 registered voters, she would have found it very difficult, if not impossible, to vote in the 2012 presidential elections because midterms fell on Election Day and the wait time at the on-campus voting location was approximately two hours.  With 2016 also being a presidential election year in which turnout is expected to be high, she will likely face similar obstacles to voting on Election Day and will be burdened by the inequitable distribution of EIP voting opportunities resulting from the one-EIP-location-per-county rule.  The reductions in the opportunities for EIP voting will likewise hinder her efforts to mobilize students to vote early.  Additionally, Isern's frequent moves make it more likely that she will be sent a confirmation notice pursuant to Ohio's voter registration maintenance program to which she will not respond, with the result that she is more likely to be excluded from the statewide mailing of absentee ballot applications.  Similarly, she is more likely than the population as a whole to be forced to cast a provisional ballot as a result of not having an Ohio driver's license and being less likely to possess an alternative form of proof of identification, such as a utility bill, due to her changing residences often.

32.     Plaintiff Carol Biehle is a resident of Loveland, Ohio.  She is a United States citizen over the age of 18 years old and is registered to vote in Ohio.  She is registered as a

12

Democrat.  For 20 years, she has voted and served as a poll worker in Clermont County at a multi-precinct voting location.  Clermont County did not consolidate its poll books at multi-precinct voting locations in 2014.  The inconsistent voting system created by S.B. 216's grant to each county BOE of the discretion to consolidate the poll books at multi-precinct locations deprives Plaintiff Biehle of the right to have her vote counted according to uniform statewide standards.

33.     Plaintiff Reverend Bruce Butcher is an African-American resident of Akron, Ohio, which is in Summit County, Ohio's fourth most-populous county, and a registered Democrat.  Plaintiff Butcher is a pastor at the St. Paul African Methodist Episcopal Church in Akron.  He has participated in voter-registration and GOTV drives in numerous elections in Ohio, including the 2008 and 2012 presidential elections and the 2010 and 2014 midterms.  Through these efforts, he has encouraged and helped many people to register and vote early on the same day during "Golden Week" and to vote early on weekends as part of "Souls to the Polls" drives.  Plaintiff Butcher's voter-registration and GOTV efforts will be substantially burdened by a number of the Challenged Provisions.  The elimination of "Golden Week" will hinder his ability to register voters in his community and to mobilize them to vote early.  Similarly, the inequitable distribution of EIP voting locations has discriminatorily burdened, and will continue to discriminatorily burden, his efforts to mobilize members of his community to vote early.  Summit County has approximately 370,000 registered voters, a vastly greater number than most of Ohio's 88 counties.

**B.      Defendants**

34.      Defendant Jon Husted is the Secretary of State of Ohio and, as such, Ohio's chief election officer responsible for administration of the state's voting laws.  The Secretary is sued in his official capacity.

35.      Defendant Mike Dewine (the "Attorney General" and, collectively with the Secretary, "Defendants") is the Attorney General of Ohio.  The Attorney General is the chief law officer of the State of Ohio and represents the state in all legal matters.  The Attorney General is sued in his official capacity.

### III.      FACTUAL BACKGROUND

36.      During the 2004 presidential election, thousands of Ohio voters were denied the right to vote or had that right seriously infringed as a result of inordinately long lines at the polls, an insufficient number of voting machines, machines that malfunctioned, poorly trained poll workers, and a host of other problems with the state's election system.  In the wake of these failings, Ohio instituted a number of reforms that greatly improved the voting process in the state.  Ohio undertook some of these reforms voluntarily, but others were only achieved and carried out under compulsion as a result of litigation brought by voting-rights groups.  At least in part as a result of these reforms, voter turnout increased, particularly among African American, Latino, and younger voters.

37.      These groups contributed significantly to Democratic victories in the state in 2008 and 2012.  For example, in 2008, 97 percent of African-American voters and 61 percent of voters between the ages of 18 and 29 voted for Obama in Ohio.  While Ohio-specific data does not appear to be available for Latinos in the 2008 election, 67 percent of Latinos at the national level supported Obama in that election.  Similarly, 96 percent of African-American voters, 82 percent

14

of Latino voters, and 62 percent of voters between the ages of 18 and 29 supported Obama in

Ohio in 2012.

       38.     In recent years, the current Republican majority, which has controlled the offices

of Governor, Secretary of State, and Attorney General and both houses of Ohio's General

Assembly since 2010, has worked diligently to roll back many of the reforms that made elections

in Ohio more accessible to all of the state's eligible voters.  These numerous and recent changes

to Ohio's election laws and procedures burden the right to vote of *all* of Ohio's citizens, but they

will have a particularly devastating impact upon African American and Latino voters because

they interact with the ongoing effects of Ohio's history of racial discrimination to result in those

voters having unequal access to the polls and less opportunity to elect the representatives of their

choice.  These laws also disproportionately burden the voting rights of young voters and voters

who tend to vote Democratic.

**A.**     **Ohio's History of Discrimination**

       39.     Ohio has a long history of discrimination against African Americans and Latinos

that has hindered, and the ongoing effects of which continue to hinder, their ability to participate

in the political process.

       40.     Ohio's original 1802 constitution limited the right to vote to white males.  As

provided by Article IV, Section 1 of the Ohio Constitution of 1802, the right to vote was limited

to "all white male inhabitants above the age of twenty-one years, having resided in the State one

year next preceding the election, and who have paid or are charged with a State or county tax[.]"

Despite various attempts to repeal this provision after the Civil War, including an amendment

that was defeated by referendum in 1912, it survived until 1923 when "white" and "male" were

removed from the state's constitution as part of Ohio's ratification of the 19th Amendment to the U.S. Constitution.

41.     Ohio enacted other restrictions on the political and civil rights of African Americans during this period in its history.  In 1804 and 1807, the Ohio legislature enacted "Black Codes" and "Black Laws" designed to limit the freedoms of freed slaves that migrated north.  For example, these laws required "black or mulatto persons" to obtain a court certificate verifying their freedom and imposed penalties on employers who hired African Americans without such a certificate, prohibited African Americans from owning guns, and prohibited interracial marriage.

42.     After the Civil War, Ohio continued to restrict the rights of African Americans. In 1868, it enacted a law permitting election clerks and judges to reject the right to vote of any person with "a visible admixture of African blood."  This law permitted elections officials to question, under oath, the ancestry of anyone who appeared to be of African descent, the person's official racial classification, and whether the person associated with whites or "colored persons."

43.     Furthermore, non-proportional representation, particularly in urban areas with higher African-American populations, diluted the ability of minorities to elect the representatives of their choice during the first two-thirds of the 20th century.  Under this system, each county was entitled to one representative in the state House of Representatives, no matter its population. The result of this system was that a disproportionately larger share of representatives came from less populous counties.  After the landmark Supreme Court decisions *Baker v. Carr*, 369 U.S. 186 (1962), and *Reynolds v. Sims*, 377 U.S. 533 (1964), which required that legislative districts be drawn according to the "one-person, one-vote" standard, Ohio's system for drawing legislative districts was ruled unconstitutional.  *See Nolan v. Rhodes*, 378 U.S. 556 (1964).

16

44.     Nevertheless, racial discrimination in districting continued to be a problem after these decisions.  For example, in 1991 a three-judge panel found that the state legislative districts in Mahoning County, which is home to Youngstown, a community with a large African-American population, had been drawn in such a way as to dilute the minority vote by splitting the black population into separate districts.  After surveying the history of official discrimination in the county, including domination of Youngstown's government by the Ku Klux Klan in the 1920's, the court ruled that the county's districts violated both Section 2 of the Voting Rights Act of 1965 and the Fifteenth Amendment to the United States Constitution.  *See Armour v. State of Ohio*, 775 F. Supp. 1044, 1063 (N.D. Ohio 1991).

45.     More recent deficiencies in Ohio's election system have adversely impacted minorities' right to vote as well.  In particular, Ohio voters experienced numerous problems during the 2004 presidential election resulting from the inadequate allocation of voting machines and polling places and the malfunctioning of voting machines.  These problems resulted in inordinately long lines that disenfranchised as many as 174,000 Ohioans during the November 2004 elections.  Many voters were forced to wait in line for up to 12 hours, and in one polling location voting did not finish until 4:00 a.m. the day after Election Day.

46.     These problems were particularly pronounced in urban areas with higher African-American populations, as well as areas with high student populations.  For example, African-American voters were forced to wait in line nearly three times longer than white voters (an average of 51.8 minutes for African-American voters compared to 17.9 minutes for white voters).  Voters in African-American neighborhoods in Columbus, Ohio, waited up to four hours in the rain to vote, and equipment shortages in African-American neighborhoods in Youngstown are believed to have disenfranchised thousands of voters there.  Similarly, it was widely reported

17

that officials in Knox County, Ohio, provided just two voting machines for Kenyon College's 1,300 voters, with some students waiting in line for as many as 10 hours to cast a ballot.

47.    Long lines were reported again in the 2008 and 2012 presidential elections, with voters in Franklin County in 2008, for example, facing six-hour long lines.

48.    Other restrictive voting practices have similarly restricted the right to vote in Ohio.  In 2006, Ohio passed a voter identification law that required voters to announce their full name, current address, and provide proof of their identity.  As a result of this law, voters who do not have one of the required forms of identification when they attempt to cast a ballot must cast a provisional ballot.  This law imposed greater burdens on Ohio's poor, minority, and young voters, who are less likely than other Ohio voters to possess one of the requisite forms of identification.

49.    Similarly, some groups, such as the Tea Party-affiliated True the Vote, have used Ohio's law permitting private individuals to serve as poll watchers to target areas with high concentrations of Democratic and minority voters.  During the 2012 elections, these groups disparately targeted areas such as Hamilton County, which is home to Cincinnati, that have disproportionately large populations of African Americans and college students.

50.    Ohio also has a history of racially polarized voting.  In 2012, 96 percent of African Americans in Ohio voted for Barack Obama, compared to 41 percent of the white population.  Similarly, Ohio's Latino[3] voters supported Obama over Mitt Romney by a lopsided margin of 82 percent to 17 percent in the 2012 election.  In 2008, 97 percent of African Americans in Ohio voted for Obama, compared to 46 percent of white voters.  In 2004, 84 percent of Ohio's African Americans, as opposed to 44 percent of whites, voted for John Kerry.

---

[3] The terms "Latino" and "Hispanic" are used interchangeably in this Amended Complaint.

51.     Other elections demonstrate a similar polarization in racial voting patterns.  In the 2010 governor's race, eight percent of African Americans compared to 58 percent of whites voted for Republican John Kasich.  In the 2010 Senate election, nine percent of African Americans voted for Republican Rob Portman, compared to 67 percent of white voters.  In 2012, 95 percent of African Americans voted for Democratic senatorial candidate Sherrod Brown, compared to 43 percent of whites.

52.     Minorities in Ohio also face persistent inequalities in key socio-economic areas such as employment, education, housing, and health.  For example, the unemployment rate for African Americans in Ohio is more than 12 percent, compared to 4.7 percent for whites.  Whites (32 percent) in Ohio enjoy a much greater share of professional and managerial jobs than African Americans (19 percent), and a greater percentage of African Americans (29 percent) work in service and sales occupations than whites (22 percent).

53.     Because of these disparities in employment and occupational pursuits, African Americans are more likely to have one or more hourly wage jobs that do not allow them the flexibility to go to the polls to vote on Election Day or during typical work hours during the week.

54.     Racial disparities in employment and occupations reflect inequalities in other areas such as segregated housing.  Columbus, Cincinnati, and Cleveland are among the most segregated cities in the country, ranking 21st, 12th, and 8th, respectively.  Parallel to these high levels of racial segregation, whites are twice as likely as African Americans to own a home (72.8 percent compared to 38.5 percent), with the result that African Americans are more likely to be renters and live in the most impoverished urban areas of the state.  As a consequence of these disparities, African Americans experience much higher levels of residential instability and

19

mobility. Indeed, one study found that African Americans were almost 75 percent more likely to have changed residences within the previous year than whites. Voter registration information for African Americans is therefore more likely than such information is for whites to be out of date and inaccurate.

55.     African Americans in Ohio also suffer from vast disparities in income and poverty levels. African-American income in Ohio is approximately 60 percent of that of whites. Conversely, the poverty rate for African-American families is roughly three times that of white families (30 percent compared to 10 percent).

56.     Voters living in poverty often have limited access to transportation and childcare and the above-discussed inequalities in income accordingly increase disproportionately the burdens of voting imposed on African Americans by the Challenged Provisions. African Americans in Ohio have an average 1.2 vehicles per household, compared to 2.2 vehicles for white households. African Americans in Ohio are approximately three times more likely to rely on public transportation or to walk to work, and four times less likely to own their own automobile. Similarly, 72 percent of African-American families in Ohio are single-parent households, compared to 25 percent of white households.

57.     The inequalities in employment, housing, and income also manifest themselves in disparities in educational attainment. Many public schools in Ohio are highly segregated. For example, Cleveland, Youngstown, and Cincinnati rank as the 5th, 6th, and 8th most segregated school systems of the 100 largest metropolitan areas in the country. Similarly, the drop-out rate for African American students is seven percentage points higher than that of whites, and only 15 percent of African Americans adults have attained a baccalaureate degree, compared to 25 percent of whites.

20

58.     These disparities in educational achievement reduce employment and residential opportunities for African Americans, which in turn increase the burdens and costs of voting by reducing job flexibility, access to transportation, and other advantages that make it easier to find time to vote on Election Day or during early voting.

59.     Persistent economic disparities between African-American and white Ohioans have also resulted in inequalities in health.  African Americans in Ohio are more likely than whites to be obese, have high blood pressure, be diagnosed with diabetes, experience a stroke, suffer from a disability, and lack health insurance, and African Americans face a shorter life expectancy.  African-American children are twice as likely to be born with a low birth weight, and infant mortality rates for African Americans are 2.5 times those of whites.  These disparities, in turn, exacerbate the costs of the Challenged Provisions on the African-American community in particular, further increasing the strains on the resources, time, and mobility of African-American voters.

60.     Like African Americans, Ohio's Latino population suffers from persistent socio-economic disparities that increase the costs and burdens to voting.  The unemployment rate is 2.5 percentage points higher for Latinos in Ohio than it is for whites (6.9 percent compared to 4.4 percent).  Latinos are employed in high-level professional occupations at much lower rates than whites (22 percent compared to 36 percent), and work in lower-paying service-industry jobs at a much higher rate (27 percent compared to 17 percent).  As a consequence of these disparities, Latinos in Ohio have, on average, significantly lower income levels and suffer from poverty at a much higher rate than whites.  In 2013, the median household income for Latinos was $38,128, compared to $51,328 for whites.  Conversely, the poverty rate for Latinos in Ohio was double that of whites (27.4 percent compared to 13.1 percent).

61.    These disparities in employment and income levels are reflected in inequalities that Latinos suffer in other areas such as residential stability, access to transportation, educational attainment, and health.

62.    For example, a recent report by the Ohio Commission on Hispanic/Latino Affairs found that Latinos suffer from high rates of housing discrimination in Ohio, which is related to high rates of residential instability in the Latino population.  Latinos are more likely than whites to have moved within the previous year by a margin of ten percentage points: 86.5 percent of whites live in the same house as they did 12 months ago, compared to 77.6 percent of Latinos.  A much smaller percentage of Latinos own their own home (40 percent compared to 71 percent of whites), and Latinos are twice as likely to rent (60 percent compared 29 percent).  As a result, Latino voters are more likely than white voters to have out-of-date voter registration information.

63.    Similarly, Latinos in Ohio are more likely than whites to have to rely on public transportation or to walk to work.  Eleven percent of Latinos do not have access to a vehicle, compared to approximately six percent of whites; 2.8 percent of Latinos utilize public transportation, compared to .8 percent of whites; and 4.2 percent of Latinos walk to work, compared to 2.0 percent of whites.

64.    Latinos also suffer from lower levels of educational attainment in Ohio.  For those 25 years of age and older, Latinos are three times more likely to be without a high school diploma, with approximately 30 percent of Latinos lacking a high school degree or equivalent compared to 10 percent of whites.  Latinos also graduate from college at much lower rates, with approximately 10 percent of Latinos having earned a bachelor's degree compared to 17 percent of whites.

65.     These disparities in employment, income, housing, transportation, and education are reflected in inequalities in health for Latinos in Ohio.  For example, Latinos lack health insurance at more than double the rate of whites (approximately 22 percent compared to 10 percent).

66.     As with African Americans, these socio-economic disparities impose barriers to voting on Latinos in Ohio by constraining the time and resources available to learn about and participate in the political process and find time to vote on Election Day.

67.     In recent years, Ohio has also experienced incidents of racialized appeals in voting.  For example, during the 2010 campaign for state treasurer, candidate Josh Mandel depicted his opponent, an African American named Kevin Boyce, as corrupt and unfavorably connected to Muslim mosques and lobbyists of Arab descent.  Mandel won.  During the 2012 presidential election, some members of the electorate attended rallies for Mitt Romney wearing t-shirts that said, "Put the White Back in the White House."  Similarly, "Joe the Plumber," who shot to fame during the 2008 election, posted an article online entitled "America Needs a White Republican President" and stating, "Wanting a white Republican president doesn't make you racist, it just makes you American."

68.     These overt racial appeals were accompanied by more subtle messages that played on racial stereotypes.  For example, during the 2012 presidential election, a group calling itself the "Tea Party Victory Fund" ran a commercial depicting an African-American woman in Cleveland claiming that Obama gave her a phone and suggesting that Obama would cater to those on food stamps, disability, and other public benefits.

23

**B.      Ohio's Recent Political History and Changes to Election Laws**

69.      As mentioned previously, the 2004 general elections were plagued with a host of problems resulting from long lines, an insufficient number of functioning voting machines, and poorly trained poll workers.  As a result, tens of thousands of Ohioans were disenfranchised.  As noted above, moreover, these problems fell disproportionately on African-American and young voters—two core Democratic constituencies.

70.      To remedy these problems, various voting-rights groups brought a suit alleging numerous deficiencies in Ohio's voting system with respect to: 1) inaccuracies in the state's voter registration rolls; 2) improper denials of requests for absentee ballots; 3) long wait times due to inaccurate information about polling places and an insufficient number of functioning voting machines; 4) improperly trained poll workers; 5) difficulties in casting provisional ballots; and 6) insufficient accommodations for disabled voters.  *See League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008).  That suit led to a comprehensive settlement agreement requiring the state to provide paper ballots in the event of long lines, implement procedures for pre-election planning and post-election reporting, and improve the training and recruitment of poll workers.

71.      These problems encountered during Ohio's 2004 general elections also spurred the enactment of several measures designed to increase voting opportunities and ease the pressure on polling sites.  In particular, in 2005 Ohio instituted universal, "no-excuse" absentee voting and provided a period of 35 days before an election in which any voter could cast an absentee ballot early.[4]  During the first week of this 35-day period, "Golden Week," voters could

---

[4]  Under previous law, voters had to state a reason justifying their need to cast an early absentee ballot.

register and vote on the same day.  Ohio also permitted each county to allow voters to cast

absentee ballots in person during evening hours and on weekends.

72.     Hundreds of thousands of Ohioans have taken advantage of the early voting

opportunities provided by "no excuse" absentee voting since its adoption.

73.     Absentee voting has proven particularly popular among African-American voters

in Ohio's more populous counties, such as Franklin (which includes the city of Columbus and

has a 21 percent African-American population) and Cuyahoga (which includes the city of

Cleveland and has a 30 percent African-American population) Counties.  For instance, in

Cuyahoga County, African Americans cast an estimated 77.9 percent of all early ballots in the

2008 elections, despite accounting for a mere 28.6 percent of the estimated overall vote.

74.     These reforms helped to facilitate the record high turnout among African

Americans in the 2008 presidential election.  For the first time, turnout among African

Americans in Ohio surpassed that of whites, with approximately 69 percent of African

Americans voting, compared to 66 percent of whites.

75.     These reforms also proved particularly popular with Democratic voters.  Some

reports credited the Obama campaign's focus on same-day registration during "Golden Week"

and increasing EIP voting turnout with his victories in Ohio in 2008 and 2012.  Indeed, one poll

found that early voters in Ohio in the 2012 elections supported Obama by a margin of more than

10 percentage points.

76.     Republican politicians in Ohio subsequently began to attack the very reforms that

had made such improvements possible.  In one of the first of these efforts, undertaken after

Republican candidates won the races for governor and secretary of state in 2010, the GOP-

controlled General Assembly enacted House Bill ("H.B.") 194, which, among other things,

25

would have reduced the period for early absentee voting and imposed several restrictions on absentee and provisional voting similar to those subsequently enacted with S.B. 205 and 216. Among the similarities were that H.B. 194 would have 1) repealed a provision permitting an individual without identification to execute an affirmation and have that person's provisional ballot counted; 2) permitted, instead of required, election officials to direct a voter who was in the wrong precinct to the correct precinct; 3) eliminated the provision requiring election officials to record on the provisional ballot envelope the type of identification provided by a provisional voter; 4) prohibited an election official from recording any of the information provided by the provisional voter on the provisional ballot affirmation form; and 5) eliminated the provision permitting voters who did not provide identification to provide that information within ten days after the election.

77.    H.B. 194 would have also 1) shortened the period for mail-in absentee voting from 35 to 21 days before an election and the period for EIP voting from 35 to 17 days before an election; 2) prohibited county BOEs from mailing unsolicited absentee ballot applications; 3) prohibited a BOE from prepaying the return postage on absentee ballot applications; and 4) permitted election officials to challenge an absentee voter's right to vote if the absentee ballot identification envelope was incomplete.

78.    Ohio, however, never implemented H.B. 194, because the Ohio General Assembly repealed H.B. 194 pre-emptively to avoid its repeal by a vote of the people after voting rights groups succeeded in putting a referendum on the 2012 ballot to repeal the law.

79.    In the face of these efforts to undo the post-2004 reforms of Ohio's election system, minority participation remained high in the 2012 elections.  African Americans voted at a rate of 68 percent in 2012, compared to 62 percent for whites.  This high level of minority

turnout helped propel Barack Obama and Senator Sherrod Brown to victory in the 2012 elections.

80.     On the heels of the Democratic victories in 2012, Ohio's Republican-dominated state government renewed its efforts to cut back on the reforms enacted after the 2004 elections. In particular, it resurrected a number of the repealed provisions of H.B. 194 by introducing them in separate bills, namely S.B. 238, S.B. 200, S.B. 205, and S.B. 216, which are the subject of this suit.

**C.     The Challenged Provisions**

**1.     S.B. 238 — Elimination of "Golden Week"**

81.     Ohio's establishment of "no-excuse" absentee voting and the creation of 35-day period for casting EIP ballots was crucial in easing the stress on polling sites that plagued the 2004 elections.  The "Golden Week" period proved particularly popular, with tens of thousands of Ohioans utilizing it to register and vote on the same day, including a disproportionate number of African Americans.  For example, in 2008, approximately 13,000 voters either registered or updated their registration and voted and a total of approximately 67,000 voters cast their ballots during "Golden Week."  Similarly, approximately 6,000 Ohioans registered and voted and approximately 90,000 cast their ballots during "Golden Week" in the 2012 presidential election.

82.     Nevertheless, on February 19, 2014, the General Assembly passed S.B. 238, which eliminated "Golden Week" by shortening the early voting period from 35 to 28 days.  The early voting period now begins the day after the registration period ends.

83.     S.B. 238's reduction in the EIP voting period and elimination of same-day registration severely burden the right to vote of Ohio's citizens.  The reduction in the EIP voting period will have the inevitable result of increasing the pressure on EIP voting locations during

27

the remainder of the early voting period and of forcing more people to try to vote in person on Election Day, thereby recreating the problem of long lines that Ohio has struggled to resolve since the disastrous 2004 presidential election.  Similarly, the elimination of same-day registration will burden voters' rights by forcing voters to register and vote on separate occasions.  As a result, the costs of voting will increase for many voters, and some will effectively be unable to cast a ballot in the 2016 election.

84.     As in the 2004 election, these burdens will disproportionately impact the voting rights of Democratic, minority, poorer, less-educated, and young voters who face increased barriers to voting.  These voters have less flexible work and school schedules that make it more difficult for them to vote on Election Day.  Similarly, their limited access to transportation and child care makes it less likely that they can vote on Election Day.

85.     The burdens imposed on the voting rights of Ohio's citizens by the elimination of "Golden Week" cannot be justified by any relevant or legitimate government interest.  The state's purported interests in preventing fraud and reducing costs by eliminating the "Golden Week" period for same-day registration and early voting have no basis in fact.

86.     First, allegations of voter fraud are greatly exaggerated.  Indeed, Secretary Husted launched a statewide investigation of voter fraud shortly after taking office in 2011.  This investigation found that voter fraud in Ohio was exceedingly rare, and the Attorney General referred a mere 17 of the cases identified by Secretary Husted, which constituted .0003 percent of total ballots cast in 2012, to county prosecutors for further review.  The county prosecutors, in turn, did not bring most of these 17 cases.

87.     Even if the allegations of meaningful amounts of voter fraud had merit, which they do not, S.B. 238 would nevertheless fail to protect against that problem.  Ohio law requires

28

that the registration of absentee voters, such as those using EIP voting, be verified before the ballot may be counted.  The opportunity for verifying a voter's registration thus increases the earlier a voter is allowed to cast a ballot.  Allowing voters to register and vote on the same day between 35 and 28 days before an election therefore poses a diminished, not increased, risk of voter fraud.

88.     The state's claimed interest in reducing costs by eliminating the opportunity to vote during the final week of registration also fails to withstand scrutiny.  Even after S.B. 238, county BOEs remain open during that week to register voters.  Allowing voters to cast an early absentee ballot during times when the BOEs are already open for business imposes minimal additional costs.  In any event, the benefit to the state from such cost savings is far outweighed by the burden that S.B. 238 imposes on voting rights.

89.     In sum, S.B. 238's elimination of "Golden Week" burdens the voting rights of Ohio's citizens by eliminating the days and times during which tens of thousands of Ohio voters have registered and/or cast their ballots and increasing the pressure on polling sites by forcing more people to vote in person on Election Day.  Because these burdens cannot be justified by state's purported interests in preventing fraud or reducing costs, S.B. 238 unconstitutionally burdens the right to vote.

90.     These burdens will only be worsened by the increased pressure on polling sites that will follow from S.B. 200's reduction in the number of DRE machines and S.B. 205's reductions and restrictions on the use of absentee ballots.  The cumulative effect of reducing the opportunities for early voting at the same time as reducing the number of voting machines and the availability of absentee ballots threatens a perfect storm in which Ohio voters will once again be forced to wait for hours before they can vote.

29

91.    Furthermore, S.B. 238 interacts with the ongoing effects of Ohio's history of discrimination to impose disproportionate burdens on African-American and Latino voters. African Americans utilize EIP voting at much higher rates than whites.  According to the Current Population Survey conducted by the U.S. Census Bureau, African Americans in Ohio used EIP voting at nearly twice the rate of whites from 2006 to 2010, and exceeded that rate in 2012. Similarly, a disproportionate number of African Americans voted and/or registered during "Golden Week."

92.    As a result, the voting rights of a disproportionate number of African Americans and Latinos will be burdened, abridged, and denied by S.B. 238's elimination of "Golden Week."

93.    The disproportionate burdens imposed on African-American and Latino voters by this reduction in the opportunity for same-day registration and EIP voting, alone and in combination with the other laws discussed herein, together with the totality of the circumstances, will result in minority voters in Ohio having unequal access to the polls and less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

94.    Upon information and belief, the General Assembly enacted S.B. 238 with the intent to suppress disproportionately the vote of African-American, Latino, young, and Democratic voters.  As noted, the early voting period now begins a single day after the close of registration.  The proximity of these dates indicates that the reduction in early voting was motivated not by legitimate state interests but by a desire to eliminate same-day registration.

95.    The General Assembly's reliance on an unsupported fraud rationale in enacting S.B. 238 also evinces an intent to suppress the vote of Ohioans who tend to vote Democratic.  As Lorraine Minnite has explained, there is a history in the United States of voter-fraud allegations

30

being used to shape the electorate, and "the use of baseless voter fraud allegations for partisan advantage has become the exclusive domain of Republican party activists."  Lorraine C. Minnite, *The Politics of Voter Fraud* 3-4 (2007), *available at* http://www.projectvote.org/images/publications/Policy%20Reports%20and%20Guides/Politics_of_Voter_Fraud_Final.pdf.  Similarly, research by Keith Bentele and Erin O'Brien found both "a very substantial and significant association between the racial composition of a state's residents or active electorate and both the proposal and passage of voter restriction legislation" and that "the emergence and passage of restrictive voter access legislation is unambiguously a highly partisan affair, influenced by the intensity of electoral competition."  Keith Bentele & Erin O'Brien, *Jim Crow 2.0?: Why States Consider and Adopt Restrictive Access Policies*, 11 Perspectives on Politics 1088, 1103 (2013).

### 2.  Ohio Rev. Code § 3501.10(C) — One EIP Voting Location Per County

96.  After S.B. 238 was enacted, Secretary Husted issued a number of directives eliminating the discretion each county had to provide EIP voting on weekends and during weekday evening hours.  *See* Directives 2014-06, 2014-17, and 2014-30.[5]  Secretary Husted undertook these efforts despite the fact that EIP voting during evening hours and on weekdays had been a crucial factor in alleviating the stress on polling sites, particularly in Ohio's most populous counties with high concentrations of minority, poor, and Democratic voters.  For example, in 2012, Ohio's largest counties, Cuyahoga and Franklin, permitted EIP voting during evening hours and on weekends.  More than 100,000 voters voted early in those counties, a

---

[5]  Directive 2014-30 resurrected the EIP voting schedule laid out in Directive 2014-17, which had been preliminarily enjoined as a result of the *NAACP v. Husted* litigation.  When that injunction was stayed by the U.S. Supreme Court, Secretary Husted reissued Directive 2014-17 as Directive 2014-30, which was in place for the 2014 midterm elections.

disproportionate number of whom were African Americans, and a large majority of those votes were cast during evening hours or on the weekend.  (For example, 82 percent of the early votes in Franklin County were cast during evening hours, on weekends, or the Monday before Election Day.).  Similarly, some studies indicate that more than 100,000 early votes were cast in the 2012 presidential election in Ohio during the evening hours and weekends that were eliminated for the November 2014 midterms by Directive 2014-30.

97.     Furthermore, voters in Ohio's more-populous counties tend to vote for Democrats. In 2008, 60 percent of voters in Franklin County and 69 percent of voters in Cuyahoga County voted for Obama.  In the 2010 gubernatorial election, 53 percent of voters in Franklin County and 60 percent of those in Cuyahoga County voted for Democratic candidate Ted Strickland.  In 2012, 60 percent of voters in Franklin County and 69 percent of voters in Cuyahoga County voted for Obama.

98.     As explained previously, the EIP Voting Directives were challenged as part of the lawsuit that led to the recent Settlement Agreement, which establishes a standardized statewide early voting schedule for Ohio's elections until 2018.  However, because of the law limiting each county to a single EIP voting location, *see* Ohio Rev. Code § 3501.10(C), the standardized, one-size-fits-all schedule imposed by the Settlement Agreement, like the EIP Voting Directives that preceded it, makes EIP voting less uniform than it was prior to the issuance of the EIP Voting Directives, not more.  Without the flexibility to increase the number of hours and days for EIP voting, citizens in more populous counties have unequal access to early voting opportunities.

99.     For example, the approximately 800,000 registered voters in Franklin County must now vote at a single location during the same days and times as Noble County's approximately 9,000 registered voters.  Put another way, 89 voters in Franklin County are now

allocated the same EIP voting resources as a single voter in Noble County. That is not a uniform system, and the only remedy for this problem is to require Secretary Husted to direct each county to provide a reasonably equitable number of EIP voting locations on a population-per-county basis.

100.     The inequitable distribution of EIP voting locations imposes disproportionate and discriminatory burdens on the voting rights of those living in Ohio's most populous counties. These burdens fall disproportionately on Democratic, poor, African-American, and Latino voters, who live at disproportionately higher rates in Ohio's more-populous counties. These voters also suffer from strained economic circumstances and inflexible work schedules that make it less likely that they will be able to vote on Election Day and therefore more likely that they will rely on EIP voting.

101.     The inequitable distribution of EIP voting locations and the disparate burdens it imposes on Ohio's voters cannot be justified by any relevant or legitimate state interest, such as reducing costs. For example, it is clear that a state could not constitutionally limit each county to a single polling location on Election Day regardless of size and population, no matter the funds that might be saved from doing so. Given that it could not impose this rule on Election Day, it similarly cannot impose such a discriminatory system on EIP voting locations.

102.     As a result, section 3501.10(C) unconstitutionally and discriminatorily burdens the rights of voters in Ohio's more populous counties, including a disproportionate number of Democratic, African-American, Latino, and poor voters, by depriving those voters of the same or similar EIP voting opportunities it provides to voters in the state's less-populous counties.

103.     Furthermore, section 3501.10(C) interacts with the ongoing effects of Ohio's history of discrimination to impose disproportionate burdens on African-American and Latino

33

voters.  For example, African Americans tend disproportionately to live in Ohio's more-populous counties, and they utilize EIP voting at much higher rates than whites due to the increased costs of voting on Election Day that result from socio-economic disparities in areas such as income levels, access to transportation, and work-schedule flexibility.  Latinos suffer from similar socio-economic disparities in Ohio, with the result that they, too, face higher obstacles to voting on Election Day.

104.    As a result, the voting rights of a disproportionate number of African Americans and Latinos will be burdened, abridged, and denied by the inequitable distribution of EIP voting locations required by section 3501.10(C).

105.    The disproportionate burdens imposed on African-American and Latino voters by the one-EIP-location-per-county rule, alone and in combination with the other laws discussed herein, together with the totality of the circumstances, will result in minority voters in Ohio having unequal access to the polls and less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

### 3.      S.B. 200 — Changes to the Voter Registration Maintenance System and Reductions in the Number of Direct Recording Electronic Voting Machines

106.    S.B. 200 instituted several changes to the state's system for maintaining voter registration information and reduced the number of DRE voting machines a county must have if it chooses to use those machines as its primary voting system.  Regarding the voter registration system, S.B. 200 made two principal changes.

107.    First, S.B. 200 requires that Ohio's state agencies share with the Secretary data in their possession that is relevant to voter registration. Ohio Rev. Code § 3503.15(A)(2)(a).  It also requires the Secretary to enter into agreements with other states to share this information.  Ohio Rev. Code § 3503.15(A)(3)(a).

34

108.    Second, S.B. 200 requires the Secretary to implement the state's voter registration maintenance program every year, instead of once every two years, as under the previous law. The voter registration maintenance program is required by the National Voter Registration Act of 1993 ("NVRA"), commonly referred to as the "motor voter law."  Ohio implements the voter registration maintenance program in two ways.  First, the Secretary compares the data in the state's voter registration database with that maintained by U.S. Postal Service's National Change of Address ("NCOA") database to determine which voters appear to have moved.  Ohio Rev. Code § 3503.21(D).  Second, the state supplements the NCOA process by compiling a list of voters who have been inactive during a fixed period of time, generally two years (i.e., a single election cycle).

109.    The county BOEs then send a notice to the registered voters identified by either method of the voter registration maintenance program seeking confirmation of their residence together with a self-addressed, stamped envelope containing a form that such voters can use to update their address.  Ohio Rev. Code § 3503.21(D).  Voters to whom these notices are sent will have their registration cancelled unless they affirmatively act, within four years after the confirmation notice is sent, by 1) returning the notice card confirming a valid voting address in the county; 2) properly updating their voter registration and submitting it to the county BOE; or 3) voting or engaging in another voter initiated activity before that four-year period ends.  *See* Directive 2014-14.

110.    Directive 2014-14 implements S.B. 200's requirement that the voter registration maintenance program be conducted every year.  Confirmation notices were sent out pursuant to this program in 2011, 2013, and, most recently, on June 20, 2014.  Given the four-year period for responding to these notices, the first cancellations will occur in 2015.

111.     Of particular importance here, S.B. 200 also changed the formula for determining the number of DRE voting machines to be allocated in counties using those machines as their primary voting device.  This change undermines Ohio's efforts to alleviate the problem of long lines that have historically plagued Ohio's elections.

112.     Notwithstanding significant efforts to remedy the long lines encountered by voters at the polls in Ohio in 2004 and 2008, problems persisted and some voters in 2012 waited up to seven hours to cast their votes.  The longest wait times were reported in urban areas with high minority populations, several of which use DRE machines as their primary voting devices.  Of the 12 counties with the highest African-American populations in Ohio, five use DREs as their primary voting system: Franklin (23.1 percent African American), Montgomery (22.3 percent), Lucas (20.9 percent), Richland (10.5 percent), and Lorain (10.3 percent).

113.     Furthermore, studies have demonstrated that the use of direct-recording electronic ("DRE") voting machines can exacerbate the problems that lead to long lines, because it can take significantly longer to cast a ballot using DREs than to cast paper ballots that are subsequently scanned.

114.     Recent reports that Ohio's voting equipment is old also suggest that malfunctioning machines could exacerbate these problems, yet again resulting in long lines and disenfranchised voters in the 2016 presidential elections.

115.     Despite these problems, S.B. 200 inexplicably reduces the number of DRE machines counties must have available for voters.  While Ohio law continues to require that these counties have a minimum ratio of one machine for every 175 "registered voters" in the county, S.B. 200 changes how the total number of "registered voters" is calculated.  Under previous law, the number of DREs needed was calculated based on the higher of the total number of registered

voters as of the October deadline for voter registration for the last presidential election, or the average of the total number of registered voters in the county as of the October deadline for the last two presidential elections. S.B. 200 now requires that the total number of absentee ballots cast and counted in the last presidential election be subtracted from that number, permitting counties to significantly reduce the number of DRE machines at polling locations based entirely on the number of voters who voted absentee in the prior presidential election. Ohio Rev. Code § 3506.22(B)(1).

116. This change is particularly troubling given that, in the same session, the legislature enacted S.B. 205 and S.B. 238. These laws will reduce rates of absentee voting, and thereby cause more people to try and vote in person on Election Day in 2016, by prohibiting pre-paid postage on absentee ballot, prohibiting any political office or officer, other than the Secretary, from mailing unsolicited absentee ballot applications, prohibiting the Secretary from mailing unsolicited applications without legislative authorization, and reducing EIP voting period. Thus, using 2012's absentee voting rates is a particularly poor means to predict voter turnout.

117. Secretary Husted implemented this part of S.B. 200 through Directive 2014-26, which instructed county BOEs to subtract from the number of registered voters those "who have failed to respond within 30 days to any confirmation notice" for the purpose of determining how many DREs they must have available. It also permitted BOEs to subtract those who have requested absentee ballots for the upcoming election.

118. S.B. 200 and Directive 2014-26 will burden, abridge, and deny the voting rights of Ohio's citizens in several ways.

119.    First, S.B. 200's reduction in the number of DRE voting machines will recreate the problem of long lines that has plagued prior elections in Ohio for those voters who reside in the 48 counties that use DRE machines as their primary voting device.  As explained previously, voters using DRE machines are already at a disadvantage because casting a ballot on those machines takes longer than marking a paper ballot that is subsequently scanned.

120.    This problem will be compounded by subtracting from the number of "registered voters" either a) the number of absentee ballots cast and counted in the previous presidential election, as required by the text of S.B. 200, or b) the number of voters who were mailed confirmation notices pursuant to the state's voter registration maintenance program, as required by the Secretary in Directive 2014-26.

121.    There is no legitimate basis for either S.B. 200's or Directive 2014-26's calculations for reducing the number of DRE voting machines.

122.    By reducing the number of machines available per registered voter, S.B. 200 and Directive 2014-26 will have the inevitable effect of causing those who reside in counties that use DRE machines to wait in lines that are longer than they otherwise would have been before casting a ballot.  Moreover, the reductions in the number of DRE machines will combine with the reduction in the number of absentee ballots resulting from S.B. 205 and S.B. 238's reductions to the early voting period to further increase the pressure on polling sites.  The cumulative effect of these laws will result in many locations having an insufficient number of machines to accommodate the longer lines.

123.    As a consequence, S.B. 200 and Directive 2014-26, both in isolation and in combination with the other laws discussed herein, will burden the voting rights of Ohio's citizens.  These burdens cannot be justified by any government interest in reducing the number of

DRE machines. Thus, S.B. 200 and Directive 2014-26 unconstitutionally abridge, deny, and burden the voting rights of those Ohio citizens who reside in counties that use DRE machines.

124. S.B. 200 and Directive 2014-26 also impose disproportionate burdens on voters who reside in counties with higher populations of indigent, minority and young voters. Poor, minority, and young voters have less stable housing arrangements and move more frequently than other voting populations. As a consequence, they are more likely to be sent confirmation notices under the voter registration maintenance program. Because Directive 2014-26 directs the county BOEs to subtract the number of people who failed to respond to a confirmation notice within 30 days from the number of "registered voters," machines will be allocated at a disproportionately lower rate in counties with comparatively higher populations of poor, minority, and young voters.

125. Furthermore, S.B. 200 and Directive 2014-26 interact with the ongoing effects of Ohio's legacy of racial discrimination to impose disproportionate burdens on minority voters. Racial disparities in, for example, income, transportation, work schedules, and health increase the costs of voting for African Americans trying to vote on Election Day. As a partial result of this, African Americans utilize absentee voting, particularly early in-person voting, at higher rates than other voters. Because S.B. 200 disproportionately reduces the number of machines in counties with higher rates of absentee voting, it disproportionately reduces the number of DRE machines in counties with high African-American populations. Similarly, African-American and Latino voters are more likely to suffer from higher rates of residential instability in Ohio as a result of discrimination, and are therefore more likely to have been sent confirmation notices. As a consequence, S.B. 200 and Directive 2014-26 interact with the ongoing social and economic effects of Ohio's history of discrimination against African Americans and Latinos to

disproportionately burden, abridge, and deny minority voting rights. S.B. 205 and S.B. 238 further exacerbate the discriminatory impact of reducing the number of DRE machines by disproportionately curtailing the opportunities minorities have for voting with early absentee ballots.

126.    Unless enjoined, the disproportionate burdens imposed on African-American and Latino voters by the reduction in the number of DRE machines, alone and in combination with the other laws discussed herein and the totality of the circumstances, will result in minority voters in Ohio having unequal access to the polls and less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

127.    The General Assembly enacted S.B. 200 and Secretary Husted promulgated Directive 2014-26 with the knowledge and intention that poor, African-American, Latino, and young voters would be disparately impacted by the reduced number of DRE machines and increased pressure on polling sites. The General Assembly and Secretary Husted did so with the knowledge that these voters vote for Democrats at higher rates than Republicans.

**4.    S.B. 205 — Restrictions on Absentee Ballots**

128.    On February 21, 2014, Governor Kasich signed into law S.B. 205, which resurrected a number of the restrictions on absentee voting that had been included in H.B. 194.

129.    First, a number of S.B. 205's provisions make it harder for voters to obtain and cast absentee ballots. The law prohibits county BOEs from mailing unsolicited absentee ballot applications to voters or from providing pre-paid postage for returning absentee ballot applications and ballots. Ohio Rev. Code §§ 3501.05(EE), 3509.03, 3509.04. Prior to this change, Ohio's political subdivisions, such as county BOEs, county Boards of Commissioners, and city governments, could decide to mail unsolicited absentee ballot applications, and some

40

included prepaid postage.  This practice was particularly popular in more densely populated counties with higher concentrations of African-American voters such as Cuyahoga, Franklin, and Hamilton counties.  Secretary Husted sought to end this practice in 2011, and ultimately reached a compromise with these counties whereby the Secretary agreed to mail unsolicited absentee ballot applications statewide in 2012.  In part as a result of Secretary Husted's statewide mailing of absentee ballot applications, the number of voters casting absentee ballots increased to a record number of 35 percent of all votes cast in the 2012 election.

130.    Notwithstanding this compromise, S.B. 205 now prohibits the Secretary from mailing unsolicited absentee ballots unless the General Assembly makes a specific appropriation for that mailing.  Ohio Rev. Code §§ 3501.05(EE), 3509.03, 3509.04.  This, combined with the prohibition on the mailing of absentee ballot applications by county BOEs, will significantly reduce the rate at which Ohio voters vote absentee, either in person or by mail.  Second, not only does S.B. 205 restrict the availability of absentee ballots, it makes it harder for voters to cast effective absentee ballots by requiring that those ballots be rejected unless voters accurately fill out five categories of information on the absentee ballot identification envelope.  Together with Secretary Directive 2014-18, S.B. 205 prohibits an absentee ballot from being counted unless the voter accurately provides: 1) the voter's name; 2) the address of the voter's residence; 3) the voter's date of birth;[6] 4) the voter's signature; and 5) and proof of the voter's identification in the form of i) the voter's driver's license or state identification number, ii) the last four digits of the

---

[6] A ballot will not be rejected for failure to provide an accurate date of birth if 1) the month and day of the voter's date of birth on the identification envelope matches the month and day in the voter registration database; 2) the voter's date of birth in the voter registration database is January 1, 1800; or 3) if at least three members of the BOE determine that the voter has met the four other requirements.  No provision is made for voters whose date of birth was not entered correctly in the state voter registration database, but who accurately state their date of birth on their ballot.

voter's social security number, or iii) a copy of a current and valid photo identification, a military

identification, or a current utility bill, bank statement, government check, paycheck, or other

government document showing the voter's address. Ohio Rev. Code § 3509.06(D)(3)(a)(i)–(v).

131. The information required on the absentee ballot identification envelope

unnecessarily duplicates the information a voter is required to provide when applying for an

absentee ballot. Ohio Rev. Code § 3509.03. It thereby establishes an unnecessary hurdle for

Ohioans who are lawfully registered to cast a successful absentee ballot, running the risk that any

inadvertent omission of or mistake in providing this superfluous information will result in the

voter's total disenfranchisement (including if the mistake is not the voter's, for example, where

information was not recorded correctly in the state voter registration database).

132. S.B. 205 further compounds the difficulty of casting an effective absentee ballot

by prohibiting election officials from filling out on behalf of a voter any of these unnecessary and

duplicative requirements on the absentee ballot identification envelope unless that voter is blind,

disabled, illiterate, or unable to come to the polls. Ohio Rev. Code § 3511.05. The law permits

election officials to print only the voter's name and address on the identification envelope before

sending the ballot to the voter.

133. S.B. 205's requirement that a voter accurately fill out all five categories of

information on the absentee ballot identification envelope in order to have his or her ballot

counted unnecessarily and unjustifiably burdens the rights of Ohio's citizens to cast an absentee

ballot. Any incompleteness or mismatch between the information provided and that contained in

the statewide voter registration database will cause a voter's absentee ballot to be rejected unless

the voter corrects the deficiencies within the seven-day cure period after an election. The law

requires this notwithstanding the fact that a voter is already required to provide this information

42

on his or her absentee ballot application form, which election officials must validate before

providing the voter with an absentee ballot.  As a consequence, the law contemplates that a voter

will have his or her ballot rejected even for minor or inadvertent errors, and even where the

voter's identity and eligibility are not in question.

134.    No relevant or legitimate state interest justifies the burdens these restrictions place

on voters.  Indeed, federal law expressly prohibits disqualifying a voter for such immaterial

errors as these.  Section 1971 of the Civil Rights Act of 1964 provides that:

> No person acting under color of law shall . . . deny the right of any individual to vote in
> any election because of an error or omission on any record or paper relating to any
> application, registration, or other act requisite to voting, if such error or omission is not
> material in determining whether such individual is qualified under State law to vote in
> such election.

52 U.S.C.A. § 10101(a)(2)(B). As Section 1971 makes clear, there is no legally justifiable basis

for rejecting a voter's absentee ballot for failure fully to provide the information required by S.B.

205 where the voter's identity and eligibility are otherwise not in question.

135.    Furthermore, the requirement that BOEs provide notice to voters whose absentee

ballot identification envelope is incomplete or contains inaccurate information does not

adequately alleviate the burden caused by these requirements.  S.B. 205 provides an

unnecessarily short period of seven days for curing these deficiencies.  BOEs must include in the

official canvass valid absentee ballots that were received within 10 days after the election.  There

is no legally adequate reason to terminate the period for curing non-conforming ballots while

other ballots are continuing to arrive and be counted.

136.    In sum, S.B. 205 burdens voting rights by allowing ballots to be rejected for

immaterial errors and providing an unnecessarily short time to cure mistakes on the identification

envelope.  Because these restrictions do not further any relevant or legitimate government

interest, S.B. 205 unconstitutionally abridges, burdens, and/or denies the rights of all voters casting absentee ballots.

137.    These burdens disproportionately impact poorer and younger voters whose less flexible work and school schedules, limited access to transportation, and straitened economic circumstances make it more difficult for them to travel to polls on Election Day.  Because absentee voting helps to alleviate these difficulties, S.B. 205's restrictions on the use of absentee ballots disparately burdens, abridges, and denies the voting rights of poorer and younger voters. S.B. 205 also disproportionately burdens the voting rights of less-educated voters, who will find it more difficult to understand and accurately fill out the information required on the identification envelope.

138.    S.B. 205 also interacts with Ohio's history of racial discrimination to impose disproportionate burdens on African American and Latino voters.  For example, because African Americans and Latinos in Ohio are more likely than other citizens to be poor and have lower levels of education, these minority voters are more likely to face the increased obstacles to voting on Election Day described above.  As a result, they are more likely than other segments of the population to rely on absentee voting.  For example, African Americans in Ohio utilize EIP voting at far greater rates than whites do (19.6 percent versus 8.9 percent in the 2008 election; 19.9 versus 6.1 in 2012), and cast absentee ballots at higher rates than whites.  As a result, S.B. 205's restrictions on the use of absentee ballots interact with the ongoing socio-economic effects of Ohio's history of racial discrimination to impose disproportionate burdens on African-American and Latino voters.

139.    Consequently, these restrictions on the use of absentee ballots, alone and in combination with the other laws discussed herein and the totality of the circumstances, impose

44

disproportionate burdens on African-American and Latino voters, resulting in their having

unequal access to the polls and less opportunity than other members of the electorate to

participate in the political process and to elect representatives of their choice.

140.    The General Assembly enacted S.B. 205 with the knowledge that African

Americans in Ohio utilize absentee voting, particularly EIP absentee voting, and vote for

Democrats at higher rates than the rest of the population.

### 5.    Secretary Husted's Mailing of Unsolicited Absentee Ballot Applications Only to "Active" Voters

141.    The General Assembly granted Secretary Husted an exemption from S.B. 205's

prohibition on mailing unsolicited absentee ballot applications for the 2014 general election.

Pursuant to this exemption, Secretary Husted mailed approximately 6.58 million absentee ballot

applications before the 2014 election.

142.    Secretary Husted did not mail absentee ballot applications to every registered

voter, however.  Pursuant to Directive 2014-15, Secretary Husted excluded from this statewide

mailing voters who had an "inactive" status (i.e., failed to respond to a confirmation notice sent

out by their county BOE as part of the voter registration maintenance program) and did not vote

in the 2010 or 2012 general elections.  As a result, more than a million of the 7.74 million

registered voters in Ohio did not receive absentee ballot applications as part of Secretary

Husted's statewide mailing.

143.    Secretary Husted excluded "inactive" voters despite protests from Democratic

members of the General Assembly that the exclusion would unfairly discriminate against more

than a million registered voters.  Secretary Husted also denied a request by legislative staff for a

list of those who had been sent confirmation notices and those who had been excluded from

Secretary Husted's statewide mailing.  The proffered reason was that the lists no longer existed or were in the hands of private vendors.

144.    This action unjustifiably discriminated against, and, if the policy remains in place, will continue to discriminate against, more than a million registered and qualified voters.

145.    As noted above, a voter has four years in which to respond to a confirmation notice before having his or her registration canceled.  The first confirmation notices were sent out in 2011, with additional notices being sent in 2013 and 2014.  Thus, to date, no Ohioan has had his or her registration cancelled as a result of a failure to respond to a confirmation notice.

146.    This discriminatory policy cannot be justified by a legitimate government interest, such as the state's purported interest in saving money by reducing the number of ballot applications mailed to voters.  "Inactive" voters enjoy the right to participate in the political process on the same terms as other voters.

147.    As a consequence of this discriminatory policy, Secretary Husted has unconstitutionally discriminated against and abridged, burdened, and/or denied the right to vote of more than a million Ohio citizens.

148.    Furthermore, voters who have higher rates of residential instability, such as poorer, less-educated, and young voters, are more likely to be sent confirmation notices and therefore more likely to have been and to be excluded from a statewide mailing of absentee ballot applications under the Secretary's policy.  That policy therefore imposes a disproportionate burden on these voters.

149.    This policy similarly disproportionately burdens, abridges, and denies the rights of minority voters.  Because African American and Latinos in Ohio have disproportionately high rates of residential instability due to the ongoing effects of the state's history of racial

46

discrimination, they are more likely than other voters to have been excluded from the mailing of absentee ballot applications.  As a result, this policy interacts with the ongoing social and economic effects of Ohio's history of racial discrimination to impose a disproportionate and discriminatory burden on African Americans and Latinos.

150.    This policy, alone and in combination with the other laws discussed herein and the totality of the circumstances, imposes disproportionate burdens on African-American and Latino voters in Ohio, resulting in their having unequal access to the polls and less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

151.    Secretary Husted adopted Directive 2014-15 with the knowledge that poor, less-educated, young, African-American, and Latino voters were disproportionately likely to have received confirmation notices and to vote Democratic.

**6.    S.B. 216 — Restrictions on Provisional Ballots**

152.    Voters in Ohio may be required to cast a provisional ballot for a number of reasons, including 1) the voter's name does not appear on the official poll list for that precinct; 2) an election official challenges the voter's eligibility to vote or is unable to determine the voter's eligibility; 3) the voter is unable to provide one of the required proofs of identity; 4) the voter already requested an absentee ballot; 5) the voter's name is marked on the poll list or signature book with a notation that a confirmation of registration notice has been returned as undeliverable; 6) the voter's signature, in the opinion of the precinct officers, does not match the signature on the registration form; and 7) the voter's name has changed but the voter is unable to provide legal proof of the name change.

153.    Minorities are significantly more likely to cast provisional ballots than the rest of the population.  For example, one study found that the number of votes cast by provisional ballot was significantly higher in counties with large African-American populations.  The same study found that in Cuyahoga County, where more than 28 percent of the eligible voters are African American, nearly five percent of all voters voted by provisional ballot.  This was almost  double the rate of provisional ballots in Delaware County, where 3.2 percent of the population is African American and only 2.6 percent of the voters cast provisional ballots.

154.    On February 28, 2014, Governor Kasich signed S.B. 216 into law.  S.B. 216 added a number of requirements for provisional voting that will make it less likely that provisional ballots will be counted.  Similar to the identification envelope for casting an absentee ballot, voters casting a provisional ballot must now complete a Provisional Ballot Affirmation form (Form 12-B) that requires five categories of information: 1) the voter's name; 2) the address of the voter's residence; 3) the voter's date of birth;[7] 4) the voter's signature; and 5) proof of the voter's identification in the form of i) the voter's driver's license or state identification card number, ii) the last four digits of the voter's social security number, or iii) a current and valid photo identification, a military identification, or a current utility bill, bank statement, government check, paycheck, or other government document showing the voter's current address.  Ohio Rev. Code § 3505.183(e).

---

[7] As with absentee ballots, a provisional ballot will not be rejected for failure to provide an accurate date of birth if 1) the month and day of the voter's date of birth on the identification envelope matches the month and day in the voter registration database; 2) the voter's date of birth in the voter registration database is January 1, 1800; or 3) at least three members of the BOE determine that the voter has met the four other requirements.  Ohio Rev. Code § 3505.183(e).  Also, as with the new laws governing absentee ballots, no provision is made for voters whose date of birth was not entered correctly in the state voter registration database, but who accurately state their date of birth on their provisional ballot.

155.    Before the passage of S.B. 216, voters casting provisional ballots did not have to provide their date of birth or their current address.

156.    In addition, S.B. 216 prohibits election officials from filling out on a voter's behalf the information required on the provisional ballot affirmation form.  For instance, for the fifth category of information to be provided on the provisional ballot affirmation form, voter identification, S.B. 216 prohibited elections officials from indicating on the form what type of proof of identification the voter provided.  As a result, if the voter does not provide a driver's license number or the last four digits of his or her social security number, the voter must check one of three boxes on Form 12-B indicating what type of identification and proof of address he or she provided.  A failure to do so will result in the voter's provisional ballot being rejected.

157.    S.B. 216 also shortens the cure period from 10 to seven days in which a provisional voter who did not provide one of the required forms of identification, legal proof of name change, or whose eligibility was challenged at the polls pursuant to Ohio Rev. Code § 3505.20 to provide additional information to the BOE to have the ballot counted.  Ohio Rev. Code § 3505.183(e).

158.    However, unlike voters casting absentee ballots, the law makes no provision for voters who failed to accurately complete the information on the affirmation form to correct those mistakes after casting a provisional ballot on Election Day.

159.    For polling locations that serve more than one precinct, S.B. 216 also allows BOEs to decide, by a vote of at least three of its members, to consolidate the poll books for those precincts into a single poll book for that location.  In the past, a significant number of voters had their ballots rejected or only partially counted for casting provisional ballots in the right polling location, but at the wrong precinct.  While S.B. 216 minimizes the risk of disenfranchisement in

those places that choose to consolidate the poll books for multi-precinct voting locations, voters who reside in counties that do not choose to do so will still face the risk of having their ballots rejected or only partially counted for voting "in the right church, but the wrong pew."

160.     S.B. 216's added hurdles to successfully casting a provisional ballot, including the new requirements that a voter fill out his or her date of birth and current residence and indicate which form of identification he or she provided to the election official, burden the rights of Ohio voters casting provisional ballots.

161.     In total, 643 voters had their provisional ballots rejected because of a failure to meet the technical requirements on the provisional ballot affirmation form during the 2014 general election, a low-turnout off-year election.  These numbers will only increase in the 2016 general election, a presidential election year, in which Ohioans will vote in substantially greater numbers.

162.     The burdens placed on voters' rights by these unduly stringent requirements cannot be justified by a government interest in preventing voter fraud or verifying the identity and eligibility of a voter.  Provisional voters were already required to provide their name, signature, and proof of identification prior to the passage of S.B. 216, and there is little or no evidence that those requirements were insufficient to prevent fraud (or that there is any material amount of voter-impersonation fraud in Ohio or elsewhere).

163.     Moreover, the claim that requiring a voter to provide his or her date of birth and current residence furthers the state's interest in preventing voter fraud is belied by two facts. First, S.B. 216 itself says that a voter's failure to provide a correct date of birth can be excused if at least three members of the BOE determine that the voter has met the four other requirements on the affirmation form.  Ohio Rev. Code § 3505.183(e).  This fact refutes any claim that a

50

voter's date of birth is necessary to determine the voter's right to have his or her provisional ballot counted.  Instead, this requirement is designed to create yet another hurdle for voters casting provisional ballots to have those ballots counted.

164.    Second, requiring a voter to provide his or her current address on the affirmation form adds little or no corroboration of the voter's eligibility that is not already provided by requiring a voter to provide proof of identification in the form of 1) a driver's license or state identification card number, 2) the last four digits of his or her social security number, or 3) a current and valid photo identification, a military identification, or a current utility bill, bank statement, government check, paycheck, or other government document showing the voter's current address.

165.    Moreover, there is no sufficiently weighty justification for Ohio's failure to provide voters notice and an opportunity to cure mistakes on their provisional ballot affirmation forms after Election Day.  Absentee voters are given seven days after Election Day in which to cure mistakes on their absentee ballot identification envelopes.  Allowing provisional ballot voters a similar opportunity to cure would impose minimal additional burdens on election officials, burdens far outweighed by a voter's fundamental right to have his or her ballot counted.

166.    Rather than serving a legitimate government interest, these requirements merely increase the chance that a voter will have his or her provisional ballot rejected for making inadvertent errors on the affirmation form.  As such, S.B. 216 disenfranchises voters for the very type of trivial errors prohibited by Section 1971 of the Civil Rights Act, 52 U.S.C.A. § 10101(a)(2)(B).  S.B. 216 thus unconstitutionally abridges, burdens, and/or denies the voting rights of Ohio citizens casting provisional ballots.

167.    Furthermore, poorer, less-educated, immigrant, and young voters are more likely than other voters to be forced to cast a provisional ballot because, for example, they lack one of the requisite forms of voter identification or because their eligibility to vote is challenged on the account of citizenship or residence.  S.B. 216 therefore imposes a disproportionate burden on these voters.

168.    For similar reasons, S.B. 216 interacts with the ongoing effects of Ohio's history of racial discrimination to impose disproportionate burdens on African-American and Latino voters.  For instance, because African Americans and Latinos in Ohio, as compared to the population as a whole, are more likely to be poor, are less educated, and have higher degrees of residential instability, they are less likely to possess one of the requisite forms of identification, with the result that they are more likely to be forced to cast a provisional ballot.  As a result, S.B. 216 combines with the ongoing socio-economic effects of racial discrimination to impose a disproportionate burden on the right to vote of African Americans and Latinos.

169.    As a consequence, S.B. 216, alone and in combination with the other laws discussed herein and the totality of the circumstances, imposes a discriminatory and disproportionate burden on African-American and Latino voters in Ohio, resulting in their having unequal access to the polls and less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

170.    Compounding these problems, S.B. 216 shortened the cure period for provisional voters who fail to provide one of the requisite forms of identification from 10 to seven days.

171.    There is no sufficiently compelling justification for these limitations on the ability of voters to cure defective provisional ballots.  Voters casting absentee ballots are permitted to cure deficiencies or discrepancies in any of the five categories of information required, not just

52

the failure to provide one of the requisite forms of identification. Moreover, BOEs are required to notify absentee voters of problems with the information provided on their ballot identification envelope. There is no compelling, legitimate reason why Ohio law should not similarly require BOEs to notify voters casting a provisional ballot of problems with their affirmation form.

172.    Similarly, there is no legitimate justification for shortening the period in which a voter may provide identification to support a provisional ballot after Election Day from 10 to seven days. BOEs have until 21 days after the election in which to complete their examination and counting of provisional ballots. Extending the cure period would not delay this process.

173.    These laws and practices unconstitutionally abridge, burden, and/or deny the voting rights of persons casting provisional ballots by failing to provide voters notice of deficiencies in their affirmation forms, not allowing voters to cure those deficiencies, and providing an insufficiently short period in which to supply the documentation needed to have their provisional ballots counted.

174.    Furthermore, poorer, less-educated, and transient voters are more likely to be forced to cast provisional ballots, because, for example, they lack one of the requisite forms of identification and more likely to have their eligibility challenged on the basis of citizenship or residence. Because they voters are comprised of a disparate number of African Americans and Latinos in Ohio, these inadequacies in the opportunity to cure provisional ballots interact with the ongoing social and economic effects of Ohio's history of racial discrimination to impose disproportionate burdens on the voting rights of African Americans and Latinos, resulting in their having unequal access to the polls and less opportunity to participate in the political process and elect the representatives of their choice.

175.     The lack of notice and insufficient opportunity to cure defective provisional ballots, alone and in combination with the other laws discussed herein and the totality of the circumstances, impose discriminatory and disproportionate burdens on African-American and Latino voters in Ohio, resulting in their having unequal access to the polls and less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

176.     Not only does the failure to provide notice and an opportunity to cure mistakes on the provisional ballot affirmation form unjustifiably and unconstitutionally burden voting rights, it also deprives Ohio's citizens of the procedures required by due process to protect their right to vote.

177.     Finally, S.B. 216 creates an irrational disparity between those voters casting ballots in counties that choose to consolidate the pollbooks for multi-precinct polling locations and those that do not.  As explained above, those who vote in locations with consolidated pollbooks are not at risk of having their ballots rejected or only partially counted for voting in the wrong precinct.  However, those who vote in multi-precinct locations that do not consolidate the pollbooks will still have their ballots rejected, in whole or in part, if they vote in the right location but wrong precinct.  By entrusting this decision to the discretion of the BOEs, S.B. 216 creates a voting system without uniform standards that unconstitutionally discriminates among voters based on where they live.

## IV.     CLAIMS FOR RELIEF

### COUNT I: Violation of Equal Protection Under the First and Fourteenth Amendments of the United States Constitution and Violation of 42 U.S.C. § 1983 (*Anderson/Burdick*)

178.     Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 177 above as though fully set forth herein.

54

179.     Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, a court considering a challenge to a state election law must carefully balance the character and magnitude of the injury to First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the State for the burdens imposed by the rule.  *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).  "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling opinion) (internal quotation marks omitted).  Further, all laws that distinguish between groups must at least be rationally related to a legitimate state interest in order to survive scrutiny under the Equal Protection Clause.  *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992).

180.     Thousands of Ohio voters, including Plaintiffs, will have their right to vote severely abridged, burdened, and in some cases denied if Defendants implement, enforce, or give effect to the Challenged Provisions in future elections.  In particular, the right to vote of thousands of voters, including a disproportionate number of Democratic, African-American, Latino, and young voters, will be burdened by S.B. 238's elimination of "Golden Week," section 3501.10(C)'s limitation of each county to one EIP voting location, S.B. 200's reductions in the number of direct recording electronic voting machines in counties that use them as their primary voting device, S.B. 205's and S.B. 216's restrictions on the ability of voters to cast and have counted absentee and provisional ballots, Secretary Husted's policy of excluding certain categories of voters from the mailing of unsolicited absentee ballot applications, the failure to provide notice and an opportunity to cure mistakes on the provisional ballot identification envelope, and the inadequate opportunities to cure mistakes on provisional ballots.

55

181.    The Challenged Provisions are not justified by any material or important

government interest.  Any benefits from the Challenged Provisions are clearly outweighed by the

burdens those provisions, alone and in combination, impose on the right to vote.

182.    Based on the foregoing, Defendants, acting under color of state law, have

deprived and will continue to deprive numerous voters, including Plaintiffs, of the rights secured

to them by the First and Fourteenth Amendments to the U.S. Constitution and protected by 42

U.S.C. § 1983.

### COUNT II: Violations of the Fourteenth and Fifteenth Amendments to the United States Constitution (Racial Discrimination)

183.    Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1

through 182 above as though fully set forth herein.

184.    Legislation intended, at least in part, to discriminate on the basis of race in the

voting context violates the Fourteenth and Fifteenth Amendments.  *See, e.g.*, *City of Mobile v.*

*Bolden*, 446 U.S. 55, 62, 66 (1980) (plurality opinion); *Vill. of Arlington Heights v. Metro. Hous.*

*Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

185.    Both the discriminatory effect of a statute and its legislative history are relevant

factors in analyzing a statute for discriminatory intent.  *Vill. of Arlington Heights v. Metro. Hous.*

*Dev. Corp.*, 429 U.S. 252 (1977).

186.    The Challenged Provisions have a disproportionately adverse and discriminatory

impact on the voting rights of African Americans and Latinos.

187.    A motivating purpose behind the challenged provisions of Ohio's voting laws was

to suppress the turnout and electoral participation of African-American and Latino voters, whose

voting rights are disproportionately abridged, denied, and burdened by the Challenged

Provisions.

188.     Based on the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs and other Ohio citizens of rights secured to them by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

## COUNT III: Violation of Equal Protection Under the First and Fourteenth Amendments to the United States Constitution (Partisan Fencing)

189.     Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 188 above as though fully set forth herein.

190.     The Equal Protection Clause of the Fourteenth Amendment prohibits "fencing out" voters because of the way they are expected to vote. *Carrington v. Rash*, 380 U.S. 89, 94 (1965) ("'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible."). Similarly, the First Amendment protects citizens against "a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views." *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring).

191.     The Challenged Provisions impose disproportionate burdens on the voting rights of Democratic voters, in particular the key Democratic constituencies of poor, African-American, Latino, and young voters.

192.     The Challenged Provisions were enacted or promulgated with the knowledge and intention that they would disproportionately suppress the vote of Democratic voters.

193.     Based on the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs and other Ohio citizens of rights secured to them by the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 by discriminating against them on the basis of how they vote.

## COUNT IV: Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301

194.    Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 193 above as though fully set forth herein.

195.    Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color.

196.    The Challenged Provisions have disproportionately abridged and denied and, unless enjoined, will continue to disparately abridge and deny the voting rights of African Americans and Latinos in Ohio.

197.    African Americans and Latinos have suffered from, and continue to suffer from, discrimination in the electoral and political processes in the State of Ohio and its political subdivisions, including through the use of practices or procedures that exacerbate discrimination against African-American and Latino voters and the use of racial appeals in campaigns.  Racially polarized voting in Ohio has only exacerbated the adverse effects of such discrimination against African-American voters.

198.    African-Americans and Latinos in Ohio have suffered from, and continue to suffer from, the effects of discrimination in areas such as employment, housing, and education that affect their ability to participate in the political process.

199.    The Challenged Provisions will interact with social and historical conditions— including disparities due to discrimination in areas such as education, employment, housing, health services, and voting—to cause an inequality in the opportunities enjoyed by African-American and Latino voters to elect their preferred representatives.

200.    Under the totality of the circumstances, the Challenged Provisions will result in less opportunity for African Americans and Latinos to participate in the political process and to elect candidates of their choice.

### Count V: Violation of Section 1971 of the Civil Rights Act of 1964

201.    Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 200 above as though fully set forth herein.

202.    Section 1971 of the Civil Rights Act of 1964, 52 U.S.C.A. § 10101(a)(2)(B), provides that:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

203.    As a result of the additional and superfluous requirements for casting effective absentee and provisional ballots contained in S.B. 205 and S.B. 216, the right to vote of thousands of Ohio voters will be denied as a result of immaterial errors on their absentee ballot identification envelopes and provisional ballot affirmation forms, even where election officials can determine that the voter is eligible and registered to vote, unless these provisions are enjoined.

204.    Based on the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs and other Ohio citizens of rights secured to them by Section 1971 of the Civil Rights Act of 1964.[8]

---

[8] Plaintiffs acknowledge that the Sixth Circuit has held that there is no private right of action under 52 U.S.C.A. § 10101(a)(2)(B). *See McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000). The *McKay* decision, however, reached this conclusion without any express analysis. Other courts since have persuasively found that, based on the history of the provision and analogous Supreme Court precedent, there is a private right under this section. *See Schwier v.*

**Count VI: Violation of Procedural Due Process Under the Fourteenth Amendment of the United States Constitution and Violation of 42 U.S.C. § 1983 (No Notice and Opportunity to Cure Mistakes on the Provisional Ballot Affirmation Form)**

205.     Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 204 above as though fully set forth herein.

206.     Ohio's failure to provide notice and an opportunity to cure defects on the provisional ballot affirmation form unconstitutionally violates voters' rights to procedural due process.

207.     When determining what process is due, a court must balance three factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

208.     A voter's right to have his or her vote counted is fundamental.  The risk of erroneous deprivation of this right is significant because poll workers must make subjective determinations, such as whether the signature on the affirmation form matches that in the registration books.  Finally, the state's interest in not allowing voters casting provisional ballots to cure these mistakes is slight.  Ohio permits voters casting absentee ballots to cure mistakes after Election Day, and whatever marginal burdens are imposed by allowing provisional voters a similar opportunity to remedy problems with their ballots are far outweighed by the importance of the right to vote and the risk of erroneous deprivation of that right.

---

*Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003).  Consequently, Plaintiffs assert this claim to preserve the issue for appeal.

209.     Consequently, these three factors require that voters casting provisional ballots be given an opportunity to cure defects on their affirmation forms after Election Day.

210.     Based on the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs and other Ohio citizens of rights secured to them by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

**Count VII: Violation of Equal Protection Under the Fourteenth Amendment of the United States Constitution and Violation of 42 U.S.C. § 1983 (*Bush v. Gore*—No Uniform Standards)**

211.     Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 210 above as though fully set forth herein.

212.     In *Bush v. Gore*, the United States Supreme Court held that, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another," and found that the Equal Protection Clause had been violated where "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another."  531 U.S. 98, 104-06 (2000).

213.     By giving BOEs the discretion to combine the pollbooks in multi-precinct voting locations, S.B. 216 creates an arbitrary system whereby some voters no longer face the risk that their ballots will be rejected, in whole or in part, because they vote in the right location but wrong precinct, but others who vote in locations that decide not to combine the pollbooks for multiple precincts still face this risk.

214.     This imposes different standards for accepting or rejecting voters' ballots based on the county in which they live in violation of the Equal Protection Clause.

215.    Based on the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs and other Ohio citizens of rights secured to them by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs requests that this Court enter the following relief against Defendants:

A.  Declare that 1) S.B. 200 and Directive 2014-14, S.B. 205 and Directive 2014-18, S.B. 216, S.B. 238, and Ohio Rev. Code § 3501.10(C), and Secretary Husted's policy, as formulated in Directive 2014-15, of excluding certain categories of voters from the mailing of unsolicited absentee ballot applications, individually and collectively, violate the First, Fourteenth, and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act; 2) that S.B. 205 and S.B. 216 violate section 1971 of the Civil Rights Act of 1964, 52 U.S.C.A. § 10101(a)(2)(B); 3) that the lack of opportunity to cure mistakes on provisional ballots denies voters their right to procedural due process in violation of the Fourteenth Amendment; and 4) that S.B. 216 violates the Equal Protection Clause of the Fourteenth Amendment by creating different standards for accepting and rejecting ballots cast by voters in the right polling location but wrong precinct;

B.  Issue orders preliminarily and permanently enjoining Defendants and their agents, employees, and successors, and all persons acting in concert with any of them, from enforcing or giving any effect to 1) S.B. 200 and Directive 2014-14, 2) S.B. 205 and Directive 2014-18, 3) S.B. 216, 4) S.B. 238, 5) Ohio Rev. Code § 3501.10(C), and 6) Secretary Husted's policy, as formulated in Directive 2014-15, of excluding certain categories of voters from the mailing of unsolicited absentee ballot applications;

C.   Issue an order mandating that Secretary Husted direct each county BOE to provide EIP voting locations on a reasonably equitable population-per-county basis;

D.   Issue an order mandating that Defendants give voters casting provisional ballots notice and an opportunity to cure defects in their provisional ballot affirmation forms;

E.   Issue orders preliminarily and permanently enjoining Defendants from entrusting to the discretion of county BOEs the decision to consolidate the pollbooks in multi-precinct polling locations and requiring that all multi-precinct polling locations consolidate their pollbooks;

F.   An order awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. §§ 1988, 1973(e); and

G.   Such other and further relief as this Court may deem appropriate.

DATED:  September 8, 2015                    Respectfully submitted,

                                             s/ Donald J. McTigue
                                             **Donald J. McTigue (0022849)**
                                             **Trial Attorney**
                                             **J. Corey Colombo (0072398)**
                                             McTigue McGinnis & Colombo LLC
                                             545 East Town Street
                                             Columbus, OH 43215
                                             Telephone: (614) 263-7000
                                             Facsimile: (614) 263-7078
                                             dmctigue@electionlawgroup.com

                                             **Marc E. Elias** (admitted *pro hac vice*)
                                             **Bruce V. Spiva** (admitted *pro hac vice*)
                                             **Elisabeth C. Frost** (admitted *pro hac vice*)
                                             **Rhett P. Martin** (admitted *pro hac vice*)
                                             Perkins Coie LLP
                                             700 Thirteenth Street, N.W., Suite 600
                                             Washington, D.C.  20005-3960
                                             Telephone:  202.654.6200
                                             Facsimile:  202.654-6211

                                             **Joshua L. Kaul** (admitted *pro hac vice*)
                                             Perkins Coie LLP
                                             1 East Main Street
                                             Suite 201
                                             Madison, WI  53703-5118
                                             Telephone:  608.663.7499
                                             Facsimile:  608.663.7499

                                             Attorneys for Plaintiffs Ohio Democratic
                                             Party, Democratic Party of Cuyahoga County,
                                             Montgomery County Democratic Party, Jordan
                                             Isern, Carol Biehle, and Bruce Butcher

64

## CERTIFICATE OF SERVICE

I hereby certify that on this date I served a copy of the foregoing by transmitting a copy to all counsel with an e-mail address of record, who have appeared and consent to electronic service in this action and any consolidated actions.

This the 8th day of September, 2015.


By:  /s/  Donald J. McTigue