**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **THE OHIO DEMOCRATIC PARTY, et al.** | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 2:15-CV-1802** |
| | : | |
| **v.** | : | **JUDGE WATSON** |
| | : | |
| **JON HUSTED,** *et al.***,** | : | **MAGISTRATE JUDGE KING** |
| | : | |
| **Defendants.** | : | |

---

### DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Respectfully submitted,

MIKE DeWINE
Ohio Attorney General

*s/ Steven T. Voigt*
STEVEN T. VOIGT (0092879)*
   **Lead and Trial Counsel*
Senior Assistant Attorney General
ZACHERY P. KELLER (0086930)
TIFFANY L. CARWILE (0082522)
BRODI J. CONOVER (0092082)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
steven.voigt@ohioattorneygeneral.gov
zachery.keller@ohioattorneygeneral.gov
tiffany.carwile@ohioattorneygeneral.gov
brodi.conover@ohioattorneygeneral.gov

*Counsel for Defendants Secretary of State and
Ohio Attorney General*

## INTRODUCTION

Today, as we near 2016, Ohio is a national leader in voting opportunities.  The laws of today's Ohio are not a persuasive story for Plaintiffs.  So instead of today's Ohio, they focus on the past, and specifically on the 2004 election.  Since then, however, Ohio's election system has completely transformed.  In the elections world, Ohio of 2016 is a pole apart from Ohio in 2004.

Under any grading system—whether it is 23 early voting days, 207 early voting hours, 39 evening and weekend early voting hours, early voting on two Saturdays and two Sundays, leadership in accepting provisional and absentee ballots, leadership in DRE resources, the ability to vote 24/7 by mail over four weeks, or Ohio mailing ballot applications statewide—today's Ohio is the best or one of the best in the nation.  In today's Ohio, without question, it is easy to vote.  But Ohio also shoulders what many other States do not: partisan attention as a "swing" State.  Plaintiffs complain about minor changes in Ohio's overall election regime.  Had nearly any other State made these changes, this case likely never would have seen a courtroom.

For Ohio, even resolving an election issue does not necessarily mean it is gone.  In 2014, different plaintiffs raised the Golden Week claim.  After a favorable ruling for Ohio by the Supreme Court, Ohio voluntarily settled the lawsuit.  Both sides praised the settlement as good for Ohio voters.  Only a month after the ink was dry on the settlement, however, Plaintiffs here raised the identical Golden Week claim.

Ohio's witnesses established that all of the challenged laws improve election administration and serve multiple important state interests.  Election administrators testified about how they learn from each election, compromise across the political aisle to serve Ohio's voters, and constantly strive to make improvements.  Ohio's experts demonstrated that the challenged laws have had no negative effect on minority voting or the voting of any Ohioan.

1

Plaintiffs called a number of political campaign workers.  Those witnesses said that in past elections, the Democratic Party used early voting to "bank" votes.  Not a single one of Plaintiffs' witnesses testified that the challenged laws will prevent the Democratic Party from promoting early-voting in 2016.  And Plaintiffs did not identify a single person who was prevented from voting as a result of the challenged laws.  Plaintiffs' experts were unable to establish any racial disparities resulting from the challenged laws.

Despite Plaintiffs' extensive discovery—(1) sending public records requests beginning in December 2014; (2) serving twenty-four non-party document production subpoenas; (3) taking twenty-eight depositions; (4) receiving more than 529,000 pages of documents from Ohio and non-parties; (5) filing 70-page Pre-Trial and Post-Trial briefs; and (6) traveling from Washington D.C. to Columbus for 10 days of trial—Plaintiffs did not come close to their burdens of proof, both with respect to the facts and the law.  Ohio requests judgment in its favor on all claims.

This brief is divided into two parts, Proposed Findings of Fact and Proposed Conclusions of Law.  In the Proposed Findings of Facts, Sections I and II, Ohio provides an overview of the witnesses who testified at trial.  Section III explains the challenged laws and sets forth Ohio's interests supporting the laws.  In the Conclusions of Law, Ohio walks through the legal insufficiencies in Plaintiffs' case.

## PROPOSED FINDINGS OF FACT

### I.  OHIO'S WITNESSES

### A.  Dr. M.V. (Trey) Hood III

1.      Dr. Hood is a tenured professor of Political Science at the University of Georgia. Ex. 15 p. i (Hood report)[1]; Vol. IV 5:12-13 (Hood)[2].  He has three degrees in political science:

---

[1]      "Ex. __" refers to Defendants' Supplemental List of Trial Exhibits (Doc. 72).  The pin cite is identified by either the page number (*e.g.*, "p. __") or paragraph number (*e.g.*, "¶ __").

Ph.D. (Texas Tech 1997), M.A. (Baylor 1993), and B.S. (Texas A&M 1991).  Ex. 15 p. i.

2.     Hood has authored at least thirty-seven peer-reviewed papers and five book chapters, and he has presented on political science topics at dozens of symposia.  *Id.* at i-xii.  He is the Director of Graduate Studies at the University of Georgia.  *Id*. at i.  He sits on the editorial boards of the Social Science Quarterly and the Election Law Journal.  *Id*. at xii.  His research includes the areas of American politics and policy, election administration, early voting, voter ID laws, voter fraud, voting behavior, demographics and voting, and racial politics.  Vol. IV 5:14-25, 7:17-8:2 (Hood).

3.     Ohio tendered Hood as an expert in the areas of political science, public policy related to election laws, election administration, voter fraud, and voter behavior.  *Id*. 12:13-16.  Plaintiffs did not dispute that Hood is an expert in those areas.  *Id*. 12:17-20.  The Court admitted Hood as an expert in those areas.  *Id*. 12:22-25.

4.     Hood authored two expert reports.  Ex. 15 (Hood report); Ex. 18 (Hood rebuttal).  He relied on numerous qualitative and quantitative sources, including but not limited to voting data from the Secretary and boards, the U.S. Census Bureau, journal articles, an interview with the Secretary's Chief of Staff, and nineteen declarations from Republican and Democratic county commissioners and election officials.  Vol. IV 13:23-22:19 (Hood).  Declarants were from small, medium, and large-sized counties.  *Id*. 21:25-22:5.

5.     Hood's reliance on both qualitative and quantitative data and analysis is widely used and accepted in political science research and peer-reviewed papers.  *Id*. 23:15-26:8.

_____

The document is specifically identified in parentheticals, as well.
[2]     "Vol. __ __:__" refers to the corresponding Transcript of the Bench Trial Proceedings filed with this Court.  Further, the speaker is identified in a parenthetical.

6.     Hood determined that the challenged laws are supported by legitimate state interests.  *Id.* 116:25-117:3.   He also concluded that the challenged laws would not disproportionately impact minorities or any other voters.  *Id.* 117:4-12.

**B.     Dr. Nolan McCarty**

7.     Dr. McCarty is Princeton's Chair of the Department of Politics.  Ex. 20 at C.V. (McCarty rebuttal).  He has three degrees: A.B. Economics with Honors (Univ. of Chicago 1990), M.S. Political Economy (Carnegie Mellon 1992), and Ph.D. Political Economy (Carnegie Mellon 1993).  *Id.*

8.     McCarty has authored three books on political issues and dozens of journal articles and book chapters.  He has received many prestigious awards/honors as well as notable teaching positions.  *Id.*  He is the founding co-editor of the Quarterly Journal of Political Science. Vol. III 30:5-10 (McCarty).  His research focus is American politics and legislative and electoral behavior.  *Id.* 28:11-14.

9.     Plaintiffs stipulated as to McCarty's qualifications as an expert.  *Id.* 31:17-24.

10.     McCarty authored a rebuttal expert report that addressed significant quantitative data and analysis problems within Timberlake's initial report.  *Id.* 32:17-25.  McCarty's conclusions included that the percentage of African Americans utilizing early voting *increased* in 2014 (with the challenged laws in place) in comparison to the previous midterm election (prior to the challenged laws).  Ex. 20 p. 8 (McCarty rebuttal).

**C.     Sean Trende**

11.     Trende is the Senior Elections Analyst for RealClearPolitics, "one of the most widely-used election resources on the net" with about 60 employees.  Vol. VIII 41:12-13, 42:11-13, 43:1-6 (Trende).  He has three degrees: B.A. History and Political Science (Yale 1995), M.A. Political Science (Duke 2001), and J.D. (Duke 2001).  Ex. 14A (Trende C.V.).

12. Trende has nearly two decades of experience studying and analyzing elections. Vol. III 49:3-6 (Trende). He is the author of two books and two book chapters addressing politics, he has written dozens of columns, and he has made numerous appearances discussing political trends. Ex. 14A (Trende C.V.). One of Trende's books, which he co-authored, is considered a foundational text for understanding congressional districts. Vol. VIII 46:4-23 (Trende). He contributes to Larry Sabato's Crystal Ball. *Id*. 44:9-19. Trende routinely speaks to academic groups, think tanks, and other associations about elections. *Id*. 47:2-4. He is an advisor for "the States of Change," a group "dedicated to try to recreate the demographic projections that the Census Bureau used to do but no longer does." *Id*. 47:17-22. The group is a "joint effort between the American Enterprise Institute, the Brookings Institute and the Center for American Progress." *Id*. His research focuses on demographic trends, voter turnout, and election trends. *Id*. 43:8-44:5. He has been accepted as an expert in several prior lawsuits. *Id*. 48:5-49:2.

13. Ohio offered Trende as an expert in the fields of campaigns and elections, voter behavior, voter turnout, demographic trends, and political history. *Id*. 49:7-10. The Court admitted him as an expert. *Id*. 49:13.

14. Trende wrote an expert report and a rebuttal report. His expert report examined Ohio's election laws in a national context. *Id*. 51:14-16. His rebuttal responded to Timberlake's calculus of voting analysis. Ex. 17 ¶1 (Trende rebuttal). Trende's conclusions included that Ohio "has the tenth-longest early voting period in America." Ex. 14 ¶35 (Trende report).

**D.  Dr. Theodore Allen**

15. Dr. Allen is an associate professor at The Ohio State University. Ex. 16 p. 16 (Allen report C.V.). He has four degrees: B.A. Physics (Princeton 1991), M.S. Solid State Physics (UCLA 1992), and M.S. and Ph.D. Industrial and Operations Engineering (Michigan 1994, 1997). *Id*.

16. Allen is the author of over 50 peer-reviewed publications and two textbooks. Vol. VII 116:8-9 (Allen). About six of his publications specifically address election systems and allocation of election resources. *Id*. 116:16-20. Private companies and the U.S. Army have engaged Allen to conduct studies about resource allocation and other issues. *Id*. 117:1-10. Counties in Ohio and New York have retained him to conduct waiting line analyses. *Id*. 117:11-23. Allen declined to serve as an expert for Plaintiffs. *Id*. 119:3-21.

17. Ohio offered Allen as an expert in integrated systems engineering and waiting-line analysis, specifically in the elections context. *Id*. 118:18-22. Plaintiffs did not object. *Id*.

18. In his first report, Allen analyzed resource allocation problems that would emerge if counties in Ohio added early voting sites. Ex. 16 (Allen report). He examined the relative merits of the revised DRE formula. *Id*. Allen's rebuttal report responded to Yang's report. Ex. 19 (Allen rebuttal). Allen concluded in part that splitting early voting resources among multiple locations "would have caused in-polling waiting lines to significantly increase in 2012" and would not support the "goal of providing a better voter experience to Ohioans." Ex. 16 ¶29 (Allen report).

### E. Additional Witnesses

19. Ohio also called Matthew Damschroder, Assistant Secretary of State and Chief of Staff to the Secretary; Sherry Poland, Director of the Hamilton County Board of Elections; Timothy Ward, Director of the Madison County Board of Elections; and Mark Munroe, Chair of the Mahoning County Board of Elections. Vol. IX 48:17-19 (Damschroder); Vol. IX 9:8-10 (Poland); Vol. VIII 223:10-14 (Ward); Vol. VII 94:1-2 (Munroe).

## II. PLAINTIFFS' WITNESSES

### A. Dr. Jeffrey Timberlake

20. Plaintiffs' primary expert was Dr. Timberlake, an associate professor from the

University of Cincinnati's Department of Sociology.  PX0109 p. 63 (Timberlake report, C.V.)[3].
Timberlake has never taught a course or authored a paper related to election administration,
election laws, or legislative intent.  Vol. V 54:4-55:16 (Timberlake).  He admitted he is not an
expert on those topics.  *Id*. 55:8-16.  He has never previously been hired as expert.  *Id*. 55:22-25.
He has not taught courses or authored papers related to the Voting Rights Act, the Senate
Factors, or the calculus of voting, all primary areas of discussion in his report.  *Id*. 56:5-7, 56:19-
24, 57:10-15.  He never previously conducted a "calculus of voting" analysis.  *Id*. 57:16-18.

21.     Timberlake copied substantial parts of two experts' reports in *NAACP*,[4] Drs.
Roscigno and Smith.  Regarding copying from Roscigno, Timberlake testified: "I definitely took
more in some places than others . . . there are parts of the report that are entirely rewritten,
there's parts of the report that are entirely new, and there are other parts that are basically, you
know, what he [Roscigno] wrote."  *Id*. 135:16-25.  Regarding taking content from Smith,
Timberlake claimed in his report that Smith's report used "appropriate data and statistical
methods."  PX0109 p. 52.  But Timberlake did not actually look at the data that Smith used or try
to replicate Smith's calculations.  Vol. V 96:16-97:1 (Timberlake).  He was unaware of
significant problems with Smith's calculations, including early vote totals for census blocks that
exceeded the total number of voters in the blocks and charts that purported to show voting on
days when there was no voting.  *Id*. 98:2-99:5.

22.     Much of Timberlake's report consisted of aggregate-level analyses of socio-
economic issues based on grouping Ohio's counties into three different categories.  Based on
calculation errors, Timberlake twice revised the chart in his report depicting the three categories.

---

[3]     "PX0__" refers to Plaintiffs' Supplemental List of Trial Exhibits (Doc. 77).  The pin cite
is identified by either the page number (*e.g.*, "p. __") or paragraph number (*e.g.*, "¶ __").  The
document is specifically identified in parentheticals, as well.
[4]     *Ohio State Conference of the NAACP v. Husted*, No. 2:14-cv-00404 (S.D. Ohio).

*Id*. 111:8-115:14. In his second erratum, Timberlake changed the counties in the three categories. *Id*. 115:11-14. Timberlake, however, did not revise the nine charts in his report that are based on the grouping of Ohio's counties into the three categories. *Id*. 116:14-117:15.

23. Timberlake's reports did not analyze Latino or young voters. *Id*. 92:15-20.

24. Based on Timberlake's calculation errors and verbatim copying from other reports, coupled with Timberlake's lack of background in the type of analysis that he conducted, there are substantial reliability issues with Timberlake's analysis and findings.

**B. Drs. Muer Yang, Lorraine Minnite, and David Canon**

25. Plaintiffs proffered three additional experts, Dr. Yang, Dr. Minnite, and Dr. Canon. Yang's waiting line analysis was deeply flawed. Yang wrongly assumed that the revised DRE formula was a ceiling, rather than a floor, and he did not consider back-up optical scan procedures in DRE counties. Ex. 19 ¶¶7, 10 (Allen rebuttal).

26. Dr. Minnite's report discussed voter fraud. She provided testimony and conclusions that contradict Plaintiffs' claims. While she used an overly narrow definition of voter fraud (Ex. 18 pp. 16-17 (Hood rebuttal)), Minnite admitted that voter fraud exists and "a state has a rational reason to guard against fraud in elections." Vol. VII 58:3-5, 62:3-4 (Minnite). Her report was limited to discussing voter fraud; she did not examine other reasons for election laws, such as promoting orderly election administration. *Id*. 60:21-24.

27. Dr. Canon's report had a narrow scope and consisted of disagreeing with Hood's and Trende's citation of a journal article discussing early voting and SDR that Canon co-authored. Vol. VI 41:10-13 (Canon). Trende merely quoted a line from the journal verbatim. *Id*. 47:3-5. Canon's article does not include any analysis of the effects of early voting and SDR on any demographic patterns in voting. *Id.* 68:1-3.

**C. Individual Plaintiffs**

28.     Plaintiff Carol Biehle said her only claim is the right church/wrong pew claim (now moot).  Vol. I 194:11-25 (Biehle); Dir. 2015-24 pp. 2-80-81.[5]  Plaintiff Reverend Butcher testified that his registration efforts would not change in 2016, and he was unaware how many early voting Sundays are in the 2016 calendar.  Vol. I 121:8-22 (Butcher).  Plaintiff Jordan Isern did not testify.

### D.     Political Employees and Workers

29.     Plaintiffs called a number of Democratic political employees and workers: Gregory James Beswick, Executive Director of the ODP; Nick Martin, Executive Director of the CCDP; Mark Owens, Chair of the MCDP; Joseph Longley, a former Democratic campaign worker; Terri Taylor, volunteer for the Democratic Party; Rachel Bowman, a Democratic field organizer; Matthew Caffrey, President of the College Democrats of The Ohio State University from 2009 to 2011 and a paid worker for President Obama's campaign in 2012; Andrew Kohn, a paid worker for the Obama for America 2008 campaign.  Vol. VI 108:6-9 (Beswick); Vol. II 5:14-18 (Martin); Vol. VI 85:18-20 (Owens); Vol. II 69:11-70:7 (Longley); Vol. II 200:3-4 (Taylor); Vol. III 10:6-12, 11:3-7, 25:1-4 (Bowman); Vol. I 125:6-10, 150:20-22 (Caffrey); Vol. I 157:20-158:5, 166:1-8 (Kohn).

30.     The testimony of these political witnesses can be distilled into a few basic points:

(1)  None of the witnesses has any experience in election administration.  Vol. I 150:14-19 (Caffrey); Vol. II 52:8-16 (Martin); Vol. II 85:16-21 (Longley); Vol. II 214:25-215:5 (Taylor); Vol. VI 103:15-20 (Owens); Vol. VI 150:16-20 (Beswick).

(2)  The Democratic Party's strategy in some prior elections was to bank or lock

---

[5]     Directive 2015-24 is the newly enacted Proposed Permanent Directive on Election Administration (Ex. 14CC), now available in the 2015 Election Official Manual (pp. 2-80-81) at http://www.sos.state.oh.us/sos/upload/elections/EOResources/general/2015EOM.pdf.

in votes using early voting. Vol. I 126:4-13, 152:9-10 (Caffrey); Vol. I 166:5-8 (Kohn); Vol. II 53:3-5 (Martin); Vol. II 77:3-5 (Longley); Vol. VI 89:5-8, 104:15-18 (Owens).

(3) The Democratic Party will continue to be able to do GOTV drives; the challenged laws do not prevent it from doing so. Vol. II 54:1-4, 54:15-25 (Martin); Vol. II 54:9-25 (Longley); Vol. III 26:9-18 (Bowman); Vol. VI 105:5-7 (Owens).

(4) Some of the witnesses had little familiarity with Ohio's election laws. *See*, *e.g.*, Vol. I 168:1-15 (Kohn); Vol. II 216:2-4 (Taylor).

### E. Democratic Politicians

31. Plaintiffs called two Democratic politicians, Senator Nina Turner, a former member of the Ohio Senate, and Phyllis Cleveland, a member of the Cleveland City Council. Vol. I 43:16-19 (Turner); Vol. VII 76:11-12 (Cleveland). Neither has election administration experience. Vol. I 94:1-10 (Turner); Vol. VII 90:12-16 (Cleveland). Senator Turner is generally unfamiliar with the early voting calendar. Vol. I 94:11-16 (Turner). Ms. Cleveland testified about a billboard with a voter fraud warning on it, but testified that the billboard was not put up by Ohio's election administrators or the General Assembly. Vol. VII 90:17-91:1 (Cleveland).

### F. Board Members, Directors, and Deputy Directors

32. Lastly, Plaintiffs called a few Democratic board officials. Most of these witnesses are extensively involved with the Democratic Party and two coordinated with Plaintiffs' counsel about litigation strategy. Brad Cromes, former Deputy Director for the Portage County Board of Elections, has actively participated in Democratic campaign efforts. Vol. VIII 25:22-27:10 (Cromes). Timothy Burke, Chair of the Hamilton County Board of Elections, is also the Chair of the Hamilton County Democratic Party. Vol. V 152:12-15 (Burke). William Anthony, Director of the Franklin County Board of Elections, is also the Chair of the Franklin County Democratic Party. Vol. I 196:24-25 (Anthony). Eben McNair, a member of the Cuyahoga County Board of

10

Elections, holds various positions with the CCDP and communicated with Plaintiffs' counsel regarding litigation strategy.  Vol. V 5:6-7, 35:22-36:3 (McNair).  Anthony Perlatti, Deputy Director of the Cuyahoga County Board of Elections, also spoke with Plaintiffs' counsel regarding litigation strategy.  Vol. II 217:13-14 (Perlatti); Vol. V 40:24-41:4 (McNair).

33.     These witnesses provided notable points that contradict Plaintiffs' claims (referenced throughout this brief).  One important theme did emerge, which Burke testified to, and that is that reasonable minds "can disagree about appropriate policy choices," but Ohio's election officials "do endeavor to work hard to try and make the election system work hard for everybody."  Vol. V 187:14-20 (Burke).

## III.     PLAINTIFFS DID NOT MEET THEIR FACT BURDEN

### A.     Ohio is a Leader in Voting Opportunities and Convenience

34.     Ohio's election system, which has evolved over the past decade, makes voting easy and uniform for all voters across the State.  Uniformity provides basic fairness to Ohio's voters, reduces voter confusion, makes it easier for the State to educate voters about election days and hours, and enables organizations to more effectively coordinate GOTV messaging.  Ex. 15 pp. 12-14 (Hood report); Vol. I 241:23-242:4 (Anthony); Vol. XIII 239:16-240:19 (Ward); Vol. IX 44:16-32 (Poland); Vol. IX 68:11-69:10 (Damschroder).

35.     The Ohio Association of Election Officials ("OAEO") supported uniform hours (and many of the challenged laws).  Vol. VIII 224:21-25, 225:6-10, 239:16-240:19 (Ward).  The OAEO is a bi-partisan organization comprised of the members of Ohio's 88 county boards of elections, as well as board directors and deputy directors.  *Id.* 224:21-25.  The OAEO's trustees consist of twenty members—ten Democrats and ten Republicans—from a diverse cross-section of Ohio's large, medium, and small counties.  Ex. 15 p. 16 n.44 (Hood report); Vol. VIII 245:8-20.  The ACLU of Ohio also supported setting uniform hours.  Vol. IX 70:1-3 (Damschroder).

36.     Today, Ohio is a leader in voting opportunities.  The polls on election day are open for thirteen hours—from 6:30 AM until 7:30 PM.  Ohio Rev. Code § 3501.32.  Ohio voters can also vote before election day by marking and casting the ballot at the board, mailing the ballot to the board, marking the ballot at home and returning it in-person, or having a family member return it to the board.  Ohio Rev. Code § 3509.05(A).

37.     In a presidential general election, Ohio has 23 days of early in-person voting spread over four weeks.  Ex. 14 ¶¶34, 43 (Trende report).  These are more early voting days than the days in *forty-one* other States.  *Id.* ¶¶34, 43, 52.  For the 2016 general election, there will be 207 hours of early in-person voting.  *Id.* ¶92.  Only eight States have more early in-person hours. *Id.*  Ohio's early in-person voting includes a large number of early morning, evening, and weekend hours—39 hours after 5 PM or on weekends and 21 hours before 9 AM.  *Id.* ¶93; Ex. 14J (2016 voting calendar).  Ohio is one of thirteen jurisdictions with early voting on Sundays. Ex. 14 ¶55.  Ohio's early voting period will have two Saturdays and two Sundays.  Ex. 14J.

38.     Ohio (unlike twenty-three States) offers no-excuse mail-in voting.  Ex. 15 p. 36 (Hood report).  With the possible exception of North Carolina, Ohio is the *only* State that mails ballot applications to all active, registered voters.  Ex. 14 ¶174 (Trende report).  Ohio mailed absentee ballot applications statewide in 2012 and 2014.  Vol. IX 54:24-55:3-7 (Damschroder). For the 2016 general election, Ohio will once again mail applications across the State.  *Id.*

39.     Ohio has shown its commitment to voting opportunities and convenience through important initiatives.  For example, in February 2015, the Secretary established a baseline for online voter access to information that all boards are required to implement.  The requirements include:  (1) the capability for voters to identify the address where they are registered to vote, (2) a link to a change of address form, (3) a link to a voter registration form, (4) the capability for

absentee voters to track their ballots, (5) the ability for voters to identify their correct polling place, and (6) the ability to view and print a sample ballot.  Ex. 14G (Dir. 2015-02).

40.     Ohio also has set aside $12.7 million to help counties purchase electronic poll books.  Ex. 15 p. 39 (Hood report); Vol. IX 183:22-24 (Damschroder).  Ohio pre-prints voters' names and addresses on their absentee ballot envelopes and also notifies voters of any errors on their envelopes.  Ex. 14C (Dir. 2014-27).  Moreover, the Secretary's office provides precinct election officials with training materials and election officials are able to complete an online training program through the Secretary's office.  Vol. IX 78:23-79:6 (Damschroder).

41.     With regard to voting equipment, Boards have discretion to decide their particular management software system.  Some counties use direct-recording electronic ("DRE") voting machines.  Vol. IX 83:16-20 (Damschroder).  Ohio has more DRE machines in its inventory *than any other State*.  Ex. 14 ¶170 (Trende report).  In addition, Ohio's ratio of DRE machines to eligible voters (1:175) is far better than every other State.  *Id*.

42.     The U.S. Government Accountability Office determined that the average wait time to vote in Ohio was only about 10 minutes in 2012 and reported that voters in many other States experienced longer, sometimes much longer, wait times.  Ex. 14 ¶249 (Trende report); *see also* Vol. I 234:20-235:1 (Anthony) ("I did not witness long lines" in Franklin County in 2008 on election day).

### B.     Minor Changes in the Law Had No Negative Effect on Voters and Voting

43.     The challenged laws that were adopted in early 2014 were in place for the 2014 midterm general election.  Ex. 20 p. 3 (McCarty rebuttal); *see also* Vol. VI 136:7-9 (Beswick). The 2014 general election can be compared with the preceding midterm election in 2010 to assess whether the challenged laws created difficulties for voters.  Vol. III 49:13-22 (McCarty).

44.     Beyond providing comparison points for before/after the challenged laws, midterms are better to test the direct impact of election laws because presidential elections involve diluting factors such as contested races, more spending/advertising, and increased mobilization. *Id.* 50:2-51:4. McCarty stated that if the challenged laws "had little effect across midterm elections, we might reasonably expect that the[y] would have an even smaller effect in presidential elections where greater partisan mobilization and voter interest ought to counteract such changes." Ex. 20 p. 3 (McCarty rebuttal).

45.     Comparing 2010 and 2014, the challenged laws did not harm voters. In 2010, 4.6% of all votes were cast early in-person. Ex. 15 p. 6 (Hood report). That percentage remained unchanged in 2014 (4.6%). *Id.* In 2010, 21.5% of the votes were cast absentee by mail. *Id.* Vote-by-mail slightly increased in 2014 to represent 22.5% of the vote. *Id.*

46.     Nor is there any evidence that the challenged laws negatively affected African Americans. In 2010, 6.9% of the votes cast by African Americans were early in-person. Ex. 20 p. 8 (McCarty rebuttal). In 2014, the percentage of African American voters who chose to vote early in-person *increased* to 7.1%. *Id.* McCarty concluded that Ohioans who sometimes use early in-person voting tend to be "high propensity voters," meaning that they are more likely to "persist in voting from election to election." Vol. III 60:10-61:12 (McCarty).

47.     McCarty also calculated that African American and white voters voted absentee by mail in 2014 at nearly identical rates (22.9% versus 22.8%). Ex. 20 p. 14 (McCarty rebuttal).

48.     The individual Plaintiffs did not claim that the challenged laws prevented them from voting. Ex. 2 p. 5. (Biehle Inter. No. 3); Ex. 3 p. 5 (Rev. Butcher Inter. No. 3).

49.     The organizational Plaintiffs did not identify any specific individual who was unable to vote as a result of the challenged laws. Ex. 8 p. 8 (ODP Inter. No. 3); Ex. 9 pp. 6-7

14

(CCDP Inter. No. 3); Ex. 10 pp. 6-7 (MCDP Inter. No. 3); Ex. 11 (ODP R.F.A. No. 20); Ex. 12 (CCDP R.F.A. No. 20); Ex. 13 (MCDP R.F.A. No. 20).

      C.      **The Challenge to the Elimination of "Golden Week"**

      50.      From 2006 to 2013, Ohioans had approximately five days at the start of the early in-person no-excuse absentee voting period when they could register and vote at the same time. The period was known by some as "Golden Week" (*i.e.* same-day registration or SDR). Ex. 15 p. 15 (Hood report). Following legislation in early 2014, Ohio's early in-person voting period was changed to begin after the registration cut-off. *Id.* at 3, 12; Ohio Rev. Code § 3509.01(B)(2)-(3). Voters can still register up to 30 days before an election. Vol. IV 34:14-21. (Hood)

      51.      The 2014 and 2015 general elections proceeded without SDR. *Id.* 30:22-24.

      **1.**      **Ohio has one of the longest early voting periods in the nation**

      52.      The overwhelming majority of States do not have SDR. Thirty-six jurisdictions, including Ohio, do not provide SDR or election-day registration ("EDR"). Ex. 14 ¶¶108-109 (Trende report).

      53.      Even after the elimination of Golden Week, Ohio's early voting period remains one of the longest in the nation. In the 2016 general election there will be only *three* fewer days for early in-person voting than in the 2012 general election, which included the SDR period. *Compare* Ex. 14H (2012 voting calendar) *with* Ex. 14J (2016 voting calendar).

      54.      In the 2016 general election, Ohio will offer 23 days when a voter can cast a ballot early in-person. Ex. 14 ¶43 (Trende report). Those 23 days will be spread over a 29-day period. *Id.* ¶¶34-35. During those 23 days, there will be 207 hours during which a person will be able to cast a ballot before election day in-person. *Id.* ¶92. Many of the early voting hours are on weekends, in evenings, and in early mornings. *Supra* ¶37.

      55.      In 2016, there will be 24 weekend early voting hours; in 2012, there were only 10.

*Compare* Ex. 14H (2012 voting calendar) *with* Ex. 14J (2016 voting calendar). Including election day, Ohio will have 220 in-person voting hours. Ex. 14J (2016 voting calendar).

56. All States that have a higher share of African Americans in their population offer fewer early voting days than Ohio, with the exception of Illinois. Ex. 14 ¶62 (Trende report). Of the twenty-one States (Washington D.C. included) with an African American population of 10% or greater, Ohio has the second-most number of early in-person voting days. *Id*. ¶¶62-63. Of those twenty-one States, nineteen[6] do not offer SDR or EDR. *Id.* ¶¶62, 108.

## 2. The elimination of Golden Week did not decrease voter participation

57. Hood concluded there is no "evidence for th[e] hypothesis" that "eliminating same-day registration during the first week of the early in-person voting period will depress turnout." Ex. 15 p.14 (Hood report).

58. Even when Golden Week existed, the "vast majority" of new voter registrations occurred "outside of the golden-week period." Vol. IV 32:10-19 (Hood). For example, there were 541,421 new registrations in 2012. Ex. 15 p. 7 (Hood report). Only 5,844 (1.08% of the total) of registrations were during Golden Week. *Id.* Less than one-third of those 5,844 new registrations (1,789) were in Ohio's three largest urban counties. *Id.* at 8; Vol. IV 33:8-14 (Hood). The numbers correspond to an extremely low percentage of the total vote: 0.10% in Cuyahoga, 0.16% in Franklin, and 0.05% in Hamilton. Ex. 15 p. 8 (Hood report).

59. Voter registration cards are readily available in Ohio. Perlatti testified:

Registration cards [are] at the local libraries, at many of the municipal city halls, high schools have registration cards. So there's various locations in the county where they will have those cards. And county treasurer's office have them. Cards [are] at health and human services agencies run by Cuyahoga County . . . [Voters] can [also] print out a form off of our Cuyahoga County website, provide a writable PDF that someone can complete and print.

---

[6] The number will fall to eighteen when Maryland implements SDR. Ex. 15 pp. 20-21 (Hood report).

Vol. II p. 268:13-24 (Perlatti).

60.     Few individuals voted consistently during Golden Week in successive elections. In the 2008 general election, 8,534 voters in Franklin County chose to vote during Golden Week. Vol. IX 104:8-9 (Damschroder). Only 259 of those 8,534 individuals voted again during Golden Week in the 2012 general election. *Id*. 104:6-13. Only 61 Franklin County voters chose to vote during Golden Week in all of the past three even-year general elections. *Id*. 104:11-13.

61.     Regarding African American voting in particular, comparing 2010, an election with Golden Week, and 2014, an election without Golden Week, McCarty calculated that a *higher* percentage of African American voters voted early in 2014. Ex. 20 p. 8 (McCarty rebuttal). McCarty testified that his findings contradict Plaintiffs' claim "that people who were taking advantage of early voting are, in some sense, low propensity or marginal voters who are voting primarily because it was convenient in 2010 but no longer convenient in 2014." Vol. III 60:10-19 (McCarty). Instead, the data "[s]eems to suggest the opposite." *Id*. 60:17.

62.     McCarty also established that African Americans who voted early in-person in 2010 during Golden Week, or on other early voting days that were eliminated in 2014, "voted at much *higher* rates than those who voted" early on calendar days in 2010 that were also in the 2014 early-voting calendar. Ex. 20 p. 12 (McCarty rebuttal). In other words, African Americans who voted in the past during Golden Week "are among the highest propensity voters" and "simply switched to another day of early voting or voted by mail." *Id*. at 12-13. He testified:

> Among African-Americans we actually find the counterintuitive finding that having voted on an eliminated day is associated with higher participation in the 2014 election. Again, I don't think that change in election laws caused that increase but I do think it's associated with the idea that those African-Americans who use early voting tend to be highly engaged and persistent voters and therefore, they were not impacted substantially by the changes in Ohio law.

17

Vol. III 71:22-72:4 (McCarty).

63.     Plaintiffs did not provide evidence of racial differences in the use of Golden Week.  In fact, Timberlake found that voters in his "low-minority" counties used Golden Week more than voters in his "high-minority" counties.  Vol. V 100:5-13 (Timberlake); *see also* Ex. 17 ¶51 (Trende rebuttal) (observing that Timberlake's data showed that "Golden Week was more popular or roughly as popular in low minority counties as in high minority counties.").

64.     Other States where early voting was shortened much more than in Ohio are illustrative.  In 2013, North Carolina reduced its early voting period from 17 to 10 days and eliminated SDR.  Ex. 15 p. 21 (Hood report).  In 2014, with the shorter early voting period and no SDR, African American turnout greatly increased, with a 45.03% turnout in 2014 compared with a 36.00% in 2010.  *Id*. at 23.

65.     In 2011, Georgia reduced its early voting period from 45 to 21 days and eliminated two-weeks of SDR.  *Id*. at 29.  Despite the 53.3% decrease in days of early voting, African American turnout in 2014 exceeded 2010 by 4.9%.  *Id*. at 30.  Notably, in 2011, Georgia was a Section 5 pre-clearance State and the Department of Justice did not interpose an objection to Georgia's reduction in days and the elimination of SDR.  *Id*.

### 3.     Bipartisan support existed for the elimination of SDR

66.     Both Democrats and Republicans in the General Assembly have advocated for the elimination of Golden Week.  For example, in 2009, two House Democrats sponsored H.B. 260, a bill that would have eliminated SDR.  Sub. H.B. 260 (Ohio 2009).

67.     Democratic and Republican election officials also have supported the elimination of SDR.   Ex. 15 p. 13 n.32 (Hood report).   The OAEO also has consistently supported eliminating the overlap of registration and voting.  *Id*. at 15-16.

**4. Golden Week created opportunities for fraud and damaged voter confidence**

68.     Golden Week increased the risk of fraud.  Ex. 15 p. 15 (Hood report); Ex. 18 p. 16 (Hood rebuttal).  Witnesses at trial explained this risk and provided examples.  Poland testified that Hamilton County officials discovered two instances of voter fraud during Golden Week in 2012.  Vol. IX 17:9-12 (Poland).  Ward testified that there have been instances of voter fraud in Madison County.  Vol. VIII 235:2-25 (Ward) (not limited to Golden Week).  Damschroder described instances of Golden Week fraud in Franklin County.   Vol. IX 106:3-107:15 (Damschroder).  He also testified that "registration fraud" is "the most prevalent" type of fraud "that boards of elections have to work against."  *Id*. 111:8-10.  Notably, one of the original Plaintiffs in this litigation (the Ohio Organizing Collaborative) is under investigation for potential voter registration fraud.  *Id*. 111:22-112:5.  Even Minnite admitted that voter fraud exists.  Vol. VII 58:3-5 (Minnite) (not limited to Golden Week).

69.     Hood reviewed the accounts of several county election officials who documented instances of fraud or potential fraud associated with Golden Week.  Ex. 15 p. 15 (Hood report). Hood concluded: (1) "Allowing SDR certainly increases the possibility that an individual may simultaneously register and cast a ballot who may not be a *qualified* elector," (2) "there is also the possibility that a voter could cast an absentee ballot and then register and vote in another county," and (3) "Local election officials have little time to carry out the verification process . . . therefore, closing off registration prior to the beginning of early in-person voting makes practical sense . . . ."  *Id*. (emphasis in original).

70.     Eliminating Golden Week did not end the potential for voter fraud.  Vol. IX 112:12-15 (Damschroder).  It did, however, eliminate a time period when there was significant potential for fraud.  *Id*. 112:12-19.  Without Golden Week, there is a better chance that a board

will be able to confirm the status of a voter before the voter casts a ballot.  Vol. VIII 236:14-18

(Ward); Vol. IX 112:12-19 (Damschroder).

71.    Reducing the potential for fraud naturally improves confidence in the election

system.  As Ward testified:

> [Golden Week] would be the best time to commit the voter fraud if you're going
> to commit voter fraud.  So, if you get a weather forecast that says there's a chance
> of rain, do you run around and open all your windows so you have a wider open
> window, or do you close all your windows when there is a chance of rain?  So I
> look at it, when there is a chance of voter fraud, I don't increase the amount of
> chance for voter fraud. I try to eliminate it.   And that's why OAEO voted to
> eliminate golden week, because we saw, as an organization professionally running
> elections, that's the greatest time for voter fraud to occur.

Vol. VIII 253:10-21 (Ward).

72.    Minnite admitted that "a state has a rational reason to guard against fraud in

elections" and an interest in deterring fraud.  Vol. VII 61:25-62:7 (Minnite).

### 5.    Golden Week caused administrative burdens, generated disproportionate costs, and created the potential for confusion

73.    *Administrative burdens*.   Hood concluded that "a number of local election

officials pointed specifically to the . . . administrative burdens associated with the initial week of

early in-person voting (Golden Week), including hiring additional staff and/or paying overtime."

Ex. 15 p. 15 (Hood report).  Ward and Poland testified that five weeks out from an election is an

extremely busy time for boards.  Vol. VIII 227:16-20 (Ward); Vol. IX 14:3-4 (Poland).  Ballots

can be changed up to 40 days before an election.  Vol. VIII 227:20-22 (Ward).  After that is

completed, boards conduct "logic and accuracy" tests to make certain that every potential

sequence of votes on a ballot is recorded by the voting machine.  *Id*. 228:1-7; Vol. IX 14:14-17

(Poland).  This is a busy time for processing absentee ballot applications and voter registrations.

Vol. VIII 228:22-230:4 (Ward); Vol. IX 14:10-13 (Poland).  Ward testified that in Madison

County, employees may need to work until 9 PM or 10 PM to complete the day-to-day work

during this busy period.  Vol. VIII 231:18-24 (Ward).

74.     Based on the administrative burdens on boards during this time period, a bipartisan OAEO task force in 2010 recommended that early voting should not begin until 21 days before election day.  *Id.* 232:14-19.

75.     *Costs*.    Hood stated "that there is a monetary cost associated with the administration of early in-person voting" and specifically with Golden Week.  Ex. 15 pp. 15-16 (Hood report).   He provided the example of Tuscarawas County, where the cost of elections increased by 41.7% from 2004 to 2012.  *Id*. at 16.

76.     Munroe testified that Golden Week caused Mahoning County to incur "a few thousand dollars" in extra expenses—for only 60 to 70 voters.  Vol. VII 96:7-24 (Munroe).

77.     *Voter confusion and orderly elections.*   Golden Week created the potential for voter confusion.  Munroe testified:

> [W]hen golden week first became a reality, I was very concerned that voters could become confused, because oftentimes people hear stories on the news, the radio, or television, they hear about something that was in the paper, and they hear that, oh, election day is coming, and, hey, we can -- we can just show up and register and vote at the same time, without having an appreciation for that is a very -- there is a very narrow window to do that.

Vol. VII 98:1-8 (Munroe).  Damschroder also testified that "clear, defined" time periods help eliminate confusion and promote orderly elections:

> [T]here is value in having a registration period and having that registration period ending, and then having a voting period start and then having that period ending and then having election day.  So that you have blocks of times that people can understand this is registration time.  All right, everybody, registration time has ended.  Now we're in voting time.  And so then we do that and then voting time has ended and now it's election day.  At 7:30 p.m. voting has ended.

Vol. IX 112:25-113:11 (Damschroder).

**D.     The Challenge to One Early Voting Center in Each County**

78.     Ohio counties have never had more than one early in-person voting site.  Ohio

Rev. Code § 3501.10(C). Boards may use their regular office for early voting or instead use a different location. *Id.* Plaintiffs contend that Ohio must have many more early voting sites; they seek to "require Secretary Husted to direct each county to provide a reasonably equitable number of EIP voting locations on a population-per-county basis." Am. Compl., Doc. 41, ¶99.

### 1. Plaintiffs' demand entails 784 additional centers and would cost over $60 million

79. Trende calculated the number of early voting centers that Ohio would be required to add under Plaintiffs' population-per-county theory. To obtain rough proportionality, he used the smallest counties as the baseline and assigned each of those counties one early voting center. Ex. 14 ¶78 (Trende report). Ohio would need to add *784 early voting sites* to reach a roughly proportionate number of centers measured against the population size of each county. *Id.* ¶¶84-85. For example, Cuyahoga County would need to add 98 sites; Franklin County, 88; Hamilton County, 61; Montgomery County, 40; Lake County, 17; Miami County, 7; and Belmont County, 5. Ex. 17 ¶64 (Trende rebuttal).

80. The cost for these additional voting sites would be enormous. Ex. 14 ¶85 (Trende report). Using a conservative number, Hamilton County would need to spend $4.5 million on new voting locations. *Id.* ¶87. The cost to Montgomery County would be $3,032,000. *Id.* Cuyahoga County would have to spend $7,428,400. *Id.* ¶78 (98 sites x $75,800). The total cost, again conservatively tabulated, would be $60 million statewide *per election*. *Id.* ¶85.

81. If Plaintiffs' theory became the law, there would be profound implications for every State. Across the nation, there is great variation in the number of voters served by early voting centers. On one end of the spectrum is Loving County, Texas, which has one early voting center for 73 voters. *Id.* ¶70. At the other end is Los Angeles, which has one early voting center for 7,416,397 voters. *Id.* ¶72. No State, with the possible exception of Nevada, apportions early

voting centers according to county population. *Id*. ¶¶74-82.

82. To reach Plaintiffs' formula, *every* State would need to make dramatic changes. As a few examples, Montana would be required to open 1,956 centers, Colorado 6,507, California 30,372, and Texas 249,550. *Id*. ¶84. States that do not have early voting would be forced to open numerous sites. Michigan, for example, would have to open 4,257 early voting locations. *Id*. ¶95. Pennsylvania would need to open 2,418 locations. *Id*.

### 2. Early voting centers are closer to minorities and Democrats

83. In nearly all of Ohio's counties, the early voting location is closer, on average, to minorities and Democrats. Trende depicted the location of early voting sites in every county having an African American population of 5% or more. *Id.* ¶¶114-56. The maps speak for themselves. But, as Trende summarized, "The early voting centers tend to be placed closer to nonwhite and Democrat voters than to white and Republican voters." *Id*. ¶111.

84. Across all counties, non-Hispanic white voters must travel on average two miles farther than African Americans to reach the early voting center. Ex. 17 ¶62 (Trende rebuttal, providing averages weighted by county population). Non-Hispanic white voters travel 1.4 miles farther than Hispanic voters. *Id.* Democrats are also favored. On average, Democrats are one mile closer than Republicans to their early voting location. Ex. 14 ¶157 (Trende report).

85. The disparity in Cuyahoga and Montgomery Counties is much more. In Cuyahoga County, non-Hispanic white votes are on average 3.6 miles farther from the early voting center than African American voters and 3.3 miles farther than Hispanic voters. Ex. 17 ¶62 (Trende rebuttal). On average, a Cuyahoga Democratic voter is 2.5 miles closer than a Cuyahoga Republican to the early voting location. Ex. 14 ¶157 (Trende report). In Montgomery County, non-Hispanic white voters are on average 2.7 miles farther from the early voting center than African American voters and 1.2 miles farther than Hispanic voters. Ex. 17 ¶62 (Trende

rebuttal). A Montgomery Democrat is on average 1.8 miles closer than a Montgomery Republican. Ex. 14 ¶157 (Trende report).

86. Hood observed that the location of early voting sites "advantage[s] racial/ethnic minorities and Democrats." Ex. 15 p. 10 (Hood report). Timberlake admitted that the cost of voting would be lower for minorities than for whites if minorities reside on average closer to the early voting center. Vol. V 130:14-24 (Timberlake).

### 3. Spreading resources to multiple sites would create administrative burdens and lengthen wait times

87. The counties in Ohio that use DRE machines designate those machines for either early voting or for voting on election day. Vol. IX 132:2-11 (Damschroder). Technological and logistical issues, as well as best-elections practices, effectively preclude counties from using early-voting DRE machines again on election day. Ex. 15 p. 11 (Hood report); Vol. IX 132:2-11 (Damschroder). Plaintiffs' theory, if implemented, would force Ohio counties to spread their voting machines across numerous early voting sites. Ex. 17 ¶63 (Trende rebuttal).

88. Allen calculated the effect of spreading finite DRE resources to multiple sites and concluded "that using a single location in 2012 was more desirable from a waiting line point of view." Ex. 16 ¶1 (Allen report). He calculated that "if 100 machines had been spread out between 10 locations in Franklin County, my approximate model suggests that lines would have increased from approximately 7.7 minutes to approximately 83 minutes on average." *Id*. ¶¶1, 25. Of course, 10 early voting locations are far fewer than the 88 locations in Franklin County that would be required under Plaintiffs' case theory. Ex. 17 ¶64 (Trende rebuttal).

89. With multiple early voting centers, counties would also either need to hire more staff or spread out existing staff to serve the early voting sites. Ex. 15 p. 11 (Hood report). The logistical, real estate, IT, and financial burdens would be substantial. As Damschroder testified:

> I think having multiple locations for in-person early voting can introduce a number of administrative challenges and logistical challenges.  Where are the locations going to be?  Are you going to just rent them for the two months a year?  Is that going to result in moving from election to election?  The IT issues are significant to make sure that if you have multiple locations that when a voter checks in at one location, it populates the voter file for all the locations so that the person can't then turn around and go to the next location.  Staffing, resource allocation, all of those things are challenges.

Vol. IX 98:13-23 (Damschroder).  Poland raised many of the same issues.  Vol. IX 20:11–22:13 (Poland).  She also expressed concern about relying on temporary workers as opposed to her full-time staff, who are much more knowledgeable about election procedures.  *Id.* 21:12-19.

### 4.  Boards are able to staff the early voting site according to need and to position it in a convenient location for access by public transportation

90.    Ohio's counties are able to allocate resources at their early voting location according to need.  Ex. 15 p. 11 (Hood report).  And, the capacity for early in-person voting is "very much a function of the resources deployed by a county to its early voting site."  Ex. 18 p. 12 (Hood rebuttal).  In 2012, Franklin County, one of Ohio's most populous counties, allocated 100 DRE machines to its early voting location and had 35 poll workers available to assist with voter check-in.  *Id.*  Counties can adjust their allocation of resources over time.  For example, for the 2016 general election, Franklin County expects to increase the number of DREs in the voting center to 125.  *Id.*  Franklin County plans to have a "state-of-the-art" early voting center ready for the 2016 presidential election.  Vol. I 238:24-239:2 (Anthony).

91.    The early voting location in most counties is situated in or near the county's major population center.  Ex. 14 ¶¶113-56 (Trende report).  By way of example, Anthony testified that "probably 60 percent of the voters in Franklin County live in that general area based on the voting population, eligible voters."  Vol. I 237:20-25 (Anthony).

92.    Trende concluded that "early voting centers are often placed in areas designed to be most accessible to voters."  Ex. 17 ¶61 (Trende rebuttal).  Franklin County's early voting site

is intentionally located on a public transportation route.  Vol. I 237:9-13 (Anthony).  Cuyahoga County's early voting location is "on the bus line" and has good freeway access.  Vol. II 252:7-11 (Perlatti).  In Hamilton County, the voting location is at the Board of Elections—a "central hub for public transportation in Cincinnati" and "minutes away from 71 and 75, major interstates."  Vol. IX 20:3-7 (Poland).

### 5. Counties cannot afford additional early voting locations and Plaintiffs did not prove there is a need for more locations

93.     Timberlake admitted that, if there is no mention of "discretion" in the Amended Complaint (and there is not), then he "may have had a flawed understanding of what relief was that Plaintiffs sought."  Vol. V 129:10-13 (Timberlake).  The pleading states that Plaintiffs seek *mandatory* additional early voting centers.  Am. Compl., Doc. 41, ¶ 99.[7]

94.     Nonetheless, even if Plaintiffs are seeking county discretion to add more early voting centers, Plaintiffs did not introduce any evidence that one early voting center in each county is insufficient to handle the needs of voters.

95.     Nor did any witness assert that the county boards actually want more than one early voting location.   When McNair discovered that Plaintiffs were seeking mandatory additional early voting centers, he called the Plaintiffs' counsel for assurances that they were only seeking discretion to add new sites.  Vol. V 34:6-36:6 (McNair).  Perlatti testified that opening a second location in Cuyahoga County "would be very difficult."  Vol. II 258:9-12 (Perlatti).  Poland testified that Hamilton County's board does not have sufficient money in its current budget to open a second early voting center.  Vol. IX 22:21-23 (Poland).  Anthony was

---

[7]     Had Plaintiffs wanted to allege a different theory, they should have amended their Complaint to do so.  *Tucker v. Union of Needletrades*, 407 F.3d 784, 788 (6th Cir. 2005) (recognizing that amendment is the proper means to "advance a new claim" and that otherwise allowing a plaintiff to shift claims at late stages "would subject defendants to unfair surprise").  Plaintiffs did amend their Complaint—but their legal theory remained the same.

ambivalent on more early voting sites.  Vol. I 218:22-219:5 (Anthony).  Damschroder testified that "the logistical challenges for multiple locations would be particularly acute for smaller counties."  Vol. IX 100:15-21 (Damschroder).  Munroe testified that the Mahoning County's board's budget could not accommodate an additional early voting site and that there is no need for more early voting locations: "I think Ohio has got many opportunities for voting right now. Voting has never been easier or more convenient."  Vol. VII 103:9-104:5 (Munroe).

96.     While Timberlake asserted that larger counties will experience longer lines and more crowding at a single center (Vol. V 100:14-22 (Timberlake)), he did not know that boards are permitted to add voting machines and equipment to their early voting sites, (*id*. 100:23-101:2).  He also did not know that boards can add staff.  *Id*. 101:15-20.  He conceded, "I think I didn't know much about how county boards do their work, that's correct."  *Id*. 101:19-20.

97.     Under Plaintiffs' evolving, unpled discretion theory, counties could end up with a patchwork of procedures, where there would be inconsistency within congressional (and school) districts, among others.  As Damschroder testified, congressional districts do not fit neatly within counties.  If some counties have more early voting centers than other counties, this would result in different voting opportunities within a single district.   Vol. IX 101:9-22 (Damschroder). Inconsistencies could also develop over time, as new board members and new Secretaries take office and change the number of early voting locations.  *Id*. 100:22-101:8.

98.     And under such a discretion theory, wealthier counties would have more flexibility to add sites; economically depressed counties would not have the same luxury.

**E.     The Challenge to the Revised DRE Formula**

99.     Counties in Ohio are permitted to choose the type of voting equipment that best fits their needs.  Ohio Rev. Code § 3506.02; Vol. IX 83:16-20 (Damschroder).  Some use DRE machines, while others do not.  Ohio Rev. Code § 3506.01(F).   Of the five most populous

27

counties (Cuyahoga, Franklin, Hamilton, Summit, and Montgomery), only Franklin and Montgomery Counties use DRE machines.  Ex. 14AA (Ohio voting systems map).

100.    By statute, counties that choose to use DRE machines are required to maintain a certain number in their inventory.  Ohio Rev. Code § 3506.22.  In 2006, the General Assembly set the ratio at 1 machine for every 175 registered voters within a county.  Vol. IX 84:14–85:16 (Damschroder).  But after the DRE ratio was initially set, the voting landscape in Ohio changed with the expansion of early in-person absentee and mail-in absentee voting.

101.    In 2014, the General Assembly updated the ratio.  Am. S.B. 200 (amending Ohio Rev. Code § 3506.22(B)).  Under the new formula, the ratio remains at 1:175, but the denominator is now calculated by subtracting the number of absentee ballots counted in the last presidential election from the greater of either, (i) *the total number of registered voters* in the county at the voter registration deadline in the last presidential election, or (ii) *the average of the total number of registered voters* in the county as of the voter registration deadlines for the last two presidential elections. Ohio Rev. Code § 3506.22(B); Vol. IX 81:19-25 (Damschroder).  In other words, the ratio now accounts for absentee voting.  *Id*. 82:6-13.

102.    Ohio has the best ratio of DRE machines to population in the country.  Ex. 14 ¶170 (Trende report).  Ohio would have to divest itself of more than 60% of its DRE machines to drop below the national median for DRE machines per population.  *Id*. ¶171.

### 1.    The new formula appropriately balances cost and voting trends

103.    Given that about 26% to 33% of voters voted early in recent elections (Ex. 15 p. 6 (Hood report)), Hood concluded that the new formula makes "intuitive sense," (*id*. at 31).  Trende stated, "It makes sense that as fewer voters make their way to the polls, fewer machines will be needed to support Election Day electors."  Ex. 17 ¶78 (Trende rebuttal).  Allen testified that the new formula is a more qualitatively "thoughtful approach" because it subtracts "people

[who] have already voted" from election day administration.  Vol. VII 186:8-14 (Allen).

104.    The new formula allows counties to account for this shift to absentee voting when allocating resources.  Damschroder testified that the new formula is reasonable:

> because the . . . machine allocation is primarily for election-day machine inventory.  And it seems reasonable for a board to be allowed to exclude from any future purchases of voting machines that happen to be DREs, . . . voters who have . . . demonstrated a willingness to vote absentee before election day and not use -- not need to use the service of a DRE on election day.

Vol. IX 82:7-13 (Damschroder).  The bipartisan County Commissioners Association of Ohio supported the change.  *Id*. 82:1-5.

### 2.        Under the new formula, counties have retained their DRE inventories

105.    Plaintiffs introduced no evidence that counties have reduced their existing DRE inventories.  The evidence shows the opposite.  Ex. 17 ¶¶77-81 (Trende rebuttal).

106.    The Secretary instructed counties not to divest themselves of DRE machines, even if their stock exceeds the statutory floor.  Ex. 14BB (Adv. 2014-03).  In addition, counties may (and do) exceed the required minimum.  Ex. 15 p. 31 n.82 (Hood report); Vol. IX 96:7-18 (Damschroder).  The new formula sets a floor for DRE machines—not a ceiling.  It does not preclude counties from purchasing more DRE machines than the minimum.  Vol. IX 96:24-97:5 (Damschroder).

107.    Allen testified that Plaintiffs' assumption that counties will necessarily drop to the minimum is wrong.  Election administrators "want to run an election" and do what they can to avoid "really long lines."  Vol. VII 205:5-13 (Allen).  In other words, election administrators are interested in serving the needs of voters.  *Id*. 207:24-25.

108.    Allen testified that "catastrophic failure" of DREs is "fairly rare."  *Id*. 132:3-21.

### 3.        The new formula enhances flexibility in election administration

109.    The new formula favors election administration.  The 1:175 ratio applies, in

addition to counties as a whole, to individual precincts. Ex. 62 (Dir. 2014-26). With inventories unchanged, the new formula gives boards greater flexibility to apportion DRE resources to the precincts where the machines are most needed. Vol. IX 95:11-23 (Damschroder).

110. The Secretary directs the boards to consider "contests on the ballot in each political subdivision to determine whether or not the board should exceed the minimum requirements of state law" for DREs/ballots. Ex. 27 (Dir. 2015-05). Boards must account for the anticipated turnout in an election when deciding how many DRE machines to deploy, even if that number exceeds the statutory floor. Damschroder testified that boards "should take into account" whether particular precincts have a "hot local issue" such as a "school levy or something of that nature." Vol. IX 95:11-15 (Damschroder). DRE machines are allocated to precincts during a public meeting of the county's board. Ohio Rev. Code § 3501.11(I).

111. Allen concluded that the new formula is more appropriate and is "qualitatively closer to an ideal provisioning approach." Ex. 16 ¶31 (Allen report). Allen observed that the original formula, one machine for every 175 registered voters, "is quite arbitrary" and does not account for relevant information, including the number of early voters. *Id*. ¶30. Thus, a change back to the old formula "would likely not help to ensure higher quality elections." *Id*. ¶31.

112. He testified that the new formula is "a conceptual step towards a formula that is supported by applied waiting-line analysis, or queuing theory." Vol. VII 129:21-24 (Allen). He explained that a best-practices approach is to apportion voting machines on election day based not only on expected turnout but also based on "variable ballot" length. *Id*. 208:3-12. He stated that ballot length in a single election in one county can vary significantly, with "some places hav[ing] twice-as-long ballots as others." *Id*. 209:2-17.

113. DRE counties must also have a back-up plan in the event of long-lines. The plan

can involve giving voters the option of filling out paper ballots. Ex. 63 (Dir. 2014-23).

**4. Plaintiffs' experts based their opinions on flawed assumptions**

114. Plaintiffs presented no evidence that the extra DRE machines "will be removed from heavily minority neighborhoods" (Ex. 17 ¶81(Trende rebuttal)) or that existing DRE inventories will be depleted (Vol. V 106:11-13 (Timberlake)).

115. Timberlake admitted that he wrote his report under the incorrect assumption that the new formula "would reduce the number of DRE machines available to the voters." *Id*. 105:3-16. He did not know that the new formula sets a "floor," and he conceded that the new formula "does not necessarily mean that . . . there will be a greater reduction in the number of DRE machines available to voters." *Id*. He also stated that he "missed" the part in Advisory 2014-03 instructing boards not to divest themselves of their DRE inventory. *Id*. 105:17-106:9.

116. Yang did not know of any county that would reduce its DRE inventory. Vol. III 204:6-10 (Yang). He did not discuss the back-up optical scan procedures in his report. *Id*. 202:18-25. He did not support his assumption, that the challenged laws would cause more individuals to vote on election day, with any empirical analysis. *Id*. 205:23-25. McCarty's empirical research contradicted Yang's assumption. Ex. 20 pp. 13-14 (McCarty rebuttal).

**F. The Challenge to the New Absentee Ballot Envelope Identifiers (Date of Birth and Pre-Printed Address)**

117. In 2006, Ohio changed its laws to permit any registered voter to cast an early absentee ballot for any reason, *i.e.* "no-excuse absentee voting." Ex. 14E (Dir. 2014-18).

118. To cast an absentee ballot, a voter is required to fill out and return an application to their boards. Ohio Rev. Code § 3509.03; Ex. 14E (Dir. 2014-18). For identification purposes, the application requires the voter's (i) name, (ii) address, (iii) date of birth, (iv) signature, and (v) a method of identification, such as a driver's license number or state identification number,

the last four digits of the voter's social security number, or a copy of a document (*e.g.* a current utility bill) showing the voter's address. Ohio Rev. Code § 3509.03; Ex. 14E (Dir. 2014-18).

119.    After verifying the voter's eligibility, the board provides the voter with a ballot and a ballot envelope. Ex. 14E (Dir. 2014-18). The voter can return the ballot envelope by mail or drop it off at the board (a voter's family member can also deliver the ballot). *Id.* Some boards maintain a secure drop box, allowing voters to drop off their ballot at any time. Vol. I 235:22-236:5 (Anthony); Vol. IX 20:8-10 (Poland); Vol. IX 64:5-16 (Damschroder).

120.    The required identifiers on the ballot envelope mirror the information required on the ballot application: the voter's (i) name, (ii) address, (iii) date of birth, (iv) signature, and (v) a form of identification. Ohio Rev. Code § 3509.06(D)(3)(a). The voter's name and address are pre-printed on the envelope. Ex. 26 (Dir. 2014-17). *That means that on the envelope, a voter needs to only provide three items*: (1) date of birth, (2) a form of identification, and (3) signature.

121.    The only envelope identifiers S.B. 205 (the bill Plaintiffs challenge) added to this process were date of birth and address (which is pre-printed). Sub. S.B. 205 (Ohio 2014).

122.    Notably, only the month and day of the date of birth need to be accurate; the year can be incorrect and the ballot will still be processed. Ohio Rev. Code § 3509.06(D)(3)(a)(iii)(I); Vol. IX 116:22-117:7 (Damschroder). And even if a voter provides a nonmatching date of birth, if the absentee voter provides all other information the vote may be counted. Ohio Rev. Code § 3509.06(D)(3)(a)(iii)(III) (requiring a vote of at least three board members).

### 1.    A process exists if information is missing from the envelope

123.    If an absentee ballot envelope is missing required information, the board must send notice to the voter, detailing the defect, and the voter has until seven days after the election to cure the defect. Ohio Rev. Code § 3509.06(D)(3)(b); Ex. 26 (Dir. 2014-17); Ex. 15 pp. 37-38 (Hood report). In such an instance, the board contacts the voter (with a courtesy reply envelope)

to enable the voter to cure the defect. Ex. 26 (Dir. 2014-17). The board is permitted to identify the specific information that is missing or inaccurate. *Id*.

### 2. The two new identifiers create uniformity

124. The challenged law creates uniformity. The same fields are now required on the absentee ballot envelope and on the absentee ballot application. Ex. 15 p. 37 (Hood report).

125. Likewise, the same five fields are required on provisional ballot identification envelopes. Vol. IX 25:16-18 (Poland). The same fields also are required for voter registrations. Vol. IX 119:3-11 (Damschroder). This uniformity across procedures reduces confusion:

> [T]here's been a lot of talk going back to 2008 about the five fields and that there's five fields required for voter registration: Name, address, date of birth, form of identification, like the last four of your social or your driver's license number, and your signature. *And that it makes sense to have those same five elements* you use to register to vote be the same five elements you use to request an absentee, be the same five elements you would use to cast an absentee.

*Id.* 119:2-11 (Damschroder) (emphasis added).

### 3. The identifiers reduce the risk of fraud

126. The envelope identifiers "ensure[] that the individual casting the ballot is, indeed, the individual who was sent the absentee ballot." Ex. 15 p. 37 (Hood report); *see also* Ex. 17 ¶76 (Trende rebuttal). Minnite testified that the risk of voter fraud is higher with mail-in ballots. Vol. VII 67:14-25 (Minnite).

127. A birthdate requirement adds security to the process by helping to ensure that the proper voter is casting the ballot. Poland provided examples from the 2012 election where individuals cast mail-in ballots on behalf of other people. Vol. IX 24:12-25:3 (Poland).

### 4. The additional fields assist with orderly and efficient election administration

128. Damschroder testified that "having more information is helpful to specifically hone in on a particular voter in the voter file. . . . Having multiple different data elements to kind

of triangulate, if you will . . . the right person." Vol. IX 120:20-121:5 (Damschroder). He explained that there are some voters in county databases who share even the same first and last name and the last four digits of their social security numbers. *Id*. 121:6-11.

129.    Poland testified that the added information "allows us to accurately identify the voter." Vol. IX 24:3-11 (Poland). Ward stated, "Birthday is . . . from an election-administration standpoint . . . the best piece of information we can garner." Vol. VIII 259:14-16 (Ward).

130.    The OAEO supported adding the two identifiers. *Id.* 237:10-19.

### 5.    Plaintiffs did not show any racial disparity

131.    "Ohio has a relatively low rate of absentee ballot rejections" (1.5%), and two-thirds of rejections are because voters missed the filing deadline. Ex. 17 ¶70 (Trende rebuttal).

132.    McCarty calculated that African Americans and other racial groups used vote-by-mail in 2014 at nearly identical rates. Ex. 20 p. 14 (McCarty Rebuttal). Thus, providing one's birthdate on the ballot envelope did not dissuade minorities from voting by mail.

133.    Plaintiffs did not introduce evidence that African American voters' absentee ballots are rejected more than the absentee ballots cast by white voters. Ex. 17 ¶¶68, 74 (Trende rebuttal); Ex. 18 pp. 13-14 (Hood rebuttal) (stating that Timberlake lumped together mail-in absentee ballots and in-person absentee ballots, and Timberlake's calculations were "based upon an aggregate-level estimation technique that does not permit the necessary precision to make racial inferences"); Vol. V 107:22-108:8 (Timberlake admitting same). Furthermore, Plaintiffs provided no expert testimony about *why* absentee ballots are rejected. Ex. 17 ¶69 (Trende rebuttal); Vol. V 107:11-17 (Timberlake admitting same).

### 6.    Ohio's innovation regarding absentee ballots

134.    Board websites enable voters to track the status of their absentee ballot, from application to acceptance. Ex. 14G (Dir. 2015-02).

135.    In the States that do permit early voting by mail, practices vary widely, with some States requiring much more than Ohio, such as a notarization.  Ex. 14 ¶175 (Trende report); Ex. 17 ¶73 (Trende rebuttal).  Alabama requires a voter to provide an excuse and requires a notarized affidavit or two witnesses.  Ex. 14 ¶175 (Trende report).  Hawaii and North Dakota do not give voters an opportunity to cure mistakes.  *Id.* ¶¶177, 179.  In Illinois, there is no uniformity, with individual counties deciding whether to mail ballots and local boards given the discretion whether to strike ballots for errors.  *Id.* ¶180.

136.    Lastly, Ohio has been responsive to feedback.  Damschroder described a meeting with Plaintiffs' local counsel before this litigation commenced where they discussed uniformity and pre-printing addresses on absentee ballots.  Vol. IX 115:19-116:6 (Damschroder).  Subsequent to those discussions, Ohio began pre-printing addresses on the envelopes.  *Id.*

### G.    The Challenge to Mailing Absentee Ballots Statewide

137.    Following implementation of no-excuse early absentee voting in 2006, a few counties began mailing unsolicited absentee ballot applications to voters.  Vol. IX 55:8-15 (Damschroder).  Franklin County was the only county that mailed applications in the 2006 election.  *Id.* 61:8-11.  For the 2008 election, "the General Assembly had appropriated a little bit of money to help counties offset the expense of" mailing applications "if the county chose to do so."  *Id.* 61:12-14.  That year, with the help of state funds, approximately thirteen counties chose to mail applications.  *Id.*  Damschroder testified that "it was kind of a patchwork quilt of different counties doing different things as it related to unsolicited absentees."  *Id.* 62:10-13.

138.    In 2006, when Franklin County's board first mailed absentee ballot applications, it mailed them to all voters.  *Id.* 60:18-24.  The post office returned about 20 percent of the applications as undeliverable.  *Id.*  Consequently, in subsequent mailings, Franklin County excluded inactive voters from the mailing.  *Id.* 62:2-7.  In 2010, Cuyahoga County likewise

35

excluded inactive voters from its mailing.  *Id.*; Vol. II 262:2-9 (Perlatti).

139.    For both the 2012 and 2014 general elections, Secretary Husted, with funding by the General Assembly, mailed unsolicited absentee ballot applications to Ohio voters statewide. Vol. IX 54:24-55:2 (Damschroder).  Ohio will again mail applications statewide for the 2016 general election.  *Id.*   This mailing will cost approximately $1.25 million.[8]

140.    Applications are broadly mailed to (i) every registered, active voter, and (ii) every registered voter who cast a ballot in one of the past two federal general elections.  Ex. 15 p. 35 (Hood report); Ex. 14F (Dir. 2014-15).  The initial mailing is followed by a supplemental mailing to new registrants or registrants who have altered their registration.  Ex. 15 p. 35 (Hood report).  Plaintiffs challenge the laws that create this uniform state-wide mailing.

### 1.    The uniform mailing is fair

141.    The Secretary's office wanted to send applications statewide to create uniformity:

> [T]he Secretary had a long-standing view that a voter, regardless of what county they live in, should have the same opportunity to vote as another voter whether it's in a different part of the same congressional district, a different . . . city but in a different county, and wanted to make sure that all voters across the state had the opportunity to receive an absentee ballot and had the opportunity to decide whether or not they wanted to use it.

Vol. IX 55:21-56:4 (Damschroder).

### 2.    More voters receive applications with a statewide mailing

142.    The statewide mailings eliminated the patchwork of some voters receiving an application while others did not.  Ex. 14F (Dir. 2014-15).  Under the current system, many more voters receive applications than previously when only a handful of counties mailed applications.

143.    The applications are pre-printed with the voter's address.  This means that sending an application to an inactive voter who has moved would provide the inactive voter with

---

[8]     The approximate cost of these mailings was $1.4 million in 2012 and $1 million in 2014. Ex. 15 p. 36 n.97 (Hood report).

an application that he or she would not be able to use. Vol. IX 57:23-58:4 (Damschroder). Because of this, the Secretary's office mailed inactive voters a postcard in 2012 and 2014 reminding them to update their registration. *Id*. 58:17-59:6. It will do so again in 2016. *Id.*

144. The "majority of the registered voters in the state are in an active status." *Id.* 57:7-10. The mailing is limited to the active voters plus voters who have recently voted because ballot applications are "highly unlikely" to reach inactive voters. Ex. 15 p. 36 (Hood report).[9]

### 3. The mailings encourage voting and reduce election day pressures

145. The statewide mailing encourages early voting and therefore helps reduce the potential for longer lines on election day. Vol. IX 56:5-10 (Damschroder).

### 4. Absentee ballot applications are widely available

146. The statewide mailing is not the only way for voters to obtain an application for an absentee ballot. Candidates and political parties mail applications to voters. *Id.* 54:17-23. Applications are available at many libraries. *Id*. They are also available at boards and can be downloaded from the Secretary's website. *Id*. Boards may also place absentee ballot applications in public places, or post them on their website. Ex. 14E (Dir. 2014-18). Any voter can request an absentee ballot application, in writing or verbally. *Id*.

147. The challenged law does not prevent Plaintiffs from mailing absentee ballot applications. Vol. VI 124:8-13 (Beswick); Vol. II 54:1-4 (Martin); Vol. V 48:2-8 (McNair).

### 5. Ohio is one of only two States that mails absentee ballots statewide

148. Hood, Trende, and McCarty put Ohio's program in proper context. Hood observed that twenty-three States do not allow no-excuse absentee voting by mail. Ex. 15 p. 36 (Hood report). He explained that, even including the two States that are exclusively vote-by-

---

[9]     Federal law requires States to maintain accurate and up-to-date registration rolls. Ex. 64 (Dir. 2015-09).

mail (Washington and Oregon), only one State other than Ohio has mailed unsolicited absentee ballot applications statewide.  *Id.*; *see also* Ex. 14 ¶174 (Trende report).

149.    McCarty calculated that African American and white voters in Ohio mailed in their ballots in 2014 at about the same rate.  Ex. 20 p. 14 (McCarty report)(22.9% versus 22.8%).

### 6.    Plaintiffs did not provide evidence of racial disparities

150.    Timberlake admitted that when he wrote his report he did not know that the Secretary would be mailing absentee ballot applications statewide.   Vol. V 102:17-20 (Timberlake).  He asserted that the "fairest" method for sending applications would be one where "all counties were able to . . . get applications for absentee ballots to their voters."  *Id.* 104:14-21. Thus, Timberlake agrees that the present system is more equitable than the prior system.

151.    At trial, Plaintiffs appeared to raise concerns about the postage required to return an absentee ballot application.  Hamilton County's board has an arrangement with the Post Office where the Post Office will return all absentee ballots, even ones without stamps.  Vol. V 175:5-8 (Burke).  Plaintiffs introduced no evidence that other counties are unable to make the same arrangement with the postal service.  *See* Vol. VI 123:23-24:1 (Beswick).

### H.    The Challenge to the New Provisional Ballot Identifiers (Date of Birth and Address)

152.    Provisional ballots provide voters with the opportunity to vote on election day even when circumstances raise questions about their eligibility.  Scenarios that raise eligibility questions, and require provisional ballots, include: (i) the individual does not appear on the list of eligible voters for the precinct; (ii) the individual is unable to provide acceptable identification; (iii) the individual has already requested an absentee ballot (thus creating the possibility of double voting); and (iv) the individual's signature does not appear to match the signature on his or her registration form.  Ohio Rev. Code § 3505.181(A); Ex. 61 (Adv. 2014-04).

153.    A person voting provisionally must complete a ballot affirmation containing his or her (i) name, (ii) date of birth, (iii) current address, (iv) signature, and (v) include a method of identification (the broad list of permissible identification includes, among other categories, a driver's license number, the last four social security number digits, a current utility bill, a bank statement, a paycheck, a government check, and a state or federal photo identification).  Ohio Rev. Code § 3505.182; Ex. 66 (Form 12-B).  A provisional voter who does not provide identification at the time of voting has seven days after election day during which he or she can do so at the county board.  Ohio Rev. Code §§ 3505.181(B)(7), 3505.182(D)(4).  When an individual casts a provisional ballot, he or she receives notice (i) with a telephone hotline number for learning about the status of his or her ballot; (ii) explaining the reasons why additional information may be needed for his or her ballot to count; and (iii) giving instructions if he or she did not provide identification.  Ex. 14D (Dir. 2014-20); Ex. 67 (Form 12-H).

154.    The day after an election, boards begin reviewing provisional ballots.  Ex. 14D (Dir. 2014-20); *see also* Ohio Rev. Code § 3505.183(G)(1).  Boards may not start counting any provisional ballot until after the board members have determined, by majority vote at a public meeting, the validity of all provisional ballots within the county.  Ohio Rev. Code § 3503.183(F); Ex. 14D (Dir. 2014-20).  Boards must complete both this validity determination and the count of provisional ballots no later than 21 days after an election.  Ohio Rev. Code § 3505.32(A).

### 1.    The challenged law added only date of birth and address fields

155.    Statutory changes in 2014 only added two new, and basic, identification requirements for provisional ballot affirmations: current address and date of birth.  *See* Ohio Rev. Code § 3505.182; Ex. 66 (Form 12-B) (provisional ballot affirmation form).

156.    The bipartisan OAEO supported this change.  Vol. VIII 244:11-245:17 (Ward).

157.    The date of birth field requires only a correct month and day of birth.  Ohio Rev.

Code § 3505.183(B)(3)(e).  Moreover, as long as a provisional voter satisfies all other requirements, providing a non-matching date of birth does not control whether the provisional ballot is counted.  Ex. 15 p. 32 (Hood report); Ohio Rev. Code § 3505.183(B)(3)(e)(ii) (providing that an inaccurate date of birth does not require invalidation if the board finds, by a vote of at least three members, that the voter has met all other requirements).

158.    Also, if a voter's current address does not match the information in the voter registration system, and if the voter indicates he or she has moved, then the individual's provisional ballot will be counted so long as the voter has not voted elsewhere.  Ex. 15 p. 32 (Hood report); Ohio Rev. Code § 3505.183(B)(3)(f); Ex. 14D (Dir. 2014-20).

### 2.    The new fields (date of birth and address) create uniformity

159.    The two new identifiers create uniformity with the information required for voter registration.  *Compare* Ohio Rev. Code § 3505.182; *with* Ohio Rev. Code § 3503.14(A).  They also conform to the requirements for absentee ballots.  *See supra* ¶118.

### 3.    The new identification fields are reasonable and not a hardship

160.    Hood concluded, "On its face asking a provisional voter to recall and record their date of birth and residential address does not appear unreasonable."  Ex. 15 p. 32 (Hood report).

161.    The change does not mandate rejections for trivial errors.  "[P]rovisional ballots are subject to scrutiny by a group of individuals who are able to screen out what could be termed trivial errors from substantive errors."  Ex. 15 p. 32 (Hood report).  Anthony testified that election workers should not fill out the forms for voters.  Vol. I 250:8-14 (Anthony).  If they did, the worker might make an error.  *Id.*  The form is "to be filled out by the voter."  *Id.*  The law does, however, permit assistance to a blind, disabled, or illiterate voter.  Ohio Rev. Code § 3505.181(F).

**4.** **The additional fields help identify voters, determine voters' eligibility, and prevent fraud**

162.    As with the new fields required for absentee ballot envelopes, the same fields help prevent fraud in the provisional ballot context.  Ex. 15 p. 32 (Hood report); Ex. 17 ¶76 (Trende rebuttal).

163.    Poland explained that date of birth is especially useful to identify a voter:

> There [are] lots of voters that have the same first name and the same last name. And the form of ID was not always sufficient in order to identify them.  For example, they may have provided the last four digits of their Social Security number when they registered to vote, but then, when they appeared to vote at the polling place, they presented a utility bill.  And so there is nothing for us on the envelope to match that voter.  So the date of birth has helped us be able to identify the voter.

Vol. IX 27:6-14 (Poland); *see also* Vol. VIII 259:14-16 (Ward) ("Birthday is . . . from an election-administration standpoint . . . the best piece of information we can garner.").

164.    Damschroder likewise explained the value of "having additional data elements to search, first, the county voter file and then the statewide voter file to find that needle in the haystack, so to speak, to confirm the voter's eligibility so that the board can count the ballot." Vol. IX 124:2-5 (Damschroder).

**5.** **The additional fields help boards count more votes**

165.    In the 2014 general election, after the challenged laws were in effect, the number of provisional ballots accepted *increased* over the prior general elections in 2008, 2010, and 2012.  Ex. 15 pp. 33-35 (Hood report).  Only 599 provisional ballots, 0.02% of the total votes cast, were rejected due to any type of voter error.  *Id*. pp. 33-34.

166.    Poland explained that the additional fields will enable boards to count more ballots.  She stated that the date of birth helps identify voters.  This is partially because the form of identification provided on the provisional ballot (*e.g.* last four of social or utility bill) does not

41

always match the form that the voter used when registering. Vol. IX 27:2-14 (Poland). Likewise, without an address, the board has "no way of knowing where the voter lives" and "with no way of knowing if they cast the ballot in the correct location, their ballot would be rejected." *Id*. 26:17-22.

167.    Ohio has leapt in front of most other States with respect to counting provisional ballots.  In 2014, Ohio had one of the highest provisional ballot acceptance rates in the country. Ex. 17 ¶75 (Trende rebuttal).  It was one of only five states in 2014 that counted 90 percent or more of provisional ballots.  *Id*.

168.    Most provisional ballots are rejected for reasons completely unrelated to identifiers on ballots, much less because of the two identifiers added in 2014.  The most common reason for rejecting provisional ballots—representing more than half of all rejected provisional ballots in 2014—is that the individual failed to register to vote.  Ex. 15 p. 33 (Hood report).

### 6.    The additional fields enable boards to register unregistered voters

169.    The identification information on provisional ballot affirmations also serves the important purpose of allowing boards to update a voter's address in the registration records and to register previously unregistered individuals.  *Id.* at 32; Vol. IX 125:9-20 (Damschroder). Hence, the information encourages future voting.

### 7.    Ohio's requirements are not an outlier

170.    Any nationwide comparison of provisional voting laws is difficult because States use many different approaches.  *See* Ex. 14 ¶173 (Trende report).  But Ohio's requirements are not outliers.  Alabama's laws require a provisional voter's signature, name, address, date of birth, and telephone number.  *Id.* ¶175.  In Delaware, the provisional ballot process is left to the discretion of reviewers, and voters receive no notice/opportunity to cure.  *Id.* ¶176.  Virginia requires provisional voters to provide their name, address, last four digits of their social security

number, birth date, phone number, a copy of photo identification, and a signature; Virginia voters receive only three days to cure, and only as to lack of photo identification. *Id.* ¶181.

### 8. Plaintiffs did not provide evidence of racial disparities for rejections of provisional ballots

171.     Plaintiffs did not provide evidence that the minor 2014 changes will disproportionately affect minority or Democrat voters. Hood concluded, "No evidence has been provided that decomposes the provisional ballot rejection rate by race of voters in this category." Ex. 18 p. 14 (Hood rebuttal); *see also* Ex. 17 ¶75 (Trende rebuttal). Timberlake admitted that he did not calculate the percentage of African American provisional ballots that are rejected, whether minorities or whites have their provisional ballots rejected at a higher rate, or the reason why provisional ballots are rejected. Vol. V 107:22-108:8 (Timberlake).

### I.     The Challenge to the Provisional Ballot Cure Period

172.     The 2014 changes made a small reduction to the cure period during which a provisional voter may provide identification, reducing the period from 10 to 7 days. *See* Ohio Rev. Code §§ 3505.181(B)(7), 3505.182(D)(4). Plaintiffs challenge this reduction but dedicated little attention to the claim at trial or in their Pre-Trial brief.

173.     The provisional ballot process is itself a cure-process for potential irregularities. Hood observed, "Provisional balloting is not a regular form of balloting and should [ ] not be considered as such." Ex. 18 p. 14 (Hood rebuttal). The process is a method to try to count additional votes where there are issues as to eligibility. *See* Vol. IX 132:15-16 (Damschroder) (defining this is a "second chance").

174.     The 7-day period provides a reasonable window for provisional voters to supply identification, while still allowing boards a reasonable time to determine the validity of provisional ballots at public meetings and then count ballots. Ohio Rev. Code § 3505.32(A).

43

The change from 10 to 7 days provides finality before the official canvass, which starts as early as 11 days after the election, and gives boards the ability to put the ballots "in different piles based on . . . what they believe are valid provisionals" and "what has some element missing." Vol. IX 122:12-21 (Damschroder). Also, when a board "find[s] a voter who is registered to vote somewhere else in the state, they also have to contact that other county to make sure that that person didn't also cast a ballot in the other county before they count this provisional." *Id.*

175. In addition, the change in the cure period promotes uniformity and election administration by "mak[ing] the time period congruent with the cure period for absentee by mail ballots." Ex. 15 p. 33 (Hood report); Ex. 14C (Dir. 2014-27).

**J.    Multi-Precinct Voting Claim**

176. A multi-precinct voting location is a location that serves voters from more than one precinct. Plaintiffs' multi-precinct claim is moot. On December 15, 2015, after a period of public comment, the Secretary issued a permanent directive requiring multi-precinct locations to "[c]ombine the poll books for those precincts to create a single poll book for the voting location." Ex. 15 p.40 (Hood report); *see also* Dir. 2015-24. With a consolidated poll book, a voter can check in at any precinct within the multi-precinct location. Ex. 15 p. 38 (Hood report).

177. Plaintiffs admitted in their Pre-Trial brief that consolidation of poll books would moot this claim. Pls.' Tr. Br., Doc. 76, p. 42.

## PROPOSED CONCLUSIONS OF LAW

178. Plaintiffs bear the burden of proving their entitlement to relief under a preponderance of the evidence. *See United States v. Brown*, 988 F.2d 658, 663 (6th Cir. 1993). They have not met their burden with respect to the facts or the law.

## I. PLAINTIFFS DID NOT PROVE THEIR EQUAL PROTECTION CLAIM (COUNT I)

179. States have broad authority to regulate elections with neutral election laws that do

not severely burden the right to vote.  *Frank v. Walker*, 768 F.3d 744, 751 (7th Cir. 2014); *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004).  A neutral regulation might require, for example, that voters show photo identification, *Crawford v. Marion Cnty. Elections Bd.*, 553 U.S. 181, 185 (2008), register 50 days before an election, *Marston v. Lewis*, 410 U.S. 679, 680-81 (1973), or use touchscreens to vote, *Weber v. Shelley*, 347 F.3d 1101, 1107 (9th Cir. 2003).

### A.     Count I and the *Anderson-Burdick* analysis

180.    A unique "fundamental right[s]" test governing neutral election laws asks whether the law at issue unconstitutionally "burdens" the right to vote.  *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591-92 (6th Cir. 2012) ("*NEOCH*").  The level of scrutiny that applies to an election law "depends upon the extent to which [it] burdens" that right.  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

181.    To ascertain the extent of burden, courts consider the challenged law in the context of "all" of a State's voters.  *Crawford*, 553 U.S. at 202.  Courts measure a law's burden by looking at the *entire election regime*, not at the provision in a vacuum.  *See Burdick*, 504 U.S. at 435-37.

### B.     Rational basis applies to Count I and Ohio's laws easily pass the test

182.    Rational basis review applies to all of the challenged laws.  *See NEOCH*, 696 F.3d at 592; *Biener v. Calio*, 361 F.3d 206, 214-15 & n.3 (3d Cir. 2004).  The "right to vote" has never included the "right to receive absentee ballots." *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807 (1969).  An absentee ballot affords a voter a "privilege as a matter of convenience, not of right."  *Prigmore v. Renfro*, 356 F. Supp. 427, 432 (N.D.Ala. 1972), *aff'd* 410 U.S. 919 (1972).

183.    It is axiomatic that all laws almost certainly affect some people differently than others. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  Absentee-ballot laws receive higher scrutiny

*only if* a refusal to grant that option "absolutely prohibits [the challengers] from voting." *Goosby v. Osser*, 409 U.S. 512, 521 (1973); *see also Gustafson v. Illinois State Board of Elections*, No. 06 C 1159, 2007 WL 2892667, at *9 (N.D.Ill. Sept. 30, 2007) (rational basis applied because plaintiffs raised "questions of ease of voting rather than outright denial of any fundamental right"); *Fidell v. Bd. of Elections of New York*, 343 F. Supp. 913, 915 (E.D.N.Y. 1972), *aff'd* 409 U.S. 972 (1972) (the decision not to provide absentee ballots before primary elections tested against rational basis); *Prigmore*, 356 F. Supp. at 429, 432 (applying rational basis, upheld absentee ballot law that required business travelers to appear at the election board in person).

184. Ohio voters have multiple options to cast a ballot, and the rules are the same regardless of the person's race, whether they are a student, or with which party they are affiliated. Plaintiffs are challenging minor changes to an expansive, nation-leading system. It is illogical to think that a State with one of the most expansive early voting systems somehow is burdening the right to vote *because of* its expansive system. *See s*upra ¶¶34-42.

185. To carry their burden under rational basis, Plaintiffs needed to negate "every conceivable basis which might support the government action." *Johnson v. Bredesen*, 624 F.3d 742, 746-47 (6th Cir. 2010). Plaintiffs did not do this. All of the challenged laws are supported by multiple legitimate state interests. *Infra* ¶¶191-99.

**C.    Even under a higher level of scrutiny, Ohio's laws are constitutional**

186. Even if increased scrutiny applies to Count I, Plaintiffs' claim still fails. Under the higher level of scrutiny in an *Anderson-Burdick* analysis, courts balance "the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule." *NEOCH*, 696 F.3d at 592-93 (internal quotation marks omitted). "If the burden is merely 'reasonable' and 'nondiscriminatory,' . . . the government's legitimate regulatory interests will

generally carry the day." *Stone v. Bd. of Election Comm'rs for Chicago*, 750 F.3d 678, 681 (7th Cir. 2014) (quoting *Burdick*, 504 U.S. at 434).

### 1.   Any burden on voting is minimal

187.   The "burdens" imposed by Ohio's expansive voting regime are minimal.  It is counterintuitive to assert that one of the most expansive voting regimes in the nation substantially burdens voting rights after making small adjustments.  *See supra* ¶¶34-42.

188.   *Griffin* provides guidance.  The *Griffin* Court, which upheld challenged election laws under this balancing test, explained:

> [S]tate legislatures may without transgressing the Constitution impose extensive restrictions on voting.  Any such restriction is going to exclude, either de jure or de facto, some people from voting; the constitutional question is whether the restriction and resulting exclusion are reasonable given the interest the restriction serves.

*Griffin*, 385 F.3d 1128, 1130.  If "extensive restrictions" that "exclude" voters can pass the test, certainly the challenged laws in this case, which are not extensive restrictions and do not exclude anyone, pass.   Indeed, Plaintiffs did not prove that the challenged laws have excluded anyone from voting.  *Supra* ¶¶48-49.

### 2.   Ohio has compelling state interests in administering elections

189.   On the other side of the scale, Ohio's expansive voting laws further "relevant and legitimate state interests 'sufficiently weighty to justify'" them.  *Crawford*, 553 U.S. at 191 (citation omitted).  Numerous legitimate, and weighty, State interests are pertinent: (1) "public confidence in the integrity of the electoral process" (*id.* at 197; *Griffin*, 385 F.3d at 1130-31; *South Carolina v. United States*, 898 F. Supp. 2d 30, 44 (D.D.C. 2012)); (2) "preventing election fraud" (*Crawford*, 552 U.S. at 194-97; *South Carolina*, 898 F. Supp. 2d at 44); (3) reducing administrative burdens (*Bullock v. Carter*, 405 U.S. 134, 147 (1972); *Graves v. McElderry*, 946 F. Supp. 1569, 1580 (W.D.Okla. 1996)); (4) cost efficiency and conserving public money

(*Graves*, 946 F. Supp at 1580; *Dudum v. Arntz*, 640 F.3d 1098, 1116 (9th Cir. 2011)); (5) "orderly administration and accurate recordkeeping" (*Crawford*, 553 U.S. at 196; *Florida State Conference for NAACP v. Browning*, 569 F. Supp. 2d 1237, 1251 (N.D.Fla. 2008)); (6) encouraging voting (*National Broadcasting Co. v. Cleland*, 697 F. Supp. 1204, 1211 (N.D.Ga. 1988)); (7) maintaining "accurate and complete voter registration" rolls (*Hussey v. City of Portland*, 64 F.3d 1260, 1265-66 (9th Cir. 1995)); (8) election "efficiency" (*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997); *Werme v. Merrill*, 84 F.3d 479, 487 (1st Cir. 1996)); (9) "dispelling confusion" (*Werme*, 84 F.3d at 487); (10) reducing the potential for "invalid ballots" (*Griffin*, 385 F.3d at 1131); (11) ensuring voters are not "deprived of any information pertinent to their vote" (*id.*); (12) protecting "fairness" of "election processes" (*Timmons*, 520 U.S. at 364); and (13) "a strong interest in the stability of their political systems" (*id.* at 366).

190.    To balance and evaluate the above interests, the Constitution "confers on the states broad authority to regulate the conduct of elections." *Griffin*, 385 F.3d at 1130 (citing U.S. CONST. art. 1, § 4).  And, given the many "competing interests involved in the regulation of elections" the fact that Ohio, and other States, must set forth voting requirements is hardly surprising: "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick*, 504 U.S. at 433; *see also Griffin*, 385 F.3d at 1131 (balancing the "drawbacks of absentee voting" against the potential for increasing voter turnout is "quintessentially a legislative judgment")

### 3.    The challenged laws serve these compelling interests

191.    The challenged laws serve these legitimate and compelling state justifications.

192.    *SDR*.  The elimination of Golden Week improved voter confidence (*supra* ¶¶68-72), reduced the probability of fraud (*id.*), reduced administrative burdens (*supra* ¶¶73-74), promoted orderly elections (*supra* ¶77), decreased costs (*supra* ¶¶73-76), encouraged accurate and complete voter registrations (*supra* ¶¶68-72), and eliminated potential for voter confusion. *Supra* ¶77.  Placing voting closer to election day also reduces the risk that early voters will lack pertinent, late-breaking information when voting.  *See* Ex. 14 ¶¶56-61 (Trende report).  Ohio still has one of the longest early voting periods of any State.  *Supra* ¶¶52-56.  Voter participation did not decline.  *Supra* ¶¶57-65.  And, the change had bipartisan support and the support of election administrators.  *Supra* ¶¶66-67.

193.    *One Early Voting Location*.  A single early voting location in each county promotes uniformity and fairness. Ex. 15 p. 10 (Hood report).  There is long-standing stability—counties have always had one early voting location.  *Supra* ¶78.  The system is sufficient to handle early in-person voting needs. Ex. 15 p. 10 (Hood report); *supra* ¶¶94-96.  Early in-person voting is the least-used voting methods in Ohio.  *See supra* ¶45.  Boards have not demanded more locations.  *Supra* ¶95.  More centers are impossible under current county budgets.  *Id.* Additional centers would create administrative, logistical, real estate, and IT burdens. *Supra* ¶89. Existing centers are conveniently positioned on public transportation and near population centers of the counties.  *Supra* ¶¶90-92.  Additional centers would create disparities within congressional districts and would be based on the economic vitality of counties.  *Supra* ¶¶97-98.  Spreading out resources to multiple sites would increase wait times to vote.  *Supra* ¶¶87-88.

194.    *The new DRE Formula*.  The change to the DRE formula accounts for absentee voting.  *Supra* ¶¶101-04.  It allows county boards to efficiently balance cost and need.  *Supra* ¶¶109-13.  The new formula sets a floor and counties can exceed the floor.  *Supra* ¶¶105-07.

Existing inventories have not been divested.  *Id.*  The new formula promotes election administration by allowing boards to better position their voting resources where the resources are needed.  *Supra* ¶¶109-13.  Back-up procedures exist in the event of unexpected lines.  *Supra* ¶113. Ohio is the national leader in DRE machines.  *Supra* ¶102.

195.  *Absentee Ballot Identifiers.*  The two new identifiers on the absentee ballot envelopes (date of birth and address) create uniformity among identification fields for absentee ballot applications, voter registration forms, and provisional ballots—thereby reducing confusion.  *Supra* ¶¶124-25.  The new identifiers reduce the risk of fraud and thereby promote confidence.  *Supra* ¶¶126-27.  They assist in the orderly and efficient administration of elections by making it easier to identify voters.  *Supra* ¶¶128-29.  A process exists to notify voters if an application is incomplete.  *Supra* ¶123.

196.  *Mailing Absentee Ballot Applications.*  A statewide mailing creates uniformity and fairness by removing the patchwork where only some counties mailed applications.  *Supra* ¶¶141-43.  The mailing encourages voting because more voters receive applications.  *Supra* ¶¶142-44.  Encouraging mail-in voting reduces pressures on election day.  *Supra* ¶145.  If some voters do not receive the mailing, absentee applications are also widely available in public locations.  *Supra* ¶¶146-47.  Ohio is only one of two States that mails applications statewide. *Supra* ¶¶148-49.  Private groups (such as Plaintiffs) may also do their own mailing.  *Supra* ¶147.

197.  *Provisional Ballot Identifiers.*  The two new identifiers on provisional ballots (date of birth and address) create uniformity for the identification fields on absentee ballot applications, voter registration forms, and provisional ballots.  *Supra* ¶159.  The identifiers reduce the risk of fraud and thereby improve confidence.  *Supra* ¶¶162-64.  They assist election administration by making it easier to identify voters.  *Id.*  The new fields have helped boards

count more ballots than in the past. *Supra* ¶¶165-68. The new fields allow boards to register unregistered voters, thus helping avoid repeat instances of provisional voting. *Supra* ¶169.

198.    *Provisional Ballot Cure Period.* The minor reduction in the cure period from 10 to 7 days promotes election administration by providing finality before the official canvas, which enables boards to review the provisional ballots for completeness and to contact other boards as needed to prevent double-voting. *Supra* ¶¶172-74. The period also creates uniformity with the period for receiving absentee by mail ballots. *Supra* ¶175.

199.    All of the challenged laws have been in place for two general elections. Overturning the laws would cut against the State's interest in stability and potentially create confusion. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (court orders affecting elections can create confusion); *Timmons*, 520 U.S. at 364 (noting a State's interest in the stability of political systems); *Werme*, 84 F.3d at 487 (noting a State's interest in avoiding confusion). In sum, "[I]t is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems" and decide on the one that best fits their constituents' diverse needs. *Weber*, 347 F.3d at 1107. Ohio appropriately did so. There is no equal protection violation.

## II.    PLAINTIFFS DID NOT PROVE THEIR INTENTIONAL DISCRIMINATION EQUAL PROTECTION CLAIM (COUNT II)

200.    "The Equal Protection Clause forbids only intentional discrimination." *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 276 (6th Cir. 1994) (citing *Washington v. Davis*, 426 U.S. 229 (1976)). To show intentional discrimination, when faced with a *facially neutral law*, a challenger must show *both* that the law has a disparately harmful impact on the class *and* that the legislature intended to discriminate against the class. *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 372-73 (2001). "A disproportionate effect does not violate the Equal Protection Clause, even if it was foreseen." *United State v. Blewett*, 746 F.3d 647, 659 (6th Cir. 2013).

Instead, a challenger must show that an action was taken "'*because of*, not merely in spite of, its adverse effects upon an identifiable group.'" *Id.* (emphasis added) (quoting *Pers. Amd'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

201.     Proving that lawmakers worked together collectively to pass a facially neutral law because of discriminatory motives is not a small task. *See United States v. Cherry*, 50 F.3d 338, 343 (5th Cir. 1995) ("[D]emonstrating a racially discriminatory intent is a difficult burden to bear."). The Court must perform "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977). It is important not to oversimplify this sensitive inquiry: in determining the legislature's collective intent, the Court must look to the "totality of the relevant facts," *Washington*, 426 U.S. at 242, not simply selective quotes from a few individuals. *See, e.g.*, *New England Power Co. v. New Hampshire*, 455 U.S. 331, 342 (1982) ("Reliance on [] isolated fragments of legislative history in divining the intent of Congress is an exercise fraught with hazards . . . ."); *Cmty. Care Found. v. Thompson*, 318 F.3d 219, 226 (D.C. Cir. 2003) (holding that a "single statement from a House Report" was insufficient to prove congressional intent); *In re Davis*, 170 F.3d 475, 480 (5th Cir. 1999) (the "[i]solated statements of individual legislators" do not represent "the intent of the legislature as a whole"); *cf. also United States v. O'Brien*, 391 U.S. 367, 383-84 (1968) (finding it improper to determine the constitutionality of a statute "on the basis of what fewer than a handful of Congressmen said about it").

202.     Plaintiffs did not prove that the challenged, facially-neutral laws have a disparate impact. *See supra* ¶¶43-49. Under any reasonable benchmark, Ohio's expansive early-voting options *encourage* voting by allowing everyone numerous voting opportunities—far more opportunities than in most States. *See McDonald*, 394 U.S. at 810-11 ("Ironically, it is Illinois'

willingness to go further than many States in extending the absentee voting privileges . . . that has provided [the challengers] with a basis for arguing that the provisions seem to operate in an invidiously discriminatory fashion to deny them a more convenient method of exercising the franchise."). In addition, the actual voting data shows that the small adjustments to Ohio's voting laws in 2014 have not had a disproportionate effect on minorities. *See supra* ¶¶43-49.

203. Plaintiffs failed to prove their serious accusation that the Secretary issued or that the General Assembly passed the challenged laws with discriminatory intent. Within their opening brief, for example, Plaintiffs tell an incomplete, and biased, story regarding Ohio voting since 2004 (in order to suggest discriminatory intent). Pls.' Tr. Br., Doc. 79, pp. 9-17. In telling this story, Plaintiffs' downplay, mischaracterize, or simply leave out, several chapters, including:

● In 2005, while current Secretary Husted was Speaker of the Ohio House of Representatives, Republicans in Ohio's General Assembly co-sponsored the bill that created no-fault, early in-person voting. Sub H.B. 234 (Ohio 2005).

● Bipartisan support existed for eliminating Golden Week. *Supra* ¶¶66-67.

● Far from "retrenchment" of Ohio's 2004 voting system (Pls.' Tr. Br., Doc. 79, p. 12), this case is about only minor adjustments to Ohio's voting laws. *See, e.g.*, *supra* ¶53.

● The Secretary has been responsive to ideas about election procedure, even feedback from Plaintiffs' lawyers. *Supra* ¶136.

● Following a Supreme Court ruling *in Ohio's favor*, Ohio *voluntarily* settled the *NAACP* litigation; a settlement all parties praised as positive for Ohio voters.

● Ohio has expended substantial amounts of money and created programs to enhance election administration. *See, e.g.*, *supra* ¶40.

204.    Plaintiffs ignored the most important chapter of all—compromise.  This came out at trial.  Anthony testified:

> From the standpoint of election official, so I kind of put my election official hat on and not my party hat and I have to do that a lot.  So it occurred to me that as an elected official, Franklin County is pretty large and we spent a lot of money on elections here in Franklin County.  We have a budget during presidential years of about $12 million or more.  And our surrounding counties don't come nowhere close to that kind of money . . . [A]s an election administrator, I saw the problems that [the voting calendar] was giving to some of my smaller contemporaries across the state and *so I agreed to compromise and was hoping that they would also agree to compromise.*  So we basically . . . agreed to come to a consensus and that consensus was some of the hours you're seeing now.  That's where I am on it.

Vol. I 241:8-242:22 (Anthony) (emphasis added).  Similarly, testifying about the 2013 OAEO task force, Ward stated:

> [I]t was a bipartisan group where we basically took off our R hat and our D hat, put on our election official vote, and decided what's best for the voters . . . [The goal was] [u]niformity across the entire thing.  And that's where, when we sat there, you know, we had big counties.  Madison County happened to be the only small county that sent out absentee ballot applications.  We saw that because — most people don't realize this, but there are overlaps with virtually every county, whether it's a congressional district, an Ohio House district, Ohio Senate district.  There are overlapped school districts.   All of those overlaps, we wanted uniformity so that a voter in Franklin County under a Congressional District 15 had the same hours and opportunity to vote as a person in the 15th Congressional District in Madison County.

Vol. VIII 240:4-19 (Ward) (emphasis added).

205.    Plaintiffs take a similar approach to legislative history, citing highly selective portions of the legislative record.  *See* Pls.' Tr. Br., Doc.79, pp. 19-25.  In an attempt to show the legislative intent of the many lawmakers who *supported* the challenged laws, Plaintiffs rely heavily on statements of the laws' *opponents*, including former-Senator Turner—a staunch detractor of the challenged laws.  *Id.*  For obvious reasons, letting the opponents of a law dictate the intent of the supporters of that law is a problematic approach.  *See Feiger v. U.S. Att'y Gen.*, 542 F.3d 1111, 1119 (6th Cir. 2008) ("[I]solated statements made by opponents of a bill are to be

accorded little weight because [i]n their zeal to defeat a bill, [opponents] understandably tend to overstate its reach.  Thus, [t]he fears and doubts of the opposition are no authoritative guide to the construction of legislation.") (internal citation and quotation omitted).

206.    Plaintiffs failed to show that any lawmaker, much less a voting majority of the legislature, passed these laws *because of* discriminatory motives.  Plaintiffs selectively quote a few statements from lawmakers supporting the challenged laws (none of which made any reference to race).  *See* Pls.' Tr. Br., Doc. 79, pp. 19-25.  But Plaintiffs did not identify any statement from a lawmaker that reflects, or paves the way for an *objective* inference of, discriminatory motives.  Plaintiffs rest on unfounded assumptions that lawmakers' statements veil discriminatory animus.  For instance, Plaintiffs appear to assume that anytime a legislator references urban or rural counties this is an automatic signal of discriminatory intent.  *See*, *e.g.*, *id.* at 19-20.  This reading ignores election administration realities.  Election laws need to apply across all Ohio counties, both large and small.  Different size counties have different needs and different resources.  It is not improper for lawmakers to consider, balance, and debate the different circumstances of urban and rural counties when deciding what laws should apply to everyone.  Election laws, including the ones at issue here, often reflect a compromise between different types of counties.  *Supra* ¶204.

207.    Plaintiffs also use the statements and actions of people *outside* the legislature in an attempt to prove discriminatory intent.  *See* Pls.' Tr. Br., Doc.79, pp. 5-6.  For example, Plaintiffs relied on an isolated statement from Doug Preisse, a member of the Franklin County Board of Elections, *who did not vote on any of the challenged laws*.  But Plaintiffs did not show that this solitary statement of a non-lawmaker "influenced the enactment of" the challenged laws.  *Cherry*, 50 F.3d at 343 (requiring a proven "link" between "enactment of the law" and purported

55

"conscious or subconscious racism"); *see also Gray v. City of Valley Park. Mo.*, No. 4:07CV00881, 2008 WL 294294, at \*26 (E.D.Miss. Jan. 31, 2008) (statement of a mayor did not show that a board of alderman acted with discriminatory intent when passing an ordinance).

208.    Finally, there are a number of legitimate, nondiscriminatory reasons for the challenged laws.  *See Feeney*, 442 U.S. at 275 (recognizing that the existence of "legitimate noninvidious purposes" weigh against any finding of discriminatory intent).  As detailed above, the challenged laws serve numerous compelling state interests.  *Supra ¶¶*191-99.

## III.    PLAINTIFFS DID NOT PROVE THEIR VOTING RIGHT ACT CLAIM (COUNT IV)

209.    Ohio's convenient elections laws do not violate Section 2 of the Voting Rights Act.

### A.    The requirements of a Section 2 Voting Rights Act claim

210.    In 1982, Congress amended Section 2 of the 1965 Voting Rights Act to its current form: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which *results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a) (renumbered from 42 U.S.C §1973(a)) (emphasis added).  The Act was "justified by 'exceptional' and 'unique' conditions," and while "voting discrimination still exists," American elections today are different than they were in many places in 1965.  *Shelby Cnty., Alabama v. Holder*, 133 S.Ct. 2612, 2619, 2630 (2013).

211.    For a Section 2 claim, a plaintiff must prove (1) that the challenged law *harms* the right to vote of a minority group, (2) that the law *causes* the group's right to vote to be denied or abridged, *and* (3) that under the totality of the circumstances, the minority group lacks *meaningful access* to the polls, on account of race.

212.    *Proof of harm*.  A plaintiff must prove an actual injury—that the challenged practice harms a minority group's right to vote.  To prove harm, the Supreme Court has required

a comparison of the law's impact on minorities with the impact on minorities from an *alternative* practice that the State could adopt. *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 (2000) ("*Bossier II*") ("It makes no sense to suggest that a voting practice 'abridges' the right to vote without some baseline with which to compare the practice."); *Holder v. Hall*, 512 U.S. 874, 880 (1994) (noting that "a court must find a reasonable alternative practice as a benchmark against which to measure the existing voting practice").

213.    With some election laws, there can be no benchmark, because there is "no principled reason" why one voting practice "should be picked over another." *Holder*, 512 U.S. at 881; *see* Ohio's Tr. Br., Doc. 71, pp. 38-39.[10]

214.    One thing is clear: the benchmark in a Section 2 claim cannot be the old law. Using the old law as the benchmark would eliminate the important differences between a Section 2 and a Section 5 claim. Section 5 "uniquely deal[s] only and specifically with *changes* in voting procedures." *Bossier II*, 528 U.S. 320 at 334 (emphasis in original). Under Section 5, therefore, "[t]he baseline for comparison is present by definition; it is the existing status." *Holder*, 512 U.S. at 883. In contrast, under Section 2, "[r]etrogression is not the inquiry." *Id.* at 884; *see also* S. Rep. No. 97-417, at 68 n.224 (1982) ("Plaintiffs could not establish a *Section 2* violation merely by showing that a challenged [law] . . . involved a retrogressive effect . . . .").

215.    *Causation*. Essential in any VRA claim is proof that the challenged law "results" in a denial or abridgement of voting rights. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions *to cause* an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (emphasis added); *see also Ortiz v. City of*

---

[10]    To avoid unnecessarily duplicating the Pre-Trial brief, from time to time, Ohio cites to its Pre-Trial Brief (Doc. 71) and incorporates by reference all of the arguments therein.

*Philadelphia Office of the City Comm'rs Voter Registration Div.*, 28 F.3d 306, 310 (3d Cir. 1994) (Section 2 claims require a "causal connection"); Ohio's Tr. Br., Doc. 71, pp. 39-40.

216.     A plaintiff cannot establish Section 2 causation by simply pointing to statistical differences between racial groups (*i.e.* disproportionate impact).  *Wesley v. Collins,* 791 F.2d 1255, 1260-61 (6th Cir. 1986); *Brown v. Detzner*, 895 F. Supp. 2d 1236, 1255 (M.D. Fla. 2012). "The real question . . . is whether" the law "denies African-Americans the right and opportunity to vote in District elections." *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 595-96 (9th Cir. 1997).

217.     *No meaningful access*.  A plaintiff must prove a vote denial (*i.e.* the required harm) and causation before reaching the next test, whether under the "totality of circumstances," a law prevents a minority group from having "meaningful access" to the polls.  *Osburn v. Cox*, 369 F.3d 1283, 1289 (11th Cir. 2004).  Ohio's Tr. Br., Doc. 71, pp. 40-41.

218.     The nine factors of *Gingles* (applicable for redistricting cases)—which include areas such as whether elections are racially polarized, whether there is a candidate slating process, and whether a subdivision has unusually large districts—are "of little use in vote denial cases."  *Brown*, 895 F. Supp. 2d at 1249.  Instead, in litigation alleging vote denial, decisions have rested on different considerations, including: (1) the adequacy and scope of voting opportunities (*Salas v. Sw. Tex. Junior Coll. Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992)); (2) the implications of relief on other States (*Jacksonville Coal. for Voter Prot. v. Hood*, 351 F. Supp. 2d 1326 (M.D.Fla. 2004)); (3) a State's "legitimate and compelling rationale for enacting the statute" (*Wesley*, 791 F.2d at 1261); and (4) "current" or "present day" political conditions (*id.*; *see also Shelby Cnty.*, 133 S.Ct. at 2628 (focusing on "current political conditions")).

**B.     Plaintiffs did not prove a vote denial**

219.     Plaintiffs have not shown an objective benchmark against which to compare the

challenged laws.  The challenged laws are just as "inherently standardless" as in *Holder*.

220.    Plaintiffs' analysis of the challenged laws primarily consists of ten pages in Timberlake's report.  PX0109 pp. 50-60 (Timberlake report).  The report does not include any benchmark for comparison.  Timberlake claims that African Americans are more likely to vote early than whites.  *Id.* at 50-53.  Even if this is right, Ohio's expansive early-voting schedule would *benefit*—not *harm*—African-Americans compared to the vast majority of alternatives.

221.    Early voting comparisons illustrate the point.  Overall, Ohio has the tenth-longest early voting period in America.  Ex. 14 ¶35 (Trende report).  Or consider the median number of voting days.  Ohio beats that by 12 days.  *Id.* ¶¶43, 50.  Perhaps the benchmark should consider the percentage of African Americans in the State.  That too does not work for Plaintiffs.  Ohio has more voting days than 19 of the 20 other jurisdictions with 10% or higher populations of African Americans.  *Id.* ¶62.  Or maybe the benchmark should be whether other States offer SDR.  Again, that would not work for Plaintiffs.  Only 12 States offer SDR.  Ex. 15 p. 21 (Hood report).  How about the popularity of SDR?  "Ohio has, by an order of magnitude, the lowest ratio of votes cast to same day registrants of [any SDR-State]."  Ex. 14 ¶104 (Trende report).

222.    The same problem exists with the other challenged laws.  For early voting centers, no State has anything close to the standard that Plaintiffs seek to impose on Ohio: a population-per-county calculation.  *Id.* ¶64.  Under this theory, every single State would either need to add voting centers or eliminate them.  If the benchmark is a hypothetical population-per-county, not a single State passes.  *Id.* ¶¶64-89.  If Plaintiffs want to use the benchmark of where early voting sites are located, again the claim fails.  In Ohio, white voters on average must travel longer distances to reach early voting centers than African Americans.  *Id.* ¶158.  In Cuyahoga County, the disparity is 3.7 miles; in Montgomery, it is 2.7 miles.  *Id.* ¶157.

223. Ohio *already is* the *exemplary* benchmark for DRE machines. Ohio has the best ratio of DRE machines to voting population of any State. *Id.* ¶171. Regarding challenges to absentee ballots, Ohio is one of only two States that mails applications statewide. Ex. 15 p. 36 (Hood report); Ex. 14 ¶174 (Trende report). The particular practices for absentee/provisional ballots "vary widely" State by State. Ex. 14 ¶¶175, 182 (Trende report). No comparison is possible. Regardless, Ohio is a top-five State for accepting provisional ballots. Ex. 17 ¶75 (Trende rebuttal). Ohio rejects only about 1.5 percent of absentee ballots and two-thirds of those occur because the voter missed the deadline. *Id.* ¶70.

224. Plaintiffs' hypothetical choice is standardless; Ohio complies with Section 2 under any *reasonable* benchmark. It is inconceivable that the Congress that amended Section 2 *in 1982* would have intended to cover Ohio's *present day* early-voting schedule. Early absentee voting, or "convenience voting," barely existed when the Voting Rights Act was passed in 1965 and amended in 1982. Roughly a decade before the amendment, the Supreme Court held that the "right to vote" did not include the "right to receive absentee ballots." *McDonald*, 394 U.S. at 807. Plaintiffs' misapplication of Section 2, if ever realized, "would render the statute 'unrecognizable to the Congress that designed' it." *Util. Air Regulatory Grp. v. EPA*, 134 S.Ct. 2427, 2444 (2014) (citation omitted); *see also* Ohio's Tr. Br., Doc. 71, pp. 41-43.

### C.    Plaintiffs did not prove causation

225. Plaintiffs did not identify a single voter who was denied a vote as a result of the challenged laws. *See supra* ¶¶48-49. Plaintiffs provided no evidence that the challenged laws have caused, or will cause, minorities to be unable to vote. Ex. 18 p. 2 (Hood rebuttal). As Hood noted, "blacks and whites are on equal footing in Ohio" regarding "registration and turnout." *Id.* at 4. Plaintiffs failed to prove causation. Ohio's Tr. Br., Doc. 71, pp. 43-45.

226.    Plaintiffs' primary expert, Timberlake, did not do a causation analysis.  In his first report Timberlake did not consider any "data on registered voters by race"; and in his second report he said that his Golden Week analysis "does not mean that black voters who would have used Golden Week to vote will not be able to vote."  PX0109 p. 53 (Timberlake report); PX0110 p. 7 (Timberlake rebuttal).  His examination of demographic disparities did not include any analysis of whether demographic disparities actually caused individuals not to vote.  Vol. V 11-20 (Timberlake).  He admitted that demographic turnout rates are relevant to understand whether racial socio-economic disparities hinder participation in the political process.  *Id*. 73:6-11.

227.    McCarty *did* look at demographics, and found that in 2014, after all of the challenged laws were implemented, a *higher* percentage of African American voters voted early in-person than in 2010, before the challenged laws were in place.  Ex. 20 p. 8 (McCarty report).  He also found that African Americans who voted in 2010 on early voting days that were eliminated from the 2014 calendar voted in 2014 at a higher rate than other 2010 voters.  *Id*. at 12.

228.    There is no statistical disparity that Plaintiffs can even try to link to Ohio's voting practices.  African American turnout was the same as white turnout in 2014.  Ex. 18 p. 4 (Hood rebuttal).  Trende and Hood also reported that, in other States where early voting has been reduced, African American participation did not decrease.  *Id.* ¶¶199-200 (North Carolina); Ex. 15 pp. 21-31 (Hood report) (North Carolina and Georgia).

**D.    Every voter in Ohio has meaningful access to the polls**

229.    Because Plaintiffs failed to prove harm and causation, their VRA claim ends before considering the totality of the circumstances. But under the totality of circumstances, there can be no doubt that Ohio's broad voting opportunities provide all registered voters with meaningful access to the polls, and that the modest 2014 changes to the election procedures did

not eliminate that meaningful access.  *Jacksonville Coal.*, 351 F. Supp. 2d at 1335 (claims of "inconvenience" are not "a denial of 'meaningful access to the political process'").

230.    Ohio's broad voting opportunities weigh heavily in Ohio's favor.  *See Salas*, 964 F.2d at 1556.  Timberlake testified that voting opportunities are relevant to the calculus of voting, yet he did not consider Ohio's voting opportunities in his reports.  Vol. V 59:14-16, 66:11-15 (Timberlake).  He agreed that with more opportunities, the "cost of voting" decreases.  *Id*. 59:17-20.  He testified that early voting on evenings/weekends, as well as the option to vote by mail, all decrease the burden to vote.  *Id.* 59:23-60:5, 60:23-61:4.  He also conceded that Ohio is more "responsive" to voters than the many States that have fewer voting opportunities.  *Id*. 63:24-25.

231.    Timberlake testified that racial disparities in education, employment, and health are not limited to Ohio; they are "virtually certain" to exist in every State.  *Id.* 77:12-14.  He stated that his analysis of racial appeals in political campaigns in Ohio (which included five anecdotes) was not comprehensive and that he did not do any research about the number of political activities that do not include racialized appeals.  *Id*. 80:11-19.  Other than reading the *NAACP* district court opinion, Timberlake did not do any work to understand the reasons behind the challenged laws.  *Id*. 92:1-10.  Finally, he agreed that "Ohio has made significant progress when it comes to minority representation at state and federal levels historically and especially since the 1960s."  *Id*. 85:15-82:2; *see also* Ex. 17 ¶¶35-41 (Trende rebuttal).

232.    In Hood's analysis of the Senate Factors, Hood recognized that "data collected on registration and turnout by race in Ohio over the last decade demonstrates that on these important metrics of political participation, blacks and whites are on equal footing in Ohio."  Ex. 18 p. 4 (Hood rebuttal).  From this data Hood found it "difficult to argue that Ohio's election system is denying racial minorities equal opportunities to participate in the political process."  *Id*.

233. The numerous State interests behind the challenged laws also support Ohio under the totality of circumstances. *Wesley*, 791 F.2d at 1261; *supra* ¶¶191-99.

234. The implications of relief on other States would be profound. *Jacksonville Coal.*, 351 F. Supp. 2d at 1331. Tellingly, the *Brown* court was concerned about "far-reaching implications" or requiring more early voting days even though Florida has many fewer days (8) than Ohio (23). 895 F. Supp. 2d at 1254. Needless to say, if the *Brown* decision would have had far-reaching implications, the implications of a decision for Plaintiffs in Ohio—where Ohio is a nationwide leader in the areas Plaintiffs challenge—would be astounding.

235. Finally, Ohio's laws need to be viewed against present-day political conditions; and, *in present-day Ohio*, it is easy for everyone to vote. *Shelby Cnty.*, 133 S.Ct. at 2629; *see also Wesley*, 791 F.2d at 1261 (distinguishing "past discrimination" and "present day" conditions); Ohio's Tr. Br., Doc. 71, pp. 48-49; *supra* ¶¶34-42.

## IV. PLAINTIFFS DID NOT PROVE THEIR "PARTISAN FENCING" CLAIM (COUNT III)

236. "Partisan fencing" is not a recognized cause of action. In an attempt to create this new claim, Plaintiffs' selectively quoted a half-century-old case, *Carrington v. Rash*, 380 U.S. 89, 93 (1965), which predates the now-applicable *Anderson-Burdick* framework. Ohio briefed this non-claim in its Pre-Trial Brief (at pages 56-58) and to avoid unnecessary repetition, Ohio incorporates herein by reference the Pre-Trial Brief arguments as proposed conclusions of law.

237. In Plaintiffs' Pre-Trial Brief (at page 69), Plaintiffs cite an additional case, *Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012), that Ohio did not previously address. This citation is particularly strained. That case dealt with *facially distinct* early voting deadlines for military and non-military voters. The Court reasoned that it was problematic "to pick and choose among groups of similarly situated voters to dole out special voting privileges." *Id.* at 435. The

Court, however, suggested that the result would have been *different* if the law had been *neutral*: "If the State had enacted a generally applicable, nondiscriminatory voting regulation that limited in-person early voting for all Ohio voters, its 'important regulatory interests' *would likely be sufficient* to justify the restriction." *Id.* at 433-34 (citation omitted; emphasis added). Here, all of the challenged laws are facially neutral, imposing the same rules for everyone. No one is receiving special voting privileges or having to meet special requirements.

## V. PLAINTIFFS' DID NOT PROVE THEIR PROCEDURAL DUE PROCESS CLAIM (COUNT VI)

238. Ohio's provisional ballot system satisfies procedural due process. In Plaintiffs' Pre-Trial Brief, Plaintiff relegated discussion of this Count to a single footnote, and Plaintiffs' argument in the footnote is unavailing. Pls.' Tr. Br., Doc. 76, p. 40 n.9. Ohio briefed Count VI in its Pre-Trial Brief (on pages 58-62) and to avoid unnecessary repetition, Ohio incorporates herein by reference the Pre-Trial Brief arguments as proposed conclusions of law.

239. Two points in Plaintiffs' footnote 9 merit brief responses. First, Plaintiffs misunderstand provisional voting: the provisional ballot process *is, in and of itself, a procedural safeguard providing voters with notice and an opportunity to be heard*. A voter only votes provisionally when the circumstances raise eligibility concerns; and the voter receives notice at that time. *Supra* ¶¶152-53. The provisional ballot serves as the individual's opportunity to be heard: specifically, provisional voters complete an affirmation providing information that assists election officials in confirming their identity and eligibility. *Id.*

240. Second, Plaintiffs' limited discussion mistakenly conflates substantive and procedural due process. *See League of Women Voters v. Brunner*, 548 F.3d 463, 479 (6th Cir. 2008) (not all concerns regarding the right to vote "implicate procedural due process"). Plaintiffs suggest that Ohio is required to prove that "the costs of providing [Plaintiffs'

requested] opportunity would be so great as to overwhelm" other interests. Pls.' Tr. Br., Doc. 79, p. 40 n.9. Such an inflexible approach not only flips the burden of proof on its head, but it also fails to recognize the reality that States *must* play an active role in regulating elections. *Burdick*, 504 U.S. at 433; *Wilson v. Birnberg*, 667 F.3d 591, 601 (5th Cir. 2012) ("[T]he ability of States to operate elections fairly and efficiently" is "[p]articularly salient" to procedural due process.).

241.    Plaintiffs' requested relief goes beyond the tenets of procedural due process. Plaintiffs do not simply request additional notice or opportunity to be heard—they request a post-election opportunity for voters to *alter* their ballot affirmations, *i.e.*, "an opportunity to cure mistakes." Pls.' Tr. Br., Doc. 79, p. 40 n.9. Procedural due process, however, does not entitle litigants to substantively change election procedures in whatever way they wish. *Jahn v. Farnsworth*, 617 Fed. Appx. 453, 459 (6th Cir. 2015). Notably, *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, *9 (N.D. Ill. Mar. 13, 2006), a case Plaintiffs cite, recognized that "absentee voters and provisional voters stand in different positions before the election authority."

## VI.    PLAINTIFFS DID NOT PROVE THEIR "BUSH V. GORE" CLAIM (COUNT VII)

242.    Plaintiffs did not appear to brief Count VII in their Pre-Trial Brief.

243.    On December 15, 2015, after a period of public comment, the Secretary issued a permanent directive requiring multi-precinct polling places to consolidate their poll books. Dir. 2015-24 pp. 2-80-81.

244.    By Plaintiffs' admission at trial (*supra* ¶177), this Count is moot. To the extent further briefing is required on this Count, Ohio incorporates by reference the legal arguments in its Pre-Trial Brief at pages 71 to 73.

## VII.    PLAINTIFFS DID NOT PROVE THEIR SECTION 1971 CLAIM (COUNT V)

245.    Plaintiffs purport to bring a claim under Section 1971 of the Civil Rights Act

(renumbered as 52 U.S.C. §10101), but this statute does not create a private cause of action. *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000) ("Section 1971 is enforceable by the Attorney General, not by private citizens."); *see also* Ohio's Tr. Br., Doc. 71, p. 58.  Plaintiffs concede that binding authority exists and that the Court must reject their claim.  Pls.' Tr. Br., Doc. 79, p. 70 ("Plaintiffs acknowledge that this Court is bound by *McKay* . . . .").

## VIII.  THE DOCTRINES OF FEDERALISM, ANTI-COMMANDEERING, CONSTITUTIONAL AVOIDANCE, JUDICIAL RESTRAINT, AND LACHES PRECLUDE PLAINTIFFS' CLAIMS

246.    As detailed within Ohio's opening brief, several other legal doctrines weigh against compelling, via Court mandate, the far-reaching re-write of Ohio's election laws that Plaintiffs seek.  *See* Ohio's Tr. Br., Doc. 71, pp. 63-66, 68.

247.    Under settled principles of federalism, federal courts owe deference to state lawmakers and should generally allow States room to act as laboratories of democracy.  This is especially true with elections, where the Constitution assigns States regulatory authority.

248.    Similarly, rules against the federal government commandeering state sovereignty preclude this Court from establishing a federal regulatory regime over Ohio's regulation of elections (the practical effect of requiring the extravagant changes Plaintiffs request).

249.    Under principles of constitutional avoidance and statutory interpretation, Plaintiffs' reading of the Constitution and the Voting Right Act is unsupportable.  Ohio's already expansive early-voting system is not violating federal law.

250.    Judicial restraint also strongly weighs in Ohio's favor.  This case is about minor adjustments to Ohio's voting laws (*e.g.*, reducing early voting from 26 to 23 days).  But Plaintiffs theorize that once a State expands early voting options, it cannot make later adjustments.  If this "one-way ratchet" theory ever became precedent, it would have profound implications on every State, and would likely dissuade other States from experimenting with early voting.  Plaintiffs,

tellingly, are not suing the thirty-plus States that have never had SDR.  Instead, they sue Ohio because it once had an SDR period.  Hence, the one-way-ratchet.  If a State has 26 early voting days, it cannot change to 23.  If a State has SDR, it must keep that system (no matter how brief a period, or how limited the use).  This is not how this Court's review should work; the types of minor regulatory adjustments at issue here should be left to the States.

251.    Applying laches, Plaintiffs unreasonably delayed in bringing Plaintiffs' claims.  Specifically, Plaintiffs stayed on the sidelines during highly similar (and well-publicized) litigation—*NAACP v. Husted*, Case No. 2:14-CV-404 (2014)—that was resolved over eight months ago.  This delay has consequences.  Implementing the sweeping overhaul Plaintiffs demand would be impractical, if not impossible, in the short time before the 2016 primary—and would no doubt cause dramatic confusion for both election officials and voters alike.  *See Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (recognizing court orders regarding elections "can themselves result in voter confusion" and that this risk increases as an "election draws closer").

## IX.    PLAINTIFFS DO NOT HAVE STANDING

252.    Plaintiffs are without standing for several reasons.

253.    *There is no injury traceable to the challenged laws.*  Standing "is a threshold question in every federal case" and "[t]he burden of establishing standing is on the party seeking federal court action."  *McGlone v. Bell*, 681 F.3d 718, 728 (6th Cir. 2012) (internal quotations omitted).  Standing requires: 1) an injury-in-fact; 2) fairly traceable to the defendant's conduct; 3) that is likely redressed by a favorable decision.  *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014).  Harm cannot be proved by Plaintiffs' "speculation" about what might happen.  *Simon v. E. Kent. Welfare Rights Organization*, 426 U.S. 26, 44 (1976).  Injury-in-fact must be "both real and immediate."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).

254. Plaintiffs did not introduce evidence of any injury or of any injury caused by the challenged laws. *Supra* ¶¶45-46, 61-69, 89-92, 113-15, 140-42, 159-60, 180-81.

255. Without an injury traceable to the challenged laws, none of Plaintiffs have standing, either on their own or, in the case of the organizational Plaintiffs, on behalf of their members. *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12-13 (D.D.C. 2011) (for representational standing, an organization must prove a harm to a member of the organization).

256. *There is no representational standing.* The organizational Plaintiffs' claim to represent all of Ohio's "African American[s], Latino[s], and young people" fails. Am. Compl., Doc. 41, ¶2; Vol. VI 113:14-114:4 (Martin). This expansive theory of associational standing is untenable. *Warth v. Seldin*, 422 U.S. 490, 500-03 (1975). Ohio recently settled an early-voting case with the Ohio NAACP brought on behalf of African American voters, which was subsequently praised by the plaintiffs as beneficial for all Ohio voters. Vol. X 60:2-25 (Damschroder). The organizational Plaintiffs here—who raise, *inter alia*, the identical Golden Week claim—certainly do not have a closer relationship with the interests of African Americans than the NAACP. Nor did Plaintiffs present any expert testimony on behalf of Latinos or young people. *Supra* ¶23. Nor are all young people, Latinos, and African Americans members of the Democratic Party. *Fair Elections Ohio*, 770 F.3d at 461 (organization did not possess "close relationship" with "unidentified, future" affected voters to confer standing).

257. The organizational Plaintiffs did not even prove they have standing to sue on behalf of Democratic voters. For an organization to have standing on behalf of its members, an organization's affected members must have standing to sue in their own right, including a demonstrable injury-in-fact. *Friends of Tims Ford v. Tennessee Valley Auth.*, 585 F.3d 955, 967 (6th Cir. 2009). There is no proof of injury to a Democratic voter.

258.   *There is no class standing.*  Plaintiffs failed to prove that they represent all young people, Latinos, and African Americans as a class.  *Washington v. Vogel*, 156 F.R.D. 676, 682 (M.D.Fla. 1994).  Nor do the individual Plaintiffs have the requisite close relationship with other voters to sue on a large group's behalf.  *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).

259.   *There is no organizational standing.*  Plaintiffs did not prove that the challenged laws will injure their GOTV efforts.  *Supra* ¶32(3); *Fair Elections Ohio*, 770 F.3d at 459-60 (volunteer training about different voting procedures is not an injury).

260.    Regardless, as to all of the counts, Plaintiffs are not claiming organizational harm.  Instead, they are claiming that the challenged laws will "deprive Plaintiffs and other Ohio citizens" or "voters, including Plaintiffs" of various rights.  Am. Compl., Doc. 41, ¶¶ 182, 188, 193, 204, 210, 215.  Furthermore, an organization (on behalf of itself) cannot even allege counts such as, *inter alia*, a Voting Rights Act claim or an intentional racial discrimination claim.  *See Wright v. Dougherty Cnty.*, 358 F.3d 1352, 1355 (11th Cir. 2004); *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989); *Nejnaoui v. State*, 44 S.W.3d 111, 115-16 (Tex. App. 2001) (VRA standing is "limited to a private litigant attempting to protect his right to vote").

## X.    PLAINTIFFS' RELIANCE ON A VACATED DECISION IS MISPLACED

261.   Plaintiffs—in their Pre-Trial Brief and even in their expert reports—rely extensively on the vacated district court's preliminary injunction decision in *Ohio State Conference of NAACP v. Husted*, 43 F. Supp. 3d 808 (S.D. Ohio 2014), and even claim that decision has "preclusive effect."  Pls.' Tr. Br., Doc. 76, p. 2 n.1.  The U.S. Supreme Court stayed the district court's injunction.  *Husted v. Ohio State Conference of NAACP*, 135 S.Ct. 42 (Mem) (2014).  Thereafter, the Sixth Circuit vacated its own decision and noted that the district court's injunction "was limited to the 2014 election" and "no longer has any effect."  *Ohio State Conference of NAACP v. Husted*, No. 14-3877, 2014 WL 10384647, at *1 (6th Cir. Oct. 1,

2014).  It is well-settled that a decision vacating a judgment "deprives that court's opinion of precedential effect."  *O'Conner v. Donaldson*, 422 U.S. 563, 577 n.12 (1975); *see also Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985).  Also, a preliminary injunction's "findings of fact and conclusions of law," which are made without a fully developed record, "are not binding at trial on the merits."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  In contrast, the U.S. Supreme Court's stay of the district court's decision weighs heavily in Ohio's favor.  *See I.N.S. v. Legalization Assistance Project*, 510 U.S. 1301, 1302-05 (1993); *see also Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002) (stay factors include whether movant has "strong or substantial likelihood of success on the merits").

## CONCLUSION

For the above reasons, Ohio request judgment in its favor on all claims.

Respectfully submitted,

MIKE DEWINE
Ohio Attorney General

*s/ Steven T. Voigt*
STEVEN T. VOIGT (0092879)*
     *Lead and Trial Counsel*
Senior Assistant Attorney General
ZACHERY P. KELLER (0086930)
TIFFANY L. CARWILE (0082522)
BRODI J. CONOVER (0092082)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
steven.voigt@ohioattorneygeneral.gov
zachery.keller@ohioattorneygeneral.gov
tiffany.carwile@ohioattorneygeneral.gov
brodi.conover@ohioattorneygeneral.gov

*Counsel for Defendants Secretary of State and Ohio Attorney General*

70

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was electronically filed with the U.S. District Court, Southern District of Ohio, on December 22, 2015, and served upon all parties of record via the court's electronic filing system.

*s/ Steven T. Voigt*
STEVEN T. VOIGT (0092879)*
Senior Assistant Attorney General

71