## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

OHIO DEMOCRATIC PARTY, *et al.*,

        Plaintiffs,

    v.

JON HUSTED, *et al.*,

        Defendants.

**Case No. 2:15-CV-1802**

**JUDGE WATSON**

**MAGISTRATE JUDGE KING**

---

### PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## PROPOSED FINDINGS OF FACT

## I.  OHIO'S TROUBLED HISTORY OF ELECTION ADMINISTRATION AND REFORM EFFORTS

1.  Ohio has a history of significant difficulties administering elections that dates back to 2004. Witnesses discussing that year's election described it in superlative terms: Bill Anthony called it the "worst election cycle that I can remember." 11/16/2015 Trial Tr. 199:9-201:14. Dr. Ted Allen, an expert in waiting lines, said he does not know of any other state in the country that had lines as long as Ohio's in 2004. 11/30/2015 Trial Tr. 206:10-15. Wait times to vote were as long as 10 hours in parts of the state. 11/30/2015 Trial Tr. 189:7-189:25, 210:21-211:2 (Allen). Reports indicated that, in Franklin County, predominantly African American precincts had lines that were 30 minutes longer on average than the lines in predominantly white precincts. 11/30/2015 Trial Tr. 188:14-189:6 (Allen); *see also* PX0113 (Yang Rpt. at 5) ("'the allocation of voting machines in Franklin County was clearly biased against voters in precincts with high proportions of African Americans.'") (quoting Mebane (2006)).

2.  In response, access to the polls in Ohio was expanded. The State adopted a 35-day no-excuse early in-person voting ("EIP voting" or "early voting") period. *See* Ohio Rev. Code § 3509.01(B)(2)-(3). As a result of *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008), the State was compelled to implement other reforms. Ohio's largest counties innovated, encouraging absentee voting by mail (to alleviate stress at the polls) by sending out unsolicited absentee ballot applications and, in some cases, prepaying postage for return mailings. *See* 11/17/2015 Trial Tr. 232:24-234:5 (Perlatti) (Cuyahoga County); 11/23/2015 Trial Tr. 8:24-10:20 (McNair) (same); 11/16/2015 Trial Tr. 225:1-226:6 (Anthony) (Franklin County); 11/23/2015 Trial Tr. 172:12-175:11 (Burke) (Hamilton County).

3.     These reforms helped. Large numbers of voters began casting their ballots prior to Election Day. *See* PX0109 (Timberlake Rpt. at 56, Tbl. 6); *see also Obama for Am. v. Husted*, 697 F.3d 423, 426 (6th Cir. 2012) ("*OFA*"). And African-American voters were particularly likely to use EIP voting and to use the opportunity presented by Golden Week to register and vote on the same day. *See* PFOF ¶¶ 55-57.

4.     Even so, voters in Franklin County had to wait six hours to cast a ballot on the final weekend of early voting in 2008. 11/16/2015 Trial Tr. 205:21-206:13 (Anthony). The line snaked around the tables inside the early voting location, extended outside, and wrapped around the building. *Id.* at 208:25-209:15 (Anthony); *see also* 11/24/2015 Trial Tr. 143:12-22 (Beswick) (wait times of two to three hours in Franklin County). In Cuyahoga County, the early voting lines during the final Friday through Monday of early voting in 2008 were approximately two and a half hours long and extended out of the building. 11/17/2015 Trial Tr. 229:10-230:3 (Perlatti); 11/16/2015 Trial Tr. 57:4-58:3 (Turner) ("there were lines wrapped around East 130th street . . . just lines wrapped all around that building of families coming out to vote"); 11/17/2015 Trial Tr. 45:4-24 (Martin); 11/23/2015 Trial Tr. 16:21-17:10 (McNair).

5.     In 2012, voters again had to wait lengthy periods of time to vote during the early voting period in Ohio's largest counties. The line for early voting in Hamilton County in 2012 "went down the stairway, out the front door, down past the old Post Times-Star building, turned the corner down the street to the next block, turned the corner, back around and wrapped up the other side of the board of elections building." 11/23/2015 Trial Tr. 195:5-16 (Burke); *see also* 11/16/2015 Trial Tr. 58:4-59:7 (Turner); 11/17/2015 Trial Tr. 45:25-46:10, 57:11-22 (Martin); *id.* at 207:13-210:17 (Taylor) (voters in Cuyahoga waited outside in cold for two hours as lines

extended out of building and over an overpass); 11/23/2015 Trial Tr. 20:2-7 (McNair); 12/1/2015 Trial Tr. 12:7-13:5 (Cromes) (two-and-half-hour wait times in Portage County).

6.      Voters in some of Ohio's largest counties also continued to face long lines on Election Day. Some voters in Cuyahoga County waited two hours to vote on Election Day in 2008. 11/30/2015 Trial Tr. 83:4-14 (Cleveland). On Election Day in 2008 and 2012, voters had to wait in long lines at the precinct on the Ohio State campus. 11/16/2015 Trial Tr. 227:22-228:6 (Anthony); 11/17/2015 Trial Tr. 79:8-79:25 (Longley) ("approximately 70 percent of the line most of the time that I was there was outside and it was a very cold and windy day. . . . So that made it difficult to kind of stay in line to vote. The line took over an hour for people to get through most of the time."); *see also* 11/19/2015 Trial Tr. 23:19-24:15 (Bowman) (long lines at Bowling Green caused some students to leave polling location); 11/23/2015 Trial Tr. 157:1-9 (Burke) (long lines on Election Day in Hamilton County in 2008 and 2012); 11/24/2015 Trial Tr. 143:12-144:5 (Beswick) (long lines on Election Day in 2008 in Franklin County); *id.* at 144:6-21 (long lines on Election Day in 2012, including seven hour waits at Kenyon College).

7.      In addition to the obvious burdens on voting that are imposed by long lines—such as wasted time, lost confidence in the electoral system, and discomfort—such lines disenfranchise voters. *Defense* expert Dr. Allen has found that there is a decline in turnout of between two and four percent per hour of waiting time. 11/30/2015 Trial Tr. 197:14-198:15. The 2008 *Survey of the Performance of American Elections* estimated that, due to long lines, 2.6 million Americans were disenfranchised in 2008. PX0113 (Yang Rpt. at 5); 11/19/2015 Trial Tr. 170:3-22 (Yang). Consistent with these results, a Marist poll found that 27% of respondents said they would wait "30 minutes or less to vote" and 17% said they would wait 31-60 minutes to

vote. PX0113 (Yang Rpt. at 6); 11/19/2015 Trial Tr. 185:7-186:12 (Yang); 11/30/2015 Trial Tr. 204:24-205:2 (Allen) (confirming that a "long line is one that's longer than 30 minutes").

## II.    OHIO'S HISTORY AND THE ONGOING EFFECTS OF DISCRIMINATION

8.     It is no accident that Ohio's troubled history of election administration has especially burdened minority voters. Ohio has a lengthy history of discrimination against African Americans that dates back to its original 1802 constitution. *See* Pls. Tr. Br. at 4; PX0109 (Timberlake Rpt. at 34-36). Such discrimination has continued into the modern era in various forms, including through measures that dilute the ability of minorities to elect representatives of their choice and laws that enhance the opportunity for discrimination against minority groups. *See* Pls. Tr. Br. at 4-6; PX0107 (Minnite Rpt. at 16-17); PX0109 (Timberlake Rpt. at 36-38). To this day, the Ohio Association of Elected Officials—an organization that, according to public officials, wields considerable influence over Ohio's electoral policies—allots each county equivalent representation, regardless of its size. 11/17/2015 Trial Tr. 232:5-23 (Perlatti).

9.     The effects of this history of discrimination are plain: As Dr. Timberlake explained, "there is extensive inequality in the state of Ohio on all" measures for African Americans. 11/17/2015 Trial Tr. 174:8-10. "[I]n many cases, . . . no other conclusions [] can be drawn other than that" African Americans face "severe and persistent racial disparities" in health, education, employment, access to housing and transportation, and income. *Id.* at 182:20-23.

10.    Relative to whites, African Americans in Ohio are less likely to work in professional and managerial jobs; are more likely to work in service and sales jobs, including hourly wage jobs; have significantly lower incomes; are nearly *three times* more likely to live in poverty; are more than two and a half times more likely to live in a neighborhood in which more than 20% of the residents are in poverty; and fare worse on a variety of health-related metrics.

*See* PX0109 (Timberlake Rpt. at 4, 19, 22-24, 28-32, 50, 55, 61); 11/17/2015 Trial Tr. 174:6-175:11, 175:23-176:14, 177:14-180:5, 188:1-12 (Timberlake); *see also* 11/16/2015 Trial Tr. 45:18-47:10 (Turner) (majority African-American Hough community one "of the poorest communities in Cleveland"); 11/30/2015 Trial Tr. 77:19-79:9 (Cleveland) (describing certain majority African-American neighborhoods in Cleveland as "historically poor," "currently low-income," and "among the poorest communities in the city of Cleveland or in Cuyahoga County"). Whites in Ohio are almost twice as likely as African Americans to own a home, while African Americans are far more likely than whites to have moved within the previous year (22 percent to 13 percent for the period from 2008 to 2012). PX0109 (Timberlake Rpt. at 17-18); 11/17/2015 Trial Tr. 176:15-177:13 (Timberlake); *see also* 11/16/2015 Trial Tr. 159:2-7 (Kohn) (describing African-American areas of Columbus as transient); 11/17/2015 Trial Tr. 32:21-34:9 (Martin).

11.     As compared to whites, African Americans in Ohio have an average of one fewer vehicle per household (2.2 versus 1.2); are four times more likely to rely on public transportation or to walk to work; and are four times less likely to own their own vehicle. PX0109 (Timberlake Rpt. at 23-24); 11/17/2015 Trial Tr. at 181:8-182:1 (Timberlake). *See generally* Pls. Tr. Br. at 7-9. Phyllis Cleveland, a city council member for a majority African-American district in Cleveland, testified that "less than 50 percent" of her constituents, particularly those who live in public housing, own a vehicle. 11/30/2015 Trial Tr. 80:2-5; *see also* 11/16/2015 Trial Tr. 110:10-111:4, 114:5-11 (Butcher) (explaining the importance of providing transportation to poor African-American voters because they "count on the bus system"); *id.* at 159:16-19 (Kohn) (in African-American areas of Columbus "a lot of people use public transportation"); 11/17/2015 Trial Tr. 32:21-34:3 (Martin) (individuals in predominantly African-American areas in Cuyahoga County "lack [] reliable transportation").

12.     Ohio also has unusually high rates of residential and educational segregation. Cleveland, Cincinnati, and Columbus rank 8th, 12th, and 22nd in residential segregation among U.S. cities. PX0109 (Timberlake Rpt. at 15-16); *see also* 11/16/2015 Trial Tr. 46:11-47:10 (Turner); 11/30/2015 Trial Tr. 77:19-78:17 (Cleveland); 12/1/2015 Trial Tr. 171:4-19 (Trende). Of the 100 largest metropolitan areas in the country, Cleveland, Youngstown, and Cincinnati have the 5th, 6th, and 8th most segregated school systems. PX0109 (Timberlake Rpt. at 25-26). African Americans do worse than whites in Ohio on a number of measurements of educational attainment and achievement. *Id.* at 25-29; 11/17/2015 Trial Tr. 186:8-187:25 (Timberlake); *see also* 11/30/2015 Trial Tr. 80:20-81:2 (Cleveland) (literacy rate in her primarily African American ward "is probably among the lowest in [Cleveland]"). *See generally* Pls. Tr. Br. at 7-9.

13.     Although Ohio has made progress towards correcting its history of non-proportional racial representation, *see* Pls. Tr. Br. 4-5, no African American has ever been elected Governor, U.S. Senator, Attorney General, or State Auditor. PX0109 (Timberlake Rpt. at 45-46). None of the active justices on the Ohio Supreme Court are African American; only 5.3% of the 19 members of the State Board of Education are African American; and "until last year when Governor Kasich (under pressure from the Black Congressional Caucus) appointed Michael Colbert to head the Department of Job and Family Services, the Governor's 26 person cabinet was exclusively white." *Id.* at 46-47; *see also* 11/24/2015 Trial Tr. 92:25-93:19 (Owens) (until 2008, only one African American had been "elected county wide in either a commissioner of administrative office in the history of Montgomery County" and that in 2008 two African Americans were elected as a result of no fault absentee voting).

14.     Race remains a salient factor in voting patterns in Ohio as well. African Americans in Ohio consistently vote overwhelmingly for Democrats, while Republicans tend to

win a majority of the white vote. *See* PX0109 (Timberlake Rpt. at 39-41); 12/1/2015 Trial Tr. 200:17-22, 202:20-203:4 (Trende); 11/17/2015 Trial Tr. 31:17-32:14 (Martin) (African Americans are "strongly supportive" of the Democratic Party); 11/24/2015 Trial Tr. 87:3-17 (Owens) (strongest Democratic constituency is African-American and Hispanic communities); *id.* at 113:5-114:1 (Beswick) (African-American voters "key" Democratic constituency). Defense expert Sean Trende previously attributed the Republican Party's difficulties with African-American voters to its "atrocious record on civil rights." 12/1/2015 Trial Tr. 186:7-16.

15.     The result is that, from an electoral perspective, Republican officials in Ohio have a strong motive for working to decrease African-American turnout. Mr. Trende has explained that, the "surge in the nonwhite vote is troubling to Republicans, who are increasingly almost as reliant upon the white vote to win as Democrats are on the nonwhite vote." 12/1/2015 Trial Tr. 194:6-10. "With the white vote decreasing as a share of the electorate over time, it becomes harder and harder for Republicans to prevail." *Id.* at 194:11-15. And Dr. Minnite notes that "American political parties compete as much by demobilizing voters as by mobilizing them, and [] it is black Americans who are usually singled out as the targets of demobilization." PX0107 (Minnite Rpt. at 15, 20); *see also id.* at 2-5 (discussing history of voter suppression in the United States); *id.* at 16-18 (discussing recent incidents of voter suppression in Ohio).

16.     On many occasions in recent years, courts have intervened to enjoin voting practices that burdened the rights of poor and/or minority voters in Ohio. *See OFA*, 697 F.3d at 425-27 (upholding preliminary order restoring three days of early voting for non-military voters and explaining that "[e]arly voters were 'more likely than election-day voters to be women, older, and of lower income and education attainment'" and that "[d]ata from Cuyahoga and Franklin Counties suggests that early voters were disproportionately African-American and that a large

majority of early in-person votes (82% in Franklin County) were cast after hours on weekdays, on the weekend, or on the Monday before the election"); Pls. Tr. Br. at 6 n.6 (collecting cases).

17.     Statements by public officials within the last few years further demonstrate that race remains a consideration for officials involved in setting election policy. In 2012, Doug Preisse, the Chair of the Franklin County Board of Elections, explained, in defense of his vote not to permit early voting on weekend and evening hours in Columbus prior to the 2012 election, that "I guess I really actually feel we shouldn't contort the voting process to accommodate the urban — read African-American — voter-turnout machine." PX0125 (Preisse Decl. ¶ 1); *see also* 12/2/2015 Trial Tr. 165:5-166:12 (Damschroder) (Secretary of State's Office aware of quote but took no remedial action and did not ask Preisse about it). At a legislative hearing in 2014, State Representative Matt Huffman stated, "[t]here's that group of people who say, 'I'm only voting if someone drives me down after church on Sunday.'…Really? Is that the person we need to cater to when we're making public policy about elections?" PX0109 (Timberlake Rpt. at 48).

18.     Racialized appeals have appeared during political campaigns in Ohio. *See* Pls. Tr. Br. at 9; PX0109 (Timberlake Rpt. at 42-45). And such appeals continue to have an impact on elections. *See* 12/1/2015 Trial Tr. 200:23-201:16 (Trende) (discussing race as a factor for 27% of voters in the 2008 presidential election, with half of those having voted for John McCain).

19.     In October of 2012, numerous billboards were erected in Columbus and Cleveland that stated in part "VOTER FRAUD IS A FELONY!" PX0092; PX0109 (Timberlake Rpt. at 42-43); 11/16/2015 Trial Tr. 66:3-19 (Turner); 11/17/2015 Trial Tr. 47:18-48:20 (Martin); *id.* at 212:20-22 (Taylor); 11/24/2015 Trial Tr. 132:14-133:5 (Beswick); 11/30/2015 Trial Tr. 84:18-88:21 (Cleveland). Councilwoman Cleveland's constituents were angered and confused by the billboards and, in some instances, she had to explain that things such as outstanding warrants

and unpaid parking tickets did not prohibit voting. 11/30/2015 Trial Tr. 87:25-88:21 (Cleveland); *see also* 11/24/2015 Trial Tr. 132:5-133:5 (Beswick) (in his experience these billboards fostered a feeling of distrust and dissuaded voters from providing necessary information for voting).

20.     Further, meritless claims of voter fraud continue to be used to justify measures that restrict access to voting. *See, e.g.*, PX0010A (11/20/2013 Senate Tr. 5:12-17) (Rep. LaRose) (asserting that Golden Week "perpetuates an election system that is susceptible to some degree of voter fraud"); PX0012A (2/19/2014 House Tr. 79:5-8) (Rep. Dovilla) (same); *id.* at 99:21-100:2 (Rep. Brenner) (discussing SB 238 and stating "I've got a concern that there could be voter fraud. And just because you don't see it doesn't mean it isn't happening."); *see also infra* p. 100. As Dr. Minnite has explained, such allegations are not only unsupported by the evidence but throughout history have been and continue to be used as a pretext for suppressing the African-American vote. PX0107 (Minnite Rpt. at 11-15, 20); 11/30/2015 Trial Tr. 35:11-39:14 (Minnite).

21.     As a consequence of this history, many African Americans in Ohio are distrustful of the elections system. 11/16/2015 Trial Tr. 62:12-63:6 (Turner) ("African-American community is suspicious of the system based on historic racism and discrimination in the realm of voting"); *id.* at 64:1-65:1 (Turner); *id.* at 106:15-24 (Butcher) (explaining that when working with black voters he had to "overcome a historical suspicion of the voting process"); *id.* at 119:4-8 (Butcher) (same). Such distrust not only deters voting—both Plaintiffs' and Defendants' experts described the calculus of voting framework pursuant to which potential voters weigh the perceived costs and benefits of voting in deciding whether to vote, 11/17/2015 Trial Tr. 171:10-172:7, 172:14-173:16 (Timberlake); 12/1/2015 Trial Tr. 95:13-96:17 (Trende)—but has also resulted in disproportionate usage by African Americans of in-person methods of voting. *See* PX0132 (McDonald Dep. Tr. 66:15-67:5) (African-American community less likely to use vote

by mail because of "fear factor"); 11/16/2015 Trial Tr. 62:18-63:6 (Turner) ("The African-American community tends to be very suspicious and want to go out and vote in person. They want to see and make sure that their ballot is cast. . . . we prefer to vote in person."); *id.* at 226:23-227:15 (Anthony) (a lot of "black folks" do not trust mail or vote absentee); *id.* at 158:14-18, 159:2-7, 159:20-159:24 (Kohn) (African American and Somali communities on the east side of Columbus were skeptical "about whether their vote would count"); 11/17/2015 Trial Tr. 59:25-60:4 (Martin) (some voters "don't trust the vote by mail" and like to "cast [their] ballot in person"); 11/24/2015 Trial Tr. 121:8-21 (Beswick) ("with mail voting . . . the distrust is the fact that [voters] don't know if it's counted").

## III.    EFFORTS TO CURB THE EXPANSION OF ACCESS TO THE POLLS

22.    Following the 2008 election, in which Barack Obama was elected president, carried Ohio, and won the African-American vote in Ohio by a margin of 97 to 2, 12/1/2015 Trial Tr. 207:17-19 (Trende)—and notwithstanding the history of election administration difficulties and discrimination detailed above—Republican officials in Ohio began to undertake efforts to curb or undo Ohio's post-2004 election reforms and to prevent further expansion of access to the polls. *See* PX0097; PX0098; 11/16/2015 Trial Tr. 59:8-60:24 (Turner); 12/2/2015 Trial Tr. 147:18-148:3, 148:25-150:9 (Damschroder); Pls. Tr. Br. at 13-16.

23.    In the summer of 2012, Secretary Husted was called upon to break tie votes for counties whose CBOEs had failed to obtain majority support for any specific set of early voting hours. While several small, Republican-leaning counties unanimously agreed on expanded hours for early voting, four of Ohio's largest counties—all of which have relatively large minority populations and tend to vote Democratic—deadlocked. PX0039 (Cuyahoga Letter); PX0041 (Franklin Letter); PX0042 (Lucas Letter); PX0043 (Summit Letter); 12/2/2015 Trial Tr. 153:1-7,

155:3-158:13 (Damschroder); 11/16/2015 Trial Tr. 60:1-24 (Turner); 11/23/2015 Trial Tr. 20:8-21:1 (McNair); PX0109 (Timberlake Rpt. at 7) (discussing county demographics). Pursuant to a policy he had announced in advance, and which plainly encouraged Republican CBOE members in large counties to oppose expanded early voting hours, Secretary Husted broke these ties in favor of having early voting during regular business hours. PX0039 (Cuyahoga Letter); PX0041 (Franklin Letter); PX0042 (Lucas Letter); PX0043 (Summit Letter); 12/2/2015 Trial Tr. 67:5-25, 153:1-158:13 (Damschroder); *see also* 11/16/2015 Trial Tr. 60:1-24 (Turner); 11/23/2015 Trial Tr. 20:8-21:1 (McNair). Later that summer, Secretary Husted issued Directive 2012-35, which imposed relatively limited early voting hours statewide. PX0040-005-006.

## IV. LEGISLATIVE HISTORY OF THE CHALLENGED PROVISIONS

24.     In November 2012, President Obama was reelected and he again carried the State of Ohio. In that election, over 14,000 Ohioans used same-day registration to register and vote and nearly 90,000 Ohioans voted during Golden Week. PX0109 (Timberlake Rpt. at 51). President Obama again won the African-American vote in Ohio by a colossal margin—this time, 96 percent to 3 percent. DX14 (Trende Rpt. ¶ 236). Democratic Senator Sherrod Brown was reelected that year as well, and he won the African-American vote by a similarly commanding margin. PX0109 (Timberlake Rpt. at 41); 12/1/2015 Trial Tr. 202:24-203:3 (Trende).

25.     The Ohio General Assembly—which continued to be controlled by Republicans—renewed its effort to restrict access to the polls. Rather than pursue an omnibus bill, as they had done with HB 194, Republican members of the General Assembly introduced a series of bills that, collectively, accomplished similar ends. With SB 238, the General Assembly proposed the elimination of Golden Week. PX0025. SB 200 proposed to change the formula used for calculating and thereby reduce the number of DRE machines that counties are required

to have. PX0022. In SB 205, the General Assembly sought to prohibit CBOEs and local governments from sending unsolicited absentee ballot applications and including pre-paid postage for returning absentee ballots; to bar the Secretary of State from sending out unsolicited absentee ballot applications absent specific authorization from the General Assembly; and to add required fields on the absentee ballot envelope. PX0023. Finally, SB 216 proposed to add required fields on the provisional ballot affirmation form; to reduce by three days the cure period for provisional ballots cast for lack of an ID; to prevent elections officials from completing on a voter's behalf the information required on the provisional ballot affirmation form; and to give counties the discretion—but not to require them—to consolidate poll books and multi-precinct locations. PX0024. A number of the statements made during the legislative debates regarding these bills are detailed in Plaintiffs' Trial Brief. *See* Pls. Tr. Br. at 19-25.

26.    All four bills—SB 200, SB 205, SB 216, and SB 238—passed largely or strictly on party lines and were subsequently enacted. PX0033 (Senate Journal SB 216 and SB 238), PX0034 (House Journal SB 216), PX0035 (Senate Journal SB 200), PX0036 (Senate Journal SB 205 and SB 238), PX0037 (House Journal SB 205), PX0038 (House Journal SB 200), PX0119 (House Journal SB 238). No minority members voted for any of these bills.

27.    Following the enactment of these measures, Secretary Husted issued directives that compounded the impact the restrictive voting measures impose on voters. Although Secretary Husted received authority to mail unsolicited absentee ballot applications in advance of the November 2014 election and has received such authority for the 2016 election, he has excluded from the mailings inactive but eligible voters who did not cast ballots in the two prior even-year elections. *See* PX0028 (Directive 2014-15); 12/3/2015 Trial Tr. 16:18-22 (Damschroder). The result is that a large number of eligible voters who can vote during early

voting or on Election Day will not receive the unsolicited absentee ballot applications that other voters are receiving. *See* 12/3/2015 Trial Tr. 16:18-22 (Damschroder); PX0128 (Damschroder Dep. Tr. 80:7-81:21) (voters in active-confirmation status are eligible to vote, but the statewide mailing will only be sent to voters in active status or voters who voted in either 2014 or 2012). In addition, Secretary Husted issued a series of directives that set uniform early voting hours across the state and had the effect of limiting the evening and weekend hours that counties could offer. *See* PX0026 (Directive 2014-06); PX0029 (Directive 2014-17); PX0032 (Directive 2014-30).

## V.  LITIGATION CONCERNING THE CHALLENGED PROVISIONS

28.    The elimination of Golden Week and the early voting directives were challenged in *Ohio State Conference of NAACP. v. Husted*, 2:14-CV-404 (S.D. Ohio). Following discovery and a hearing, Judge Economus issued a comprehensive decision finding many relevant facts, *see* Pls. Tr. Br. at 16-17, holding that the provisions challenged in that case violated the Constitution and the VRA, and granting preliminary injunctive relief. *NAACP*, 43 F. Supp. 3d at 852-53. The Sixth Circuit affirmed. *NAACP*, 768 F.3d at 533-60. Shortly thereafter, on September 29, 2014, the Supreme Court stayed enforcement of the order, *see Husted v. Ohio State Conference of N.A.A.C.P.*, 135 S. Ct. 42 (Sept. 29, 2014), as it did in three other election-law cases decided around the same time. *See Frank v. Walker*, 135 S. Ct. 7 (Oct. 9, 2014); *League of Women Voters of N.C. v. McCrory*, 135 S. Ct. 6 (Oct. 8, 2014); *Veasey v. Perry*, 135 S. Ct. 9 (Oct. 18, 2014). The Supreme Court did not address the merits in any of these cases, but apparently postponed enforcement of these decisions on the doctrine that election laws should not be changed on the eve of an election. *See Purcell v. Gonzalez*, 549 U.S. 1, 5-6 (2006). In April 2015, the parties in the *NAACP* case reached a settlement, pursuant to which the plaintiffs in that case agreed to dismiss their claims and Ohio agreed to provide EIP voting on the final two

Saturdays and Sundays before the presidential general election in November 2016, and evening EIP voting hours until 7 p.m. during the final week before the election. *See* DX0014K.

29.     In this case, Plaintiffs are challenging:

- the elimination of Golden Week pursuant to SB 238;
- the bar on multiple early voting locations, *see* Ohio Rev. Code § 3501.10(C);
- SB 200's change to the law regarding the minimum number of DRE machines that counties are required to have if they use DREs as their primary voting device;
- SB 205's restrictions on absentee ballot mailings;
- the Secretary's exclusion of eligible voters from unsolicited absentee mailings;
- the added informational requirements for absentee and provisional ballots;
- the reduction in the cure period for provisional ballots cast due to a lack of ID;
- the prohibition on election officials' (with limited exceptions) completing on a voter's behalf the information required on the provisional ballot form; and
- the failure to mandate that counties consolidate multi-precinct poll books.

30.     This case was filed on May 8, 2015, and has been litigated on an expedited basis. A trial was held in this matter from November 16 through December 3, 2015

31.     **The Plaintiffs**. The Plaintiffs here are the Ohio Democratic Party ("ODP"), the Democratic Party of Cuyahoga County ("DPCC"), the Montgomery Democratic Party ("MDP" and, with ODP and DPCC, the "Democratic Party Plaintiffs"), Jordan Isern, Carol Biehle, and Bruce Butcher. All of the plaintiffs (or their representatives) but Ms. Isern testified at trial.

32.     Plaintiffs have been directly injured by the challenged provisions; their injuries are fairly traceable to the State of Ohio; and the remedies they seek would directly redress those injuries. The Democratic Party Plaintiffs' key constituencies include African-Americans, Hispanics, and young voters. 11/17/2015 Trial Tr. 31:17-23, 32:11-14 (Martin); 11/24/2015 Trial Tr. 87:3-17 (Owens); *id.* at 113:14-114:4 (Beswick). The Democratic Party Plaintiffs must register and turn-out these voters to successfully elect their candidates. *See also* PFOF ¶ 14.

33.     It is precisely these voters who are most burdened by the challenged provisions. *See* PFOF ¶¶ 9-12, 55-57, 65, 70, 74, 79, 83, 87, 92-93. The Democratic Party Plaintiffs have

thus had to, and will continue to have to, divert their resources to help their voters overcome the burdens placed on them by the challenged provisions. *See, e.g.*, 11/17/2015 Trial Tr. 36:19-37:7, 39:12-20 (Martin) (elimination of Golden Week was a "costly burden" in 2014 and DPCC will have to engage in similar costly activities to register and turnout voters in 2016). These are resources that the Democratic Party Plaintiffs would otherwise spend on efforts to educate voters about their candidates. *See* 11/16/2015 Trial Tr. 93:6-11 (Turner); 11/24/2015 Trial Tr. 146:8-14, 147:23-148:3 (Beswick).

34.     As Nick Martin, Executive Director of the CCDP explained, Golden Week had become "the absolute essential lifeline for [African Americans, Hispanics, and young voters]" who, because of Golden Week, were able to overcome the barriers that they faced to voting. 11/17/2015 Trial Tr. 33:8-34:9, 35:18-36:11; 11/24/2015 Trial Tr. 94:20-95:6 (Owens) (Golden Week facilitated youth voting). The Democratic Party Plaintiffs thus utilized Golden Week in their registration and get-out-the-vote ("GOTV") efforts, particularly with the constituencies discussed above. 11/17/2015 Trial Tr. 19:11-24, 20:2-22:6, 32:21-33:2, 34:22-35:9 (Martin) (discussing specific populations where Golden Week efforts concentrated); 11/24/2015 Trial Tr. 90:11-91:3, 94:4-95:6 (Owens); *id.* at 117:13-118:22, 126:25-128:12 (Beswick) (Golden Week efforts focused on minority and young voters). Not only did the additional week of early voting assist these Plaintiffs with their ability to get as many voters out to the polls as possible, 11/17/2015 Trial Tr. 17:22-18:7 (Martin), but the unique one-stop nature of Golden Week allowed the Democratic Party Plaintiffs to decrease the amount of contacts (and money) per voter by having voters register and vote at the same time. 11/17/2015 Trial Tr. 36:19-37:7, 38:4-20 (Martin); 11/24/2015 Trial Tr. 91:4-17, 97:10-98:5 (Owens); *id.* at 129:10-130:1 (Beswick). With the elimination of Golden Week, the costs that these entities will incur to register and turn

their voters out, as well as the costs for their voters, have increased. *See, e.g.*, 11/24/2015 Trial Tr. 130:8-131:6 (Beswick); 11/17/2015 Trial Tr. 39:12-20, 59:7-60:4, 60:9-19 (Martin) (discussing 2016 GOTV and registration activities).

35.     Since SB 205 was passed, the Democratic Party Plaintiffs have received an uptick in calls from confused voters about absentee mailings and/or absentee ballot identification forms. 11/17/2015 Trial Tr. 16:7-15 (Martin); 11/24/2015 Trial Tr. 131:13-21 (Beswick); *see also id.* at 99:13-22, 100:18-101:2, 102:19-103:12 (Owens). Fielding these calls, providing training to staff to answer the calls, and ensuring that volunteers are available to answer the phone all require an increased expenditure of time or money for these Plaintiffs—which could be used in other facets of their work. *See* 11/24/2015 Trial Tr. 100:18-101:2 (Owens).

36.     Since the passage of SB 216, ODP and CCDP have had to expend additional resources to assist voters in curing their provisional ballots. 11/17/2015 Trial Tr. 40:9-42:15 (Martin). The shorter period of time for contacting voters *increases* costs, as ODP needs to have more people contacting the voters. 11/24/2015 Trial Tr. 141:9-142:13 (Beswick); *see also id.* 136:10-20 (Beswick). Mr. Martin explained that CCDP now has insufficient time to reach and assist all of the voters who are eligible to cure their provisional ballots, meaning that CCDP has a reduced ability to help ensure that those ballots are counted and to advance its core mission. 11/17/2015 Trial Tr. 40:9-42:15, 43:1-8. The reduced period is particularly challenging for the Democratic Party Plaintiffs because African-American voters—a core constituency—generally cast a disparately high share of provisional ballots. 11/24/2015 Trial Tr. 135:18-136:6 (Beswick).

37.     With respect to SB 216's changes to the informational requirements for provisional ballot affirmation forms, ODP incurred costs educating voters about these changes between the 2014 primary and general election and will continue to educate voters about these

changes in 2016 as well. 11/24/2015 Trial Tr. 136:10-137:11 (Beswick). Further, because members of ODP's constituencies generally cast more provisional ballots than do members of the rest of the electorate, ODP has suffered and will continue to suffer a competitive harm.

38. The Democratic Party Plaintiffs also engage in voter protection efforts which require the recruitment, training, and organizing of volunteers. 11/24/2015 Trial Tr. 101:3 - 16 (Owens); *id.* at 141:9 - 14 (Beswick). One issue that their volunteers must confront on Election Day is that of voters who cast votes in the "right church, wrong pew." *Id.* at 101:17 - 102:6 (Owens). When this occurs, the Democratic Party Plaintiffs' volunteers must assist that voter to ensure that their vote is cast correctly and counted. *Id.* This expenditure of time and resources would be circumvented by the implementation of consolidated poll books in multi-precinct locations, ensuring that the Democratic Party Plaintiffs could focus on assisting voters on other challenges that voters might face and/or campaigning for their candidates.

39. ODP will also be forced to expend additional resources as a result of the challenged provisions that increase lines at the polls. Whenever long lines form at polling places, ODP sends staff to help encourage voters to stand in line. 11/24/2015 Trial Tr. 142:14-143:7, 145:7-146:7 (Beswick). Because the reduction in the DRE minimum, the elimination of Golden Week (and reduction of the early voting period), the restrictions on absentee ballot mailings, the new informational requirements for provisional ballot affirmation forms, and the one-location-per-county rule for early voting will all result in longer lines at the polls, *see* PFOF ¶¶ 63-65, 69-70, 75, 91-95, ODP will expend resources as a result of each of these rules.

40. The Rev. Bruce Butcher and Carol Biehle also have been injured or are in imminent danger of being injured by the challenged provisions. Rev. Butcher is a pastor in Summit County. 11/16/2015 Trial Tr. 102:17-25 (Butcher). Through his church, as well as

related community organizations, he engages in registration and GOTV activities in lower-income, heavily African-American neighborhoods. *Id.* at 103:3-11, 103:23-105:20, 107:25-108:21. He also coordinates voter education activities and, in 2008 and 2012, utilized Golden Week to help register and get his parishioners and community members out to vote. *Id.* at 105:21-106:24, 109:25-110:2. As Rev. Butcher testified, the extended early voting period "made a difference because it gave [him] more time to do the things [he] wanted to do in terms of registration and education and mobilization," and it also meant that he could "kill two birds with one stone" by registering people and having them vote at the same time. *Id.* at 108:22-109:13, 111:5-112:4. Further, Golden Week reduced the burdens on members of the communities he worked with, making it easier for them to vote because it reduced voting and registration from two steps to one. *Id.* at 108:22-109:13, 111:5-112:4.

41.     Rev. Butcher plans to be involved in these same activities in 2016; however, the elimination of Golden Week "will make [his organizing efforts] tougher because [he's] dealing with a population that's already suspicious of the political process" and which has a number of barriers to overcome. *Id.* at 117:5-9, 119:4-12. Both his testimony and the Democratic Party Plaintiffs' testimony demonstrate that if Golden Week is not in place in 2016, Rev. Butcher will have to expend more time and effort to accomplish his registration and GOTV activities.

42.     Plaintiff Carol Biehle is a voter who votes in a multi-precinct voting location. 11/16/2015 Trial Tr. 172:21-23 (Biehle). Unless consolidated poll books are implemented, she could be disenfranchised for casting a right church, wrong pew ballot. Ms. Biehle has also served as a poll worker for over 28 years and works in multi-precinct locations, assisting voters with voting in the correct location. 11/16/2015 Trial Tr. 170:20-21, 172:1-20, 174:15-175:9, 176:7-177:5, 178:17–179:4 (Biehle). The lack of consolidated poll books not only makes her work

more difficult but also makes it more likely that voters she and her co-workers are assisting will be unable to cast an effective ballot because they voted in the right church but wrong pew.

43. **Expert witnesses**. At trial, Plaintiffs and Defendants each called four expert witnesses. The testimony of Plaintiffs' experts should be given significant weight and fully credited. The testimony of Defendants' experts should be given much less weight.

44. Plaintiffs' expert Dr. Jeffrey Timberlake is a tenured Associate Professor of Sociology at the University of Cincinnati. PX0109 (Timberlake Rpt. at 5-6). Much of his work focuses on a topic that is directly relevant here: racial/ethnic segregation in Ohio and nationally, the reasons for this segregation, the social, economic, and health inequalities that result from this segregation, and racial/ethnic attitudes in Ohio. *Id.* at 6. He also regularly works with statistical data like that he analyzed here. *Id.* at 5-6). Dr. Timberlake's findings about the history and ongoing effects of discrimination in Ohio are beyond serious challenge, *see* 11/17/2015 Trial Tr. 182:20-23, were not materially disputed in this case, and were corroborated by lay witness testimony regarding predominantly African-American neighborhoods that face significant economic challenges, *see, e.g.*, 11/16/2015 Trial Tr. 45:18-47:10 (Turner); *id.* at 159:2-7 (Kohn); 11/17/2015 Trial Tr. 32:21-33:24 (Martin); 11/30/2015 Trial Tr. 77:19-79:9 (Cleveland). Dr. Timberlake's statistical findings are persuasive, consistent with the findings of noted voting expert Dr. Daniel Smith, *see* PX0109 (Timberlake Rpt. 51-53); 11/17/2015 Trial Tr. 122:5-18, 163:6-15 (Timberlake); *see also* 11/24/2015 Trial Tr. 30:16-31:6 (Canon testimony regarding Smith), and corroborated by multiple first-hand accounts demonstrating, for instance, that African Americans were more likely than whites to vote during Golden Week, *see, e.g.*, 11/17/2015 Trial Tr. 222:7-13 (Perlatti); 11/23/2015 Trial Tr. 156:4-6 (Burke).

45.     Plaintiffs' expert Dr. David Canon is the Chair of the Political Science Department at the University of Wisconsin and has taught political science for over 30 years. 11/24/2015 Trial Tr. 4:16-5:13 (Canon); PX0106 (Canon Rpt. at 2). His research focuses on election law, voter turnout, and race and representation. PX0106 (Canon Rpt. at 2). He has authored numerous articles, book chapters, and books. *Id.* He has testified as an expert for both Democrats and Republicans. 11/24/2015 Trial Tr. 8:1-21 (Canon). Much of his testimony in this case regarded an article on the impact of early voting and same-day registration on turnout that he co-authored and that was published in a leading political science journal, and the rest of his testimony was on a related topic (the racially disparate impact of reductions in early voting). *See generally* 11/24/2015 Trial Tr. 9:10-40:3 (Canon).

46.     Dr. Lorraine Minnite, a tenured Associate Professor at the University of Rutgers, Camden, was another expert for Plaintiffs. 11/30/2015 Trial Tr. 15:5-16:2 (Minnite); PX0107 (Minnite Rpt. at 1). She has studied voter fraud in American elections in depth over more than a decade, and her work has resulted in multiple publications, including two books. 11/30/2015 Trial Tr. 16:2-17 (Minnite); PX0107 (Minnite Rpt. at 1-2). She has also previously testified as an expert on voter fraud, *see* 11/30/2015 Trial Tr. 17:25-18:23 (Minnite); PX0107 (Minnite Rpt. at 34), and has been accepted as an expert each time, *see* 11/30/2015 Trial Tr. 18:20-21.

47.     Plaintiffs' other expert witness was Dr. Muer Yang, an Assistant Professor in the Department of Operations and Supply Chain Management at Opus College of Business, University of St. Thomas, in Minneapolis. PX0113 (Yang Rpt. at 3). Dr. Yang is an expert on the use of simulation to model waiting times, and his work has involved applying that analysis to voting queues. 11/19/2015 Trial Tr. 162:22-163:8; PX0113 (Yang Rpt. at 3-4). He has

collaborated with Dr. Allen, one of the defense experts, who said that Dr. Yang "competently implemented the simulations he did[.]" 11/30/2015 Trial Tr. 167:10-14 (Allen).

48. Dr. Nolan McCarty, one of the Defendants' experts, is the Chair of the Political Science Department at Princeton University. 11/19/2015 Trial Tr. 27:24-28:2 (McCarty). Aside from work he performed as an expert in the *NAACP* case, Dr. McCarty has never written anything about the topic on which he opined—the impact of early voting on turnout. 11/19/2015 Trial Tr. 77:23-78:13 (McCarty). He also has not analyzed same-day registration, *id.* at 78:8-13 (McCarty), and used a dubious method for determining the race of voters—focusing on Census *tracts* rather than Census *blocks* [1]—based in part on what he acknowledged was a likely misreading of a working paper, *id.* at 104:11-111:10. Further, Dr. McCarty failed to mention prior to his cross-examination at trial that he had found that, from 2010 to 2014, African-American turnout decreased *relative to white turnout*. *Id.* at 131:13-133:5 (McCarty).

49. Dr. M.V. Hood, another defense expert, is a Professor of Political Science at the University of Georgia. DX15 (Hood Rpt. at 1). Dr. Hood's conclusions here must be viewed skeptically because the methodology he used, which relied on a declarations from a sample of county election officials selected by defense counsel, contradicts the methodology he used in the only peer-reviewed article he has written on early voting. 11/20/2015 Trial Tr. 124:9-127:6 (Hood). Dr. Hood's published work about the administrative benefits of early voting also reaches conclusions that are at odds with the conclusions he drew here about the purported benefits of eliminating Golden Week. *Id.* at 135:12-137:20 (Hood). One court has previously found an

---

[1] Census blocks are much smaller than Census tracts. *See* 11/19/2015 Trial Tr. 102:20-103:21 (McCarty); 11/17/2015 Trial Tr. 127:18-129:16 (Timberlake). As a result, the fact that an individual lives in a particular Census block can provide conclusive or highly reliable information about that individual's race. *See* 11/17/2015 Trial Tr. 134:15-135:4 (Timberlake) (there are many homogenous Census blocks in Ohio due to persistent patterns of racial segregation); 11/19/2015 Trial Tr. 111:2-10 (McCarty) (acknowledging more racial heterogeneity at the Census tract level). Because of their racial heterogeneity, Census tracts are less likely to provide such helpful information.

expert report prepared by Dr. Hood to be unreliable and rejected it on *Daubert* grounds, and another court gave his opinions "little weight." *Id.* at 171:2-25 (Hood). And, with one exception, in which he worked for Republicans challenging districts enacted by a legislature controlled by Democrats, Dr. Hood has exclusively served as an expert on behalf of states defending against allegations that their laws violated the Constitution and/or VRA. *Id.* at 170:12-171:1 (Hood).

50.    Defense expert Sean Trende does not have a Ph.D. and has never written a peer-reviewed article. 12/1/2015 Trial Tr. 109:15-22 (Trende). His master's thesis related to Supreme Court voting patterns and he took a total of two courses in statistics in graduate school. *Id.* at 109:25-110:8, 117:5-13 (Trende). Mr. Trende has spent most of his professional career working as a lawyer or political commentator, and he has never written anything outside the context of his work as a paid expert witness that pertains to voting machine technology, voting machine allocation, the impact of long lines on turnout, the number of early voting locations that various jurisdictions have, resources for elections administration, provisional ballots, absentee ballots, including the mailing of and including pre-paid postage on unsolicited absentee ballot applications, same-day registration and its impact on voter behavior, or measuring the impact of an election law on voter turnout. *Id.* at 112:12-117:18 (Trende). At least some of Mr. Trende's work is either uniformed or misleading. For instance, his report contains a comparison of DRE-to-voter ratios across states. DX14 (Trende Rpt. at 83-84). But he is either making a comparison of fundamentally different types of DREs—he does not know, *see* 12/1/2015 Trial Tr. 113:3-10 (Trende)—or he is using inaccurate numbers. In connection with information about how long it takes to cast a ballot on a DRE, *see, e.g.*, 11/30/2015 Trial Tr. 173:11-20 (Allen) (7.5 minutes is a reasonable estimate), Mr. Trende's numbers would indicate that elections take *days* to complete in many jurisdictions.

51.     Dr. Ted Allen, a Professor at Ohio State, DX16 (Allen Rpt. at 1), was also a defense expert. Dr. Allen is an expert in waiting lines analysis. In his testimony, however, Dr. Allen disavowed a number of statements from his previous publications. *See, e.g.*, 11/30/2015 Trial Tr. 172:14-173:2 (he had previously written that simulation models like that used by Dr. Yang were "necessary" but he "oversold" that argument); *id.* at 178:11-179:8 (the approach he had used when planning an election was a "bad idea"). He also conceded that he was not an expert in certain topics on which he had opined. *Id.* at 213:8-214:2 (not an expert on voter behavior or how election-law changes impact turnout). And two other facts further undermine the credibility of Dr. Allen's analysis: First, while nearly all of a section of Dr. Allen's report here was pulled directly from an expert report he had written in a case in North Carolina, Dr. Allen omitted from his report here—in a case *in Ohio*—the portion of the relevant section of the North Carolina report that included his analysis of the 2004 election in Franklin County. *Id.* at 136:23-140:9 (Allen). Second, Dr. Allen has previously worked with Matthew Damschroder and hopes to work with the State of Ohio again. *Id.* at 221:24-222:17 (Allen).

## VI.     THE EFFECTS OF THE CHALLENGED PROVISIONS

52.     **The Elimination of Golden Week**. The elimination of Golden Week imposes severe burdens on the right to vote in two ways. First, it removes the same-day registration period that had been offered in advance of elections in Ohio. In 2008, nearly 13,000 voters took advantage of this opportunity to register and vote at the same time, and over 14,000 voters did so in 2012. PX0109 (Timberlake Rpt. at 51); 11/17/2015 Trial Tr. 108:9-24 (Timberlake). Voters now must register and vote at separate times, meaning that the costs of voting will increase for unregistered but eligible Ohioans. PX0109 (Timberlake Rpt. at 4, 31-33, 50); 11/17/2015 Trial Tr. 195:11-197:12 (Timberlake); 12/2/2015 Trial Tr. 38:24-39:14 (Poland) (elimination of

Golden week requires more effort because it is a two-step process now); *see also* 11/16/2015 Trial Tr. 108:22-109:13 (Butcher); *id.* at 111:5-112:4 (Golden Week allowed people to "kill two birds with one stone"); *id.* at 129:8-131:9 (Caffrey) (Golden Week helped alleviate challenges young people faced and facilitated voting); *id.* at 158:14-18, 159:2-12, 161:17-162:5 (Kohn) (Golden Week helped people in minority areas of Franklin County who had two jobs and could not take off of work on Election Day); 11/17/2015 Trial Tr. 33:17-34:9 (Martin) (lack of transportation, busy work schedules, working several jobs makes Golden Week helpful to voters); *id.* at 35:18-36:11 (Golden Week an "absolute essential lifeline" for African American and minority voters); *id.* at 76:2-19 (Longley) (challenges for young voters such as confusion alleviated by Golden Week); 11/19/2015 Trial Tr. 14:13-16:9 (Bowman) (Golden Week convenient for students and addressed challenges they face such as lack of transportation and erratic scheduling due to jobs, etc.); 11/23/2015 Trial Tr. 166:8-13 (Burke) (Golden Week "had proven to be very useful to a significant numbers of voters"); 11/24/2015 Trial Tr. 116:9-118:22 (Beswick) (describing unique challenges faced by young voters and minority voters and discussing how Golden Week facilitated their ability to vote); *id.* at 120:12-121:2 (Beswick).

53.    The elimination of same-day registration will decrease turnout. Based on his nationwide study, Dr. Canon testified that the expected increase in turnout that would result from five days of same-day registration—the length of Golden Week—would be tens of thousands of votes. PX0106 (Canon Rpt. at 8-9); 11/24/2015 Trial Tr. 38:17-39:14, 76:25-77:8 (Canon).

54.    Second, the elimination of Golden Week burdens voters by reducing the early voting period. Over 67,000 voters cast ballots during Golden Week in 2008, and almost 90,000 Ohioans voted during Golden Week in 2012. PX0109 (Timberlake Rpt. at 51); 11/17/2015 Trial Tr. 108:9-109:6 (Timberlake). While some of the large number of voters who would have cast

ballots during Golden Week in 2016 may well be unable to cast a ballot as a result of the reduction in the window for early voting, others—likely the vast majority—will vote during the other parts of early voting or on Election Day. PX0113 (Yang Rpt. at 12, 16); 11/19/2015 Trial Tr. 179:20-180:18 (Yang); 11/30/2015 Trial Tr. 192:4-17 (Allen) ("this golden week elimination, which would tend to increase the turnout on election day"). The result will be longer lines during early voting and on Election Day, *see* PX0113 (Yang Rpt. at 12) ("Queueing theory has concluded that more arrivals cause longer wait time[s]."); *see also id.* at 16; 11/19/2015 Trial Tr. 180:24-181:2 (Yang); 11/30/2015 Trial Tr. 192:18-25 (Allen) ("in general, more people means expected longer lines"), and increased burdens not only for those who must vote at a new, less convenient time but also for voters waiting longer than they otherwise would have been. *See also* 11/30/2015 Trial Tr. 194:3-21 (Allen) (lines can deter some voters from voting at all).

55.     These burdens fall disproportionately on African Americans. In both 2008 and 2012, the number of people who registered and voted during Golden Week was higher in high minority counties than in all other county types. PX0109 (Timberlake Rpt. at 2, 51) (2008 registration rates were 18% higher in high minority counties than in low minority/high poverty counties and 32% higher than in low minority/low poverty counties; 2012 registration rates were "17% higher than in low minority/high poverty counties and 56% higher than in low minority/low poverty counties"); 11/17/2015 Trial Tr. 110:3-111:2, 120:20-121:5 (Timberlake). Individual-level data for three of the largest counties in Ohio—Cuyahoga, Hamilton, and Mahoning—where over half of the state's African-American population lives show that the usage rates of Golden Week were far higher among African Americans than among whites in both 2008 and 2012 (3.514 in 2008 and 5.186 in 2012 for homogeneous black blocks; 4.100 in

2008 and 5.584 in 2012 for nearly homogeneous black blocks). PX0110 (Timberlake Rebuttal Rpt. at 6); 11/17/2015 Trial Tr. 126:3-127:6, 127:18-129:16 (Timberlake).

56.     These findings are corroborated by the analysis of Dr. Dan Smith in the *NAACP* litigation. *See* PX0109 (Timberlake Rpt. at 51-53); PX0110 (Timberlake Rebuttal Rpt. at 6-7); 11/17/2015 Trial Tr. 122:5-124:11, 162:19-163:15 (Timberlake); *see also NAACP*, 43 F. Supp. 3d at 841 (crediting Dr. Smith's findings). And any contrary finding would be extraordinary given the racial disparities described above, including the fact that African Americans are far more likely than whites in Ohio not to own a car, and the evidence that increased costs of voting disproportionately burden minority and poor voters, *see* PX0109 (Timberlake Rpt. at 5, 32-33); *see also* 11/19/2015 Trial Tr. 79:4-13 (McCarty); PFOF ¶¶ 9-12.

57.     African Americans are also far more likely than whites in Ohio to utilize early voting. *See* PX0109 (Timberlake Rpt. at 50-55) ("[I]n 2008, 19.9% of Ohio's African American voters made use of EIP voting compared to only 6.2% of whites. In 2012, 19.6% of blacks used EIP voting versus 8.9% of whites."); 11/17/2015 Trial Tr. 133:2-134:7 (Timberlake); PX0019 (Franklin County Early Voting Report at 2) ("31% of all EIP voters in Franklin County were African American while 65% were white. This figure indicates that a disproportionately higher amount of African Americans utilized EIP voting as African Americans represented only 21% of all ballots cast in 2008."); 11/16/2015 Trial Tr. 98:15-99:2 (Turner); 11/17/2015 Trial Tr. 23:13-24:1 (Martin) (more than half of ballots cast early in person in Cuyahoga County in 2008 were cast by African Americans or Hispanics); *id.* at 207:13-208:1, 210:18-25 (Taylor); *id.* at 222:7-13, 230:4-22 (Perlatti); 11/19/2015 Trial Tr. 18:8-25 (Bowman); 11/23/2015 Trial Tr. 17:3-10 (McNair); *id.* at 155:21-156:6 (Burke) (voters utilizing golden week in Hamilton County "overwhelmingly African American"); 11/24/2015 Trial Tr. 91:18-92:2, 95:7-16 (Owens); *id.* at

120:12-121:2,130:25-131:6 (Beswick); *see also NAACP*, 43 F. Supp. 3d at 837. Even Dr. McCarty found by a statistically significant margin that African Americans were more likely than whites to use early voting. 11/19/2015 Trial Tr. 76:13-77:4 (McCarty). And data from Florida show that its curtailment of early voting resulted in a disproportionate reduction in turnout among African-American voters. *See* 11/24/2014 Trial Tr. 29:25-31:6 (Canon).

58. In contrast to these severe and racially disparate burdens, the benefits to the State from the elimination of Golden Week are marginal, at best. Any cost savings from the elimination of Golden Week are minimal. *See* 11/17/2015 Trial Tr. 220:5-221:16 (Perlatti) (Golden Week costs approximately $40-41K out of a total budget in excess of $13 million in Cuyahoga County); McDonald Dep. Tr. at 37:21-38:10, 42:12-43:1, 43:21-45:19, 46:24-47:4 (confirming Perlatti's testimony and explaining that in 2016 Cuyahoga's budget is $16 million); 11/23/2015 Trial Tr. 25:8-20 (McNair) (same); *id.* at 157:10-158:6 (Burke) (no concerns about Golden Week budget during years it was in effect because it "would have added a very small percentage to our budget"); 12/2/2015 Trial Tr. 35:2-22 (Poland) (Golden Week costs $8-12K out of a total budget around $8 million in Hamilton County); 11/30/2015 Trial Tr. 96:20-24, 109:8-110:5 (Munroe) (in 2012 Golden Week cost "a few thousand dollars" out of a budget of approximately $2.5 million in Mahoning County); 12/1/2015 Trial Tr. 250:19-251:8 (Ward) (Golden Week would have cost approximately $1K in 2015 and 2016 budget will be around $400-$410K in Madison County); *see also* Pls. Tr. Br. at 32-33. Further, there are "options" for boards that need additional money, including approaching the county commissioners or even going directly to the Common Pleas Court. 11/30/2015 Trial Tr. 104:6-17 (Munroe).

59. While one witness testified that there were administrative benefits from the elimination of Golden Week, *see* 12/2/2015 Trial Tr. 15:22-16:16 (Poland), others persuasively

explained that the elimination of Golden Week hinders election administration by leaving counties with less time to process absentee ballots before the counting of such ballots begins, *see* 11/17/2015 Trial Tr. 225:14-226:17 (Perlatti); 11/23/2015 Trial Tr. 21:13-22, 22:13-25 (McNair). Golden Week also benefitted election administration by relieving pressure on the polls on Election Day. 11/17/2015 Trial Tr. 226:18-23 (Perlatti); 11/23/2013 Trial Tr. 156:7-20 (Burke); 12/1/2015 Trial Tr. 7:8-17 (Cromes).

60.     Dr. Minnite's testimony established that voter fraud is extraordinarily uncommon and that the elimination of Golden Week did not reduce the potential for fraud in Ohio. *See* PX0107 (Minnite Rpt. at 19); 11/30/2015 Trial Tr. 19:23-20:6, 55:13-56:13 (Minnite); *see also* 12/2/2015 Trial Tr. 134:14-19 (Damschroder); 10/20/2015 Damschroder Dep. 47:3-5 (Secretary Husted's position is that "voter fraud is rare"); 11/17/2015 Trial Tr. 222:20-223:6, 225:6-13 (Perlatti); 11/23/2015 Trial Tr. 24:11-21, 25:5-7 (McNair); *id.* at 161:21-162:1, 191:10-15 (Burke); 11/30/2015 Trial Tr. 89:24-90:2 (Cleveland); *id.* at 110:24-112:4 (Munroe) (voter fraud is "very rare"); 12/1/2015 Trial Tr. 10:8-23 (Cromes); *id.* at 252:12-15 (Ward) (no fraud during Golden Week). In-person fraud is particularly uncommon. *See* PX0107 (Minnite Rpt. at 10-11).

61.     Fraud was especially difficult to commit through same-day registration during Golden Week, as ballots cast by those registrants were initially segregated from other ballots so they could be pulled if a registrant failed mail-verification. *See* 12/2/2015 Trial Tr. 12:22-13:24 (Poland); *id.* at 134:22-135:7 (Damschroder); 11/17/2015 Trial Tr. 222:20-225:5 (Perlatti); 11/23/2015 Trial Tr. 23:1-12 (McNair); *id.* at 162:2-15, 170:6-13, 170:21-171:4 (Burke); 12/1/2015 Trial Tr. 10:8-23 (Cromes); *see also* 11/30/2015 Trial Tr. 53:15-55:12 (Minnite). While voters attempted to cast fraudulent ballots on a few occasions during Golden Week, those ballots, with one possible exception, were not counted. *See* 11/30/2015 Trial Tr. 53:15-21

(Minnite); 11/23/2015 Trial Tr. 160:7-15, 161:21-162:1, 170:6-17, 192:5-10 (Burke); 12/2/2015

Trial Tr. 38:5-8, 45:14-17 (Poland). *Compare* 12/2/2015 Trial Tr. 137:18-138:19 (Damschroder)

(one ballot counted), *with* 10/29/2015 Damschroder Dep. Tr. 28:23-29:8 (no ballots counted).

62.    Moreover, the election system is no more secure as a result of the elimination of

same-day registration. A voter can still register 29 days before an election and cast an in-person

ballot the next day—before the mail-verification process has been completed. 12/2/2015 Trial Tr.

36:1-37:14 (Poland); *id.* at 135:8-137:11 (Damschroder); 11/17/2015 Trial Tr. 273:9-274:3

(Perlatti); 11/20/2015 Trial Tr. 156:5-157:14 (Hood); 11/23/2015 Trial Tr. 23:1-24:7 (McNair);

*id.* at 171:5-16 (Burke); *see also* 12/1/2015 Trial Tr. 252:16-253:4 (Ward) (registration cut-off

and confirmation card process have not changed). Indeed, Sherry Poland explained that, had one

individual who registered and attempted to cast a fraudulent ballot during Golden Week instead

registered and attempted to vote through the method described in the preceding sentence, *that

fraudulent vote would have been counted* because only votes cast by Golden Week registrants

were segregated. 12/2/2015 Trial Tr. 37:15-38:23 (Poland).[2]

63.    **<u>One Location Rule.</u>** Ohio's law prohibiting counties from opening more than one

early voting location also severely burdens the right to vote. Large numbers of voters have to

travel greater distances to vote early than they would have to travel if additional early voting

locations were open. *See* PX0114 (Yang Rebuttal Rpt. at 4-5) (with one early voting location,

"[s]ome voters may need to travel a significant amount of time to go to the polling station");

11/19/2015 Trial Tr. 189:5-190:7 (Yang). This deters early voting. "Extensive literature has

concluded that polling station location can impact voter turnout." PX0114 (Yang Rebuttal Rpt. at

5.); 11/20/2015 Trial Tr. 145:25-146:9 (Hood) (the "establishment of additional early voting

---

[2] Mark Munroe stated that eliminating Golden Week could reduce confusion among voters about when they could register. 11/30/2015 Trial Tr. 97:24-98:13. He knew of no instances of such confusion. *Id.* at 110:6-23.

locations. . . might encourage more voters to take advantage of [early voting] options."); *see also* Pls. Tr. Br. at 34-35. In fact, every state in which more than 20 percent of voters use early voting has more than one early voting location per county, most have more than two, and many have even more than that. *See* 12/1/2015 Trial Tr. 153:14-155:14, 157:13-160:17 (Trende).

64.     That Ohio has had long lines for early voting despite a relatively low rate of early voting usage is compelling evidence that the one-location-per-county rule is insufficient to serve the needs of voters. Because of this rule, moreover, early voting lines are particularly burdensome, in that they consistently stretch significant distances, forcing voters to wait outside for lengthy periods of time. *See* 11/16/2015 Trial Tr. 57:4-58:3, 59:5-7 (Turner); *id.* at 115:5-19 (Butcher); *id.* at 142:16-143:12 (Caffrey); *id.* at 205:14-206:13, 208:25-209:15, 257:17-21 (Anthony); 11/17/2015 Trial Tr. 44:20-46:10, 57:11-22 (Martin); *id.* at 207:13-210:17 (Taylor); *id.* at. 229:10-230:3 (Perlatti); 11/19/2015 Trial Tr. 22:20-23:11 (Bowman); 11/23/2015 Trial Tr. 17:3-5, 20:2-7 (McNair); *id.* at 193:4-15, 195:5-196:10 (Burke); 11/24/2015 Trial Tr. 92:3-20 (Owens); *id.* at 143:12-22 (Beswick). During the 2012 election, Portage County had early voting wait times of at least two-and-a-half hours due to space limitations that prevented the county from using a sufficient amount of machines. 12/1/2015 Trial Tr. at 12:15-13:5 (Cromes). An additional early voting location would have helped to reduce the lines. *Id.* at 13:6-17 (Cromes).

65.     The one-location-per-county rule disproportionately burdens African Americans. As mentioned, African Americans are far more likely than whites in Ohio to use early voting, meaning that laws that burden early voting have a disproportionate impact on African Americans. *See* PFOF ¶ 57. Moreover, this policy has the greatest impact on voters in Ohio's largest counties—where a significant and disproportionate share of the state's African-American population lives—since those counties have the most voters attempting to cast ballots at a single

location. This is borne out by the evidence of long lines for early voting in Ohio's largest counties. *See* 11/16/2015 Trial Tr. 57:4-58:3, 59:5-7 (Turner) (Cuyahoga); *id.* at 115:5-19 (Butcher) (Summit); *id.* at 142:16-143:12 (Caffrey) (Franklin); *id.* at 205:14-206:13, 208:25-209:15, 257:17-21 (Anthony) (Franklin); 11/17/2015 Trial Tr. 44:20-46:10, 57:11-22 (Martin) (Cuyahoga and Franklin); *id.* at 207:13-210:17 (Taylor) (Cuyahoga); *id.* at 229:10-230:3 (Perlatti) (Cuyahoga); 11/23/2015 Trial Tr. 17:3-5, 20:2-7 (McNair) (Cuyahoga); *id.* at 193:4-15, 195:5-196:10 (Burke) (Hamilton); 11/24/2015 Trial Tr. 92:3-20 (Owens) (Montgomery); *id.* at 143:12-22 (Beswick) (Franklin). Further, the existence of the transportation disparities discussed above, *see* PFOF ¶ 11, strongly supports the finding that a policy that increases travel distance for voting will result in a disproportionate burden on African Americans.

66.     The State has provided almost no justification for the one-location-per-county rule. Sherry Poland asserted that counties would have to consider various issues if they were to open additional early voting locations. 12/2/2015 Trial Tr. 20:11-22:13. But consideration of such issues is a regular part of work in election administration, and Ms. Poland did not explain how it benefits counties to be prohibited from meaningfully undertaking such consideration. *But see* 11/23/2015 Trial Tr. 6:17-7:4 (McNair) ("I think counties generally should have as many tools in their tool box as they can to use those to effectuate good elections"); *id.* at 181:18-22, 192:24-193:15, 196:11-197:8 (Burke) ("I'd at least like to have the option of considering [multiple locations]."); 12/1/2015 Trial Tr. 13:6-14:21 (Cromes) (explaining that there are always logistical challenges but that boards of elections are resourceful). Director Poland also asserted that the opening of multiple early voting locations in one county could cause voter confusion in other counties. 12/2/2015 Trial Tr. 44:13-22. But she provided no concrete support

for this claim, and it makes little sense. Counties have different numbers of polling locations on Election Day and that does not cause voter confusion. *See id.* at 45:1-13 (Poland).

67.     Finally, Dr. Ted Allen asserted that the opening of multiple early voting locations would result in longer wait times to vote. 11/30/2015 Trial Tr. 126:17-20, 159:7-22. For a variety of reasons, however, Dr. Allen's analysis provides no meaningful information about the magnitude of any such effect. *See, e.g., id.* at 140:15-20, 141:9-19, 142:6-14 (counties evaluated not a representative sample); *id.* at 144:25-146:3, 149:3-17 (arrival rates used in model almost three times higher than the actual average arrival rates for one county and five times higher for another); *id.* at 154:22-157:19 (admitting that this analysis is "probably a little bit off"); *id.* at 169:13-172:11 (queuing model used for analysis does not reflect reality of election queues); *id.* at 172:14-173:1 (previously published paper saying that simulation model is necessary). Dr. Allen also failed to account for travel time, while acknowledging that this is a relevant factor. *Id.* at 165:13-22 (commuting time an "ideal" factor to consider but not considered in his analysis).

68.     Most problematically, Dr. Allen's analysis is premised on the notion that counties cannot use their Election Day voting machines for early voting and thus are tightly constrained in the number of machines they can use for early voting. *Id.* at 161:6-8; DX16 (Allen Rpt. ¶ 1) ("counties have a fixed and limited resource pool"). That premise is questionable in DRE counties, *see* 11/30/2015 Trial Tr. 164:1-15 (Allen) (Franklin County increased number of DRE machines for early voting and has back-up optical-scan machines), and it lacks any foundation in other counties, *see id.* 161:9-17 (Dr. Allen does not know whether resource constraints apply to non-DRE counties because "it is easier" "to recommission and refurbish and move around or potentially add booths than it is to add DRE machines"). Indeed, numerous other states have been able to open multiple early voting locations per county with success. *See id.* at 159:23-

161:5 (Allen) (North Carolina and New Mexico); 12/1/2015 Trial Tr. 153:14-155:16, 157:13-160:17 (Trende) (discussing high early voting turnout in many states with multiple early voting locations). In any event, Dr. Allen did not explain why counties should not be *permitted* to open multiple early voting locations if they have the resources to do so. *See* 11/17/2015 Trial Tr. 221:10-16 (Perlatti) (Cuyahoga County has surplus of approximately $2 million).

69. **Minimum Number of DREs**. SB 200's change to the policy for calculating the minimum number of DREs will reduce the minimum number of DREs that counties are required to have. *See* PX0113 (Yang Rpt. at 8-12); 11/19/2015 Trial Tr. 173:10-25, 193:18-194:1 (Yang); 11/30/2015 Trial Tr. 179:21-180:16 (Allen). To the extent that a county's DRE supply falls below the number required under the law previously in place, the effect of this change will be longer wait times to vote. *See* 11/19/2015 Trial Tr. 174:25-175:18, 177:13-179:19 (Yang); *cf.* 11/30/2015 Trial Tr. 179:21-180:16 (Allen). Dr. Yang's undisputed findings about the impact on wait times that will result if counties hew to the minimum shows that wait times to vote could increase significantly as a result of SB 200, particularly for those voters who already would have had to wait the longest. PX0113 (Yang Rpt. at 10, Tbl. 2). And that is not even accounting for the fact that the DREs in use in Ohio are aging and liable to fail. *See* 11/19/2015 Trial Tr. 201:4-202:5 (Yang); *see also id.* at 199:3-200:4 (Yang); 11/30/2015 Trial Tr. 200:22-201:10 (Allen); 11/16/2015 Trial Tr. 219:9-220:16 (Anthony) (noting concerns "about the integrity of our whole system with equipment that's ten years old and I believe there's a need to think about replacing them with either new equipment or something"); *cf.* 11/23/2015 Trial Tr. 12:9-15:9 (McNair) (DREs in Cuyahoga County were "unstable" and the county switched to an optical scan system); 12/1/2015 Trial Tr. 19:8-20:21 (Cromes) (DRE machines in Portage County caused delays).

70. The impact of SB 200 will be felt disproportionately by African Americans. Because the rates of absentee ballot use are significantly higher in counties with relatively large populations of African Americans, PX0110 (Timberlake Rebuttal Rpt. at 14), the new formula for calculating the DRE minimums (which allows counties to subtract from the "registered voting population" used in the DRE calculation the number of voters who cast absentee ballots in the last like election) results in the greatest reductions in the number of required DREs in counties with the highest African-American populations. 11/19/2015 Trial Tr. 169:2-19 (Timberlake). Specifically, three high-minority counties would see a reduction in the DRE minimum of 140 DREs per 100,000 voters, whereas the reduction would be 127 DREs per 100,000 voters in other counties—a difference of over 10 percent. PX0109 (Timberlake Rpt. at 60); PX0110 (Timberlake Rebuttal Rpt. at 15); 11/17/2015 Trial Tr. 168:2-169:23 (Timberlake). Increases in wait times to vote stemming from the reduction in the DRE minimum are thus materially more likely to occur in the counties with large African-American populations.

71. The only plausible state interest in this change is that it will reduce costs for counties, which are now much less likely to have to acquire new DREs. But the State has not attempted to quantify such cost savings. Instead, the State has focused on the facts that one or two counties will exceed the minimum requirement, *see* 11/30/2015 Trial Tr. 130:21-131:2, 180:17-182:3 (Allen), and that counties have been directed not to divest themselves of DREs, *see* 12/2/2015 Trial Tr. 91:14-22 (Damschroder). To the extent that counties' DRE stock exceeds the old minimum, however, the change in the DRE minimum serves no purpose at all—it is irrelevant. 11/19/2015 Trial Tr. 174:25-175:18 (Yang); 11/30/2015 Trial Tr. 179:9-180:13 (Allen). Moreover, the Secretary's directive does not require counties to replace DREs that break

down, meaning that the change to the minimum DRE requirement will permit counties' DRE stocks to dwindle over time. *See* 11/19/2015 Trial Tr. 203:18-204:5 (Yang).

72.     While Dr. Allen has asserted that the change to the DRE formula is a "qualitative" improvement, *see* 11/30/2015 Trial Tr. 185:12-186:18 (Allen), a theoretical improvement to the soundness of the formula will provide little solace to voters waiting in longer lines. As Dr. Yang explained, while it is theoretically sound only to consider Election Day voters in this formula, "If we want to make this formula correct, we have to change the denominator and numerator at the same time. . . . Otherwise, it could result in even worse result[s]." 11/19/2015 Trial Tr. 193:8-193:17 (Yang); *see also id.* at 193:18-194:1 (Yang) ("if we keep 175 unchanged, just make the numerator smaller because we are removing the number of absentee voters in that formula, . . . it will result in . . . [a] smaller number of voting machines" and "[t]he lines will be longer.").

73.     **Restrictions on Absentee Ballot Mailings**. The counties' sending of unsolicited absentee ballot applications to voters made the process of voting by mail easier. The consistency of these mailings—sent in odd as well as even years—was particularly valuable. *See* 11/17/2015 Trial Tr. 232:24-233:22 (Perlatti) (discussing habitual nature of voters and explaining that Cuyahoga County's consistent mail program made voters more comfortable with the vote by mail process); 11/23/2015 Trial Tr. 173:17-174:19 (Burke) (less voter confusion when program consistent); 11/23/2015 Trial Tr. 11:7-19 (McNair) (importance of consistency); 11/16/2015 Trial Tr. 60:1-2, 17-24 (Turner) (discussing voter confusion due to prohibition on county mailings of absentee ballot applications); 11/17/2015 Trial Tr. 16:7-15, 17:7-13 (Martin) (discussing voter confusion in connection with changes in absentee ballot mailing program).

74.     Likewise, counties' prepayment of postage ensured both that indigency was not a barrier to voting by mail and that confusion about how much postage was owed did not result in

ballots not being delivered to boards of elections. 11/16/2015 Trial Tr. 225:2-227:11 (Anthony) (Franklin County prepaid postage due, in part, to voter confusion about cost of postage); 11/17/2015 Trial Tr. 212:3-16 (Taylor) (describing challenges voters face in paying for postage for absentee ballots); *id.* at 233:23-234:21 (Perlatti); 11/23/2015 Trial Tr. 10:8-20 (McNair) (postage on absentee ballots varied); *id.* at 174:21-175:11 (Burke) (discussing voter confusion about postage required and ballots with insufficient postage being mailed to the board of elections); 11/24/2015 Trial Tr. 123:8-22 (Beswick) (describing varying rate of postage needed for ballots and voter confusion about amount resulting in late or non-delivered ballots)

75. These policies had the added benefit of reducing in-person turnout and thereby reducing wait times to vote. 11/17/2015 Trial Tr. 232:24-233:22 (Perlatti) (absentee ballot mailing "was a good way for Cuyahoga County, again, to relieve pressure at the polls on election day"); 11/23/2015 Trial Tr. 8:24-10:7, 16:6-20 (McNair) (reduced pressure on lines and helpful to election administration); *id.* at 172:12-173:15, 199:3-12 (Burke) (reduced pressure on lines).

76. By prohibiting counties from conducting unsolicited absentee ballot mailings and prohibiting all officials from providing prepaid postage for absentee ballot return mailings, SB 205 eliminated the benefits resulting from those policies and thus burdened voters. Those burdens are compounded by SB 205's provision that prohibits the Secretary of State from mailing unsolicited absentee ballot applications absent specific authorization from the General Assembly and restricts such mailings to even-year elections, as that provision limits the availability of an alternative means of facilitating absentee voting in some elections and eliminates it for other elections. Those burdens are compounded further still by the Secretary of State's decision to exclude a class of eligible voters from his unsolicited absentee ballot mailings.

77.     The Secretary anticipated mailing of unsolicited absentee ballot applications to voters for the 2016 election only partially and temporarily offsets these burdens. As noted, the Secretary is not permitted to include prepaid return postage with his mailings, SB 205 § 3509.03(I); he cannot conduct such mailings for odd-year elections, 11/17/2015 Trial Tr. 235:18-21 (Perlatti); 11/23/2015 Trial Tr. 173:25-174:4 (Burke); and his program—unlike the one that Hamilton County had run, *see* 11/23/2015 Trial Tr. 172:22-25, 173:17-21, 199:19-200:5 (Burke)—excludes a class of eligible voters. *See id.* at 174:5-10 (Burke) ("I do not believe it's an adequate substitute because it's not going to the same universe of voters and it's not going in municipal or odd-numbered election years."); *id.* at 199:3-200:5 (Burke) (large and small counties have differing needs and now fewer Hamilton County voters receive mailings)

78.     Further, mailings conducted by the counties, which had the opportunity to study their local electorates to determine when such mailings would be most effective, were more successful than the Secretary's was. 11/16/2015 Trial Tr. 226:3-21 (Anthony) (there was a reduction in the number of absentee ballots received in 2012); 11/17/2015 Trial Tr. 231:10-25, 235:8-17, 236:19-237:6 (Perlatti) (Cuyahoga studied timing of mailing and response rate was higher when the program was run by the county); 11/23/2015 Trial Tr. 18:23-20:1 (McNair) (Secretary of State mailing in 2012 was sent too early). Finally, there is no guarantee that mailings will be conducted in 2018 or any subsequent even-year election; indeed, the default rule under the statute *prevents* such mailings absent affirmative action by the General Assembly.

79.     SB 205's restrictions on absentee ballot mailings disparately burden African Americans.  Unsolicited absentee ballot mailings and the inclusion of prepaid postage are tools that Ohio's larger, disproportionately African-American counties used to encourage absentee voting and to reduce waiting times to vote. *See* 11/16/2015 Trial Tr. 225:2-227:15 (Anthony)

(Franklin); 11/17/2015 Trial Tr. 232:24-233:22 (Perlatti) (Cuyahoga); 11/23/2015 Trial Tr. 8:24-10:7, 16:6-20 (McNair) (Cuyahoga); *id.* at 172:12-173:15, 199:3-12 (Burke) (Hamilton). The inclusion of prepaid postage also made it easier to cast a ballot for lower-income voters in particular, who are disproportionately African American. Additionally, the Secretary's exclusion of many inactive voters from his mailings disproportionately impacts African Americans, who have higher rates of residential instability and are thus more likely than others to have out-of-date voter registrations and to be in an inactive status. PX0109 (Timberlake Rpt. at 15-18).

80.     There is little benefit to the State from these restrictions. While transferring responsibility for unsolicited absentee ballot mailings from the counties to the State serves whatever state interest there is in uniformity of unsolicited absentee ballot mailings, that interest is not implicated by the rule limiting the circumstances in which the Secretary can send his mailings, the rule prohibiting anyone—including the Secretary—from including prepaid postage in absentee ballot mailings, or the decision to exclude a class of voters from such mailings. Nor can these measures be justified on cost grounds. To the extent the State funds unsolicited absentee ballot mailings, these changes increase costs to the State. While this in turn saves money at the county level, the State has provided no evidence indicating that it has an interest in preventing counties from spending money *that the counties would like to spend. See, e.g.*, 11/17/2015 Trial Tr. 12:17-13:12 (Martin) (explaining that in 2011 when the Secretary of State prohibited county boards from sending unsolicited absentee ballot mailings the Cuyahoga County government responded by sending them itself, rather than from the board of elections).

81.     The lack of any interest in the State's decision to send unsolicited absentee ballot applications only to active voters and inactive voters who cast ballots in one of the two prior even-year elections, but not other inactive voters who are fully eligible to vote, is demonstrated

by Matthew Damschroder's explanation for that decision: "That's the choice we've made." Damschroder 30(b)(6) Dep. Tr. 95:18-96:3; *see also* 11/17/2015 Trial Tr. 238:11-242:3 (Perlatti) (in Cuyahoga County of the 240,000 inactive voters only 40,000 voters were inactive because they had moved; over 180,000 were deemed inactive for lack of activity).

82. **New Informational Requirements**. By adding two additional required fields—address and date of birth—to the absentee and provisional ballot forms, SB 205 and SB 216 further burden voting rights. The consequences are severe for voters who omit one of these fields or make certain mistakes in supplying the information for those fields: Absentee voters who do not cure their error within seven days of the election, and all provisional voters who make such an error, are disenfranchised. Because very large numbers of Ohioans cast absentee and provisional ballots, *see* 12/2/2015 Trial Tr. 76:11-22 (Damschroder) (a third of all ballots were absentee in 2012); 12/3/2015 Trial Tr. 68:6-20 (Damschroder) (Ohio has had one of the highest rates of provisional ballot use in the country), these new requirements will affect a number of voters. Indeed, even in low-turnout elections such as the 2014 election, voters have been disenfranchised as a result of these changes to the law. 11/23/2015 Trial Tr. 30:25-32:3 (McNair); *id.* at 180:2-9 (Burke). Further, by increasing the amount of information that voters must supply—and thus the amount of time spent in the voting process—the new informational requirements for provisional ballots will increase wait times to vote. *See* 11/30/2015 Trial Tr. 218:20-23 (Allen) (ballot length can affect wait time).

83. These new requirements will burden some classes of voters more than others. The challenge of accurately and fully filling out forms is plainly heightened for individuals with low levels of English proficiency, low literacy, or low levels of education in general. As explained above, African Americans in Ohio have lower levels of educational attainment than whites. *See*

PFOF ¶ 12. And, in fact, the rate at which absentee ballots are rejected is much higher in high-minority counties than in other counties in Ohio. *See* PX0109 (Timberlake Rpt. at 55-56). Provisional ballots are also rejected at a higher rate in high-minority counties. *Id.* at 57. In addition, African Americans are more likely than whites in Ohio to have to cast provisional ballots: In 2008 and 2012, voters in high-minority counties were between approximately 30 and 50 percent more likely than voters in other Ohio counties to have to vote by provisional ballot. *Id.* at 58. For each of these reasons, the burdens imposed by the new informational requirements for SB 205 and SB 216 fall disproportionately on African Americans.

84.     There is almost no state interest in the new informational requirements for absentee ballots. Elections officials were able to identify voters with the information they received before these requirements were added, so these requirements are not necessary to determine who cast an absentee ballot. 11/17/2015 Trial Tr. 243:11-14, 245:14-21 (Perlatti); 11/23/2015 Trial Tr. 26:8-26:16, 30:25-32:3 (McNair); *id.* at 176:19-177:2, 198:4-198:9 (Burke); 12/1/2015 Trial Tr. 21:14-22 (Cromes); 12/3/2015 Trial Tr. 35:13-36:12 (Damschroder). Nor is the state interest in deterring fraud materially related to the new informational requirements. Putting aside the fact that voter fraud is extremely rare, these new requirements would only prevent fraud where an individual intercepted and cast another individual's ballot; the fraudulent voter supplied the other individual's name and a form of identification (or the final four digits of the social security number) for that individual; and the fraudulent voter credibly forged the signature of the other individual; *but* the individual committing the fraud provided incorrect date of birth or address information (the latter of which is preprinted).

85.     In some contrast, address information can help election administrators determine an individual's correct precinct. *See* 12/1/2015 Trial Tr. 21:23-23:2 (Cromes). It thus makes

sense to *ask* provisional voters to supply address and date of birth information. But it does not logically follow that the failure to provide such information should result in disenfranchisement where the State is accurately able to determine a provisional voter's identity and proper precinct. *Cf.* 11/17/2015 Trial Tr. 272:5-273:8 (Perlatti); 12/1/2015 Trial Tr. 21:23-23:2 (Cromes).

86.    **Additional Provisional Ballot Restrictions**. SB 216 also makes it more difficult to cast a provisional ballot by reducing from ten to seven days the cure period for voters who fail to provide proof of identity on Election Day and prohibiting election officials (with limited exceptions) from completing the information required on the provisional ballot affirmation form on behalf of voters. The reduction in the cure period plainly burdens the right to vote of those for whom the eighth, ninth, or tenth day after Election Day is the most convenient—or only—time for them to cure their ballots. The reduction also limits the period that activists have to work with voters to cure the deficiencies, resulting in fewer voters receiving the assistance they need to cure their ballots. 11/17/2015 Trial Tr. 40:9-43:10 (Martin); 11/24/2015 Trial Tr. 142:1-13 (Beswick). The evidence shows that some voters did, in fact, take advantage of the now-eliminated days for curing these deficiencies. 11/23/2015 Trial Tr. 30:4-13 (McNair). In addition, the bar on poll workers' filling out provisional ballot affirmation forms on behalf of voters has the effect of limiting the assistance that provisional voters with low literacy or limited English proficiency can receive from poll worker—the individuals in the polling place most familiar with the forms.

87.    Each of these provisions burdens African Americans disproportionately because they make up a disproportionate share of provisional voters. *See* PFOF ¶ 83. Moreover, because the limitation on poll worker assistance in filling out provisional ballot forms will have the greatest effect on low-literacy and limited-English-proficiency voters, it will disproportionately burden those with relatively low levels of educational attainment, including African Americans.

88.     These provisions do not serve meaningful state interests. Counting ballots cured in the eighth, ninth, and tenth days after an election was not burdensome even for the largest counties in Ohio. *See* 11/23/2015 Trial Tr. 30:4-13 (McNair). Turning away voters who show up attempting to cure their ballots on those days will surely prove more difficult. Likewise, it is difficult to discern the interest in prohibiting poll workers *who want to assist votes in filling out their provisional ballot affirmation forms* from providing that assistance to voters *who want such assistance*. It is not plausible that voters with low literacy or limited English proficiency who request such assistance are more likely than are poll workers to fill those forms out accurately.

89.     **<u>Right Church, Wrong Pew</u>**. SB 216 burdens the right to vote by permitting counties not to consolidate their poll books at multi-precinct voting locations. Under current law, a voter who casts a ballot at the wrong precinct (i.e., the wrong line) in a multi-precinct location at the direction of a poll worker is entitled to have his or her ballot counted. *See SEIU v. Husted*, 698 F.3d 341, 344 (6th Cir. 2012); 11/16/2015 Trial Tr. 194:7-25 (Biehle). However, a voter who casts his ballot in the wrong line but cannot establish that this was the result of poll worker error will not have his ballot counted. 12/2/2015 Trial Tr. 179:4-180:23 (Damschroder). There is a simple fix: consolidation of poll books at multi-precinct locations, which ensures that all voters at the same location check in at the same (and thus the correct) poll book. This solution would also reduce voter confusion at polling places. 11/16/2015 Trial Tr. 178:17-179:4 (Biehle) (consolidated poll books "alleviate[] . . . confusion as to what table they're supposed to be at . . . . [T]hey go to the table with the letter of their first name whereas now they're not always sure of what table they need to go to."); *see also* 11/16/2015 Trial Tr. 201:25-205:9 (Anthony) (poll book consolidation in Franklin County). To the extent that poll book consolidation remains optional, voters will continue to be burdened through this arbitrary regime.

90.     There is no state interest in having unconsolidated poll books. The Secretary of State "has recommended that Boards of Elections consolidate their pollbooks in a multi-precinct location," *see* Damschroder 30(b)(6) Dep. Tr. 113:14-114:8, and issued a proposed directive that would mandate this, *see* DX14CC at 57; 12/3/2015 Trial Tr. 66:8-24 (Damschroder). And poll book consolidation will help save money and reduce wait times at the polls. 11/16/2015 Trial Tr. 204:11-205:9 (Anthony); 11/17/2015 Trial Tr. 250:5-17 (Perlatti); 12/1/2015 Trial Tr. 17:25-19:3 (Cromes) (benefits of poll book consolidation in Portage County).

91.     **<u>Cumulative Impact</u>**. The burdens that the challenged provisions impose on voting rights are particularly severe when they are considered collectively. Lines for early voting and/or Election Day voting are likely to be increased not only by the elimination of part of the early voting period but also by the reduction in the minimum number of DREs required for DRE counties; the new restrictions on absentee ballot mailings; and the new rule mandating that provisional voters provide address and date of birth information when casting their ballots. *See* PFOF ¶¶ 52-90. Indeed, Dr. Yang's models showed the most significant increases in wait times when he considered the combined impact of reductions in DREs and a shift of voters to Election Day due to the elimination of Golden Week and the new restrictions on absentee voting. *See* PX0113 (Yang Rpt. at 16-18); 11/19/2015 Trial Tr. 179:20-181:2 (Yang).

92.     Moreover, many voters will be burdened not simply by one of the challenged provisions but by a combination of them—resulting in further increases in the costs of voting and a depressive effect on turnout. For instance, a low-literacy voter having difficulty with SB 216's new informational requirements may have asked a poll worker to fill in those required categories of information; but a poll worker can no longer provide that form of assistance. *See* PFOF ¶¶ 82-87. Likewise, voters who would have cast their ballots during Golden Week and would now like

to vote absentee must not only familiarize themselves with a new method of voting but also are burdened by the new restrictions on absentee voting. *See* PFOF ¶¶ 52-57, 82-83.

93.     The fact that nearly all of the challenged provisions disproportionately burden African Americans means that the overall disproportionate impact of the laws will be particularly stark. Indeed, African-American turnout relative to white turnout was down in 2014 (when the challenged provisions were in effect) relative to 2010 (when only the one-location-per-county rule was in effect). *See* 11/19/2015 Trial Tr. 128:25-129:4 (McCarty). While this is far from conclusive, defense expert Sean Trende opined that "[i]f the cost of voting on African-American voters, vis-à-vis white voters, had increased, you would expect to [see a decline from 2010 to 2014 in African-American turnout relative to white turnout]." 12/1/2015 Trial Tr. 204:21-205:1.

94.     The Defendants' assertion that it is "easy to vote in Ohio" does not impact these findings. Whether it is easy to vote in Ohio *in general* has limited relevance to the question whether the challenged provisions burden voting rights. Moreover, the evidence contradicts this assertion. Ohio has had significant problems with election administration, including a recurring problem with long lines. *See* PFOF ¶¶ 1-7. The rejection of nearly 1,000 ballots in Summit County in this November's election because the U.S. Postal Service failed to postmark those ballots, 11/24/2015 Trial Tr. 139:10-141:1 (Beswick), is just the latest example—and one that highlights the problem with having disenfranchisement as the consequence of noncompliance with rigid rules that prevent county officials from using their discretion to count votes.

95.     The Defendants' claim about the ease of voting in Ohio rests largely on cross-state comparisons conducted by defense expert Sean Trende. That analysis, however, focuses largely on cherry-picked comparisons in which Ohio fares well, while ignoring comparisons in which Ohio fares poorly. Mr. Trende, for example, looked at the period of early voting

availability in several different, overlapping ways and concluded that Ohio offers expansive early voting opportunities. DX14 (Trende Rpt. at 7-33); 12/1/2015 Trial Tr. 68:2-11 (Trende). Yet Mr. Trende nowhere compared states in terms of the number of early voting locations per county, 12/1/2015 Trial Tr. 146:2-9 (Trende), and he *omitted Ohio* from his chart comparing states' relative equity in per-capita-per-county early voting locations, *see* DX14 (Trende Rpt. at 24, Tbl. 3); 12/1/2015 Trial Tr. 137:14-138:1 (Trende). These are significant omissions, as Ohio does poorly in both categories. *See* 12/1/2015 Trial Tr. 135:1-12 (Trende) (he knows of no other state that bars counties from opening more than one early voting location); *id.* at 138:2-9 (Trende) (because of one-location rule, there is no correlation between county population and number of early voting locations). In addition, Mr. Trende failed to consider that Ohioans use early voting at far lower rates than do voters in many other states, *id.* at 153:14-155:16, 157:13-160:3, 160:8-12 (Trende)—strong evidence that early voting is more accessible in those states than in Ohio— yet that Ohio still has extremely long lines for part of the early voting period. Likewise, Mr. Trende testified that Ohio's unsolicited absentee ballot program is generous and said he knew of only one other state with a similar program. *Id.* at 180:2-8, 182:7-15. Mr. Trende's report did not mention, however, that he knows of only a handful of states that impose *restrictions* similar to those set forth in SB 205. *Id.* at 182:16-25.

## PROPOSED CONCLUSIONS OF LAW

### I.     *ANDERSON-BURDICK* TEST

96.     Challenges to laws on the grounds that they unduly burden the fundamental right to vote in violation of the First and Fourteenth Amendments are governed by the *Anderson-Burdick* test, which requires courts to "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by

the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). This test operates on a sliding scale, with more rigid scrutiny applied to more burdensome laws, *id.*, and the severity of the burden judged by its impact on those affected by it, *see Crawford*, 553 U.S. at 198, 201 (Stevens, J., controlling opinion). *See generally* Pls. Tr. Br. at 30-32.

97.      **Elimination of Golden Week**. The elimination of Golden Week severely burdens the right to vote. Well over 10,000 people used the same-day registration opportunity offered by Golden Week to register and vote in each of the last two presidential elections, PX0109 (Timberlake Rpt. at 51); 11/17/2015 Trial Tr. 108:9-24 (Timberlake), and there is reason to believe that an even greater number of voters will be deterred from turning out in the future due to the elimination of five days of same-day registration. PX0106 (Canon Rpt. at 8-9); 11/24/2015 Trial Tr. 38:17-39:14, 76:25-77:8 (Canon); *see also* 12/1/2015 Trial Tr. 161:16-162:10 (Trende) (agreeing there is scholarly consensus that same-day registration increases turnout).

98.      The heavy usage of Golden Week for early voting in the two prior presidential elections also means that numerous voters will now need to vote at a different time, resulting in the longer lines at the polls. *See* PFOF ¶¶ 54; Pls. Tr. Br. at 32-33. Indeed, other states that have reduced early voting have seen increases in wait times for voting that deterred large numbers of people from casting a ballot. 11/30/2015 Trial Tr. 194:3-21 (Allen); *see also* Pls. Tr. Br. at 12.

99.      These burdens outweigh any benefit to Ohio from the elimination of Golden Week. Any cost savings from the elimination of Golden Week are far too minimal to justify this change. *See* PFOF ¶¶ 52-58; Pls. Tr. Br. at 33. *See generally NAACP*, 768 F.3d at 549 (cost-saving rationale insufficient without evidence that defendants would "struggle" with costs of

maintaining status quo). The evidence regarding the impact of the elimination of Golden Week on election administration is, at best, mixed, and on balance indicates that this change will make it *harder* to administer elections. *See* PFOF ¶ 59. *See also Beaumont v. Fed. Election Comm'n*, 278 F.3d 261, 274-75 (4th Cir. 2002) ("Although administrative convenience constitutes a legitimate state interest where rational basis scrutiny of regulatory enactments is involved, such convenience is insufficient to justify state action that triggers any level of heightened scrutiny."), *rev'd on other grounds*, 539 U.S. 146 (2003). And the evidence at trial showed both that voter fraud in Ohio is and during Golden Week was exceedingly rare and that it was especially difficult to commit voter fraud for individuals who registered during Golden Week. *See* PFOF ¶¶ 60-62; Pls. Tr. Br. at 33-34; *see also NAACP*, 768 F.3d at 547-48 (while "scattered historical examples of voter fraud" may be sufficient to justify a restriction under rational basis review, such evidence was insufficient under "more searching review" required for a significant burden). The elimination of Golden Week cannot survive scrutiny under the Equal Protection Clause.

100. **One-Location Rule**. Ohio's policy of limiting early voting to a single location per county also imposes severe burdens on the right to vote. This policy increases the distances that voters have to travel to vote early in counties that otherwise would open multiple locations, resulting not only in burdens for voters generally but for voters who lack access to a vehicle in particular. Political science literature and practical experience in different early voting regimes across the country demonstrate that the one-early-voting-location-per-county rule substantially depresses early voting usage in Ohio, meaning both that one of the methods of voting in Ohio is much more burdensome than it needs to be and that early voting does much less to relieve the strain on other methods of voting than it could.[3] *See* PFOF ¶ 63.

---

[3] While much of Defendants' discussion of this issue has focused on the *remedy* requested in Plaintiffs' Amended Complaint, the requested remedy has no bearing on the constitutionality of the challenged

101.     Notwithstanding its relatively low early voting turnout rate, Ohio's largest

counties have had extraordinarily long lines for early voting. *See* PFOF ¶ 64. Such lines provide

a powerful signal that Ohio's early voting regime is deeply flawed and unnecessarily burdening

voters. *Cf. The American Voting Experience: Report and Recommendations of the Presidential*

*Commission on Election Administration* 14 (Jan. 2014), *available at* https://www.supportthevoter.

gov/files/2014/01/Amer-Voting-Exper-final-draft-01-09-14-508.pdf (explaining, in the context of a

discussion of Election Day lines, that "as a general rule, no voter should have to wait more than

half an hour in order to have an opportunity to vote" and that "[a]ny wait time that exceeds this

half-hour standard is an indication that something is amiss and that corrective measures should

be deployed") (emphasis removed); *see also* 11/30/2015 Trial Tr. 204:24-205:2 (Allen). In

Portage County, the long lines that formed during early voting were not a result of inadequate

resources or unexpected turnout. 12/1/2015 Trial Tr. 12:7-13:5 (Cromes). Rather, they were

caused by inadequate space at the board of elections—a problem that could have been alleviated

with more early voting centers. *Id.* at 13:6-17; *see also* 11/23/2015 Trial Tr. 192:24-193:15,

195:5-197:8 (Burke) (inadequate facility contributes to long lines in Hamilton County).

102.     One effect of these long lines at a single location per county is that voters, in

order to utilize early voting in some of Ohio's largest counties, have had to wait in line outdoors

---

provision. Moreover, to the extent that there was any confusion about Plaintiffs' requested relief,
testimony at trial confirmed that Defendants have known since at least a month before their expert reports
were filed that Plaintiffs' one-location claim merely sought discretion for county boards. *See* 12/1/2015
Trial Tr. 135:18 - 136:12, 215:12 -216:8 (Trende). Thus, any such confusion was clarified well before
trial. Further, even if Plaintiffs had requested some other relief, it is well settled that parties can change
their requested relief to conform to the evidence adduced at trial even after trial has adjourned. *See, e.g.*,
*Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 595 (6th Cir. 2015), *reh'g denied*
(Sept. 14, 2015) ("when issues not raised in pleadings are raised by the express or implied consent of the
parties, the court may treat the issues . . . as if the parties had raised them in the pleadings." (citation and
quotation marks omitted)); *MBI Motor Co. v. Lotus/E., Inc.*, 506 F.2d 709, 711 (6th Cir. 1974); *Hutchins
v. Akron, C. & Y.R. Co.*, 162 F.2d 189, 192 (6th Cir. 1947). The trial record makes it clear that Plaintiffs
are seeking discretion.

for significant periods of time. *See* PFOF ¶ 64. And while these lines have tended to form at the end of the early voting period, there is little way for voters to know when to anticipate such lines. Matthew Damschroder testified that information about the length of wait times to vote is not provided to voters and that even election administrators do not know when long lines will occur. 12/3/2015 Trial Tr. 18:10-19:12 (Damschroder); *see also* 11/30/2015 Trial Tr. 159:17-160:9 (Allen) (explaining that turnout for early voting is more evenly distributed across the early voting period in North Carolina (presumably meaning that lines are more evenly distributed)).

103.    Given these severe burdens on voting, a strong state interest is required to uphold the State's refusal even to afford counties *the discretion* to open multiple early voting locations. The explanations the State offers are not up to the task. Sherry Poland testified that opening multiple early voting locations in one county could cause voter confusion in another county. *See* PFOF ¶ 66. But is not clear what such confusion would even mean in concrete terms, and the assertion makes little sense—voters are not confused by differing numbers of Election Day polling places from county to county. In any event, Director Poland's assertion is purely speculative and therefore an insufficient justification for the one-location rule. *See OFA*, 697 F.3d at 434 (law unconstitutional where "no evidence" provided to support vague justifications).

104.    Dr. Ted Allen's argument that opening multiple early voting locations would result in longer wait times to vote also fails to justify the one-location-per-county rule. As explained above, Dr. Allen's analysis is flawed in important ways and cannot be squared with the fact that many other states have successfully administered elections with multiple early voting locations per county. *See* PFOF ¶¶ 67-68. Moreover, even if taken at face value, his analysis does not indicate that opening at least one additional location would be a bad decision for all Ohio counties. *See* 11/30/2015 Trial Tr. 165:23-166:10 (Allen) (even under his analysis,

the overall time required to vote could be reduced through the opening of a second early voting location). On balance, therefore, the one-location-per-county rule imposes burdens on voting rights that far outweigh its benefits, and it must be struck down under the *Anderson-Burdick* test.

105. **Minimum Number of DREs**. SB 200's change to the formula for calculating the minimum number DREs per county fails *Anderson-Burdick* scrutiny as well. This change reduces the number of DREs that certain counties are required to have. *See* PFOF ¶ 69. To the extent that counties' DRE stock falls below the old minimum requirement, voters will face increased wait times. *See* PFOF ¶ 71. That this change takes place as Ohio's DRE stock has become aged and liable to fail, *see* PFOF ¶¶ 69, 71, only compounds the likely burden on voters.

106. In contrast to this clear burden, the state interests are nebulous. Presumably, the change was motivated by a desire to save costs, but there is no evidence that SB 200 will permit counties to save any material amount of money, much less that counties struggled to pay for the number of DREs they were required to have. *See generally NAACP*, 768 F.3d at 549 (cost-saving rationale insufficient without evidence that defendants would "struggle" with costs of maintaining status quo). Nor is it clear how the State benefits from a "qualitative" improvement to its DRE allocation formula that will have the effect of producing longer lines. *See* PFOF ¶ 72.

107. It is no answer that a few counties will continue to exceed the old DRE minimum or that, pursuant to a directive issued by the Secretary of State, counties are not permitted to sell their existing DRE stock (though the directive notably does not require counties to replace DREs that go into disuse). The challenge here is to the change *in the law*. To the extent that counties exceed the old minimum, the law neither benefits the State nor burdens voters, and the events in those counties are not pertinent to the analysis under the Equal Protection Clause—except to the extent that certain counties' decisions to exceed even the old minimum further corroborate the

conclusion that the new minimum is insufficient. *See also* 11/30/2015 Trial Tr. 203:4-22 (Allen) (explaining that even though one county he advised had more machines than the old law required, he advised that county to increase its DRE stock to avoid undesirable results). Instead, the question the Court must decide under the Equal Protection Clause is whether the burdens imposed by the law outweigh its benefits in cases in which counties' DRE stock falls below the old DRE minimum and the law is relevant. And as set forth above, that inquiry shows that the burdens of the change in the law outweigh its benefits and that it therefore must be invalidated.

108. **Restrictions on Absentee Ballot Mailings**. The burdens on voters from SB 205's restrictions on absentee ballot mailings also outweigh the benefits to the State from these new restrictions. The counties' innovations in sending unsolicited absentee ballot applications to voters and in providing prepaid postage for return mailings made it materially easier for voters to cast absentee ballots and reduced wait times at the polls. *See* PFOF ¶ 75. Through SB 205, the State has reduced the ability of officials to provide these benefits to—and thus imposed significant burdens on—voters. *See* PFOF ¶¶ 73-79. The Secretary's decision to exclude a class of inactive but eligible voters from his mailings exacerbates these burdens. *See* PFOF ¶¶ 78-81.

109. These changes provide little benefit to the State. While shifting responsibility for unsolicited absentee ballot mailings from counties to the Secretary would promote uniformity across counties if everything else were equal from county to county, everything else is not in fact equal. *See* 11/17/2015 Trial Tr. 231:10-25 (Perlatti); 11/23/2015 Trial Tr. at 199:3-200:5 (Burke). Given the impact of absentee voting on voting lines, unsolicited absentee ballot mailing are far more important for counties that have long lines than for other counties. *See* 11/17/2015 Trial Tr. 231:10-25, 232:24-233:22 (Perlatti); 11/23/2015 Trial Tr. 8:24 -10:7, 16:6-20 (McNair); *id.* at 172:12-173:15, 199:3-200:5 (Burke). Thus, shifting from the counties' highly effective absentee

ballot mailings to the less effective, one-size-fits-all mailing sent out by the Secretary undermines efforts to combat lines at and to ensure uniformity *of access* to the polls. Regardless, Ohio's interest in "uniformity, standing alone, is not an interest important enough to significantly burden Plaintiffs' ability to vote." *NAACP*, 768 F.3d at 549 (internal quotation marks omitted)).

110.    Any state interest in uniformity is not even plausibly linked to the other absentee ballot mailing restrictions. PFOF ¶ 80. Cost savings also cannot justify any of the provisions of SB 205, as that statute results in increased costs at the state level (to the extent that statewide unsolicited absentee ballot mailings are funded) and only "saves" money by preventing counties from spending money that they *want* to spend. PFOF ¶ 80. Further, while the Secretary's policy of excluding certain inactive but eligible voters from his mailings surely saves some cost, this cost savings is achieved by treating some inactive but eligible voters differently than others based simply on whether such voters have cast a ballot in one of the two prior even-year elections—even though Matthew Damschroder could provide no reasoned basis for the Secretary's decision to draw the line where he did. PFOF ¶ 81; *SEIU, Local 1 v. Husted*, 887 F. Supp. 2d 761, 789-90 (S.D. Ohio) ("the State's interests in administrative costs savings . . . are neither compelling nor sufficiently weighty to justify the arbitrary denial of a significant number of prospective registered voters most fundamental of rights") (internal quotation marks omitted), *aff'd in part, rev'd in part sub nom. NEOCH v. Husted*, 696 F.3d 580 (6th Cir. 2012) and *aff'd*, 515 F. App'x 539 (6th Cir. 2013); *cf. Carrington v. Rash*, 380 U.S. 89, 96 (1965) ("States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State."). In sum, the interests in SB 205's rules are minor and outweighed by the burdens the restrictions impose. The restrictions must be struck down.

111. **Additional Informational Requirements**. The new informational requirements for absentee and provisional ballots are unduly burdensome too. Voters must now include five pieces of information on the absentee or provisional ballot envelope. These requirements may provide little difficulty for many voters, but across the large number of voters who cast absentee and provisional ballots in Ohio, *see* PFOF ¶ 82, mistakes are bound to happen, *see, e.g.*, 12/1/2015 Trial Tr. 249:2-12 (Ward), and increasing the number of required categories of information will result in more such mistakes—and more votes needlessly being discarded. For voters with difficulty reading forms due to low literacy or limited English proficiency, moreover, forms that appear simple to sophisticated voters may present a real challenge. And, indeed, voters have been disenfranchised as a result of the new informational requirements, as well as the failure to complete the other required categories of information. *See* PFOF ¶ 82. *See generally NEOCH*, 696 F.3d at 593 (law that affected 0.248% of total ballots cast likely unconstitutional); *League of Women Voters*, 769 F.3d at 244 ("[E]ven one disenfranchised voter—let alone several thousand—is too many."); Pls. Tr. Br. at 31-32.

112. There is essentially no reason for the new requirements for absentee ballots. Elections officials were able to identify absentee voters *before* the new requirements were added, and any link between the new requirements and fraud prevention is far-fetched. *See* PFOF ¶ 84. In the case of provisional ballots, on the other hand, address information can assist election officials in determining in which precinct an individual lives, and it therefore makes sense for the State to request that voters provide that additional information (and even to inform such voters that providing that information could make their vote more likely to count). *See* PFOF ¶ 85. What does not make sense is the State's decision to *disenfranchise* voters who do not provide date of birth or address information, even if the State can identify those voters. *See Burdick*, 504

U.S. at 434 (courts must "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' *taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights*'") (emphasis added and quoting *Anderson*, 460 U.S. at 789). Thus, the burdens that the new informational requirements impose are not justified by sufficient state interests and the requirements are unconstitutional.

113.    **Additional Restrictions on Provisional Ballots**. SB 216's reduction in the cure period for voters who fail to provide proof of identity when voting and its rule prohibiting election officials (in most circumstances) from assisting voters by filling out on their behalf the required information on the provisional ballot affirmation form also must be struck down under the Equal Protection Clause. *See generally* Pls. Tr. Br. at 40-42. The reduction in the cure period limits the window that certain provisional voters have to cure their ballots, making the cure process more difficult and reducing the likelihood that the provisional ballots affected by this change will be cured. *See* PFOF ¶ 86. The rule regarding election official assistance in filing out the provisional ballot affirmation form means that the individuals at polling places who are most knowledgeable about that form will be constrained in the assistance they can provide to voters, including those with low literacy and limited English proficiency, to ensure that the form is accurate. *See* PFOF ¶ 87. The result will surely be increased voter error on provisional ballot forms, and thus the discarding of voters that otherwise would have been counted.

114.    The State's interests in these policies are minor. Election officials had no difficulty administering the curing of provisional ballots during the old cure period, and it is not clear that the change in the cure period will reduce even the minimal administrative resources devoted to the cure process. *See* PFOF ¶ 88. With respect to the rule regarding the completion of

provisional ballot affirmation forms, it simply is not credible that voters who request assistance in filling out those forms will be better off if poll workers must refuse to complete the form on the voters' behalf. *See* PFOF ¶ 88; Pls. Tr. Br. at 41-42. These provisions of SB 216 thus serve little, if any, state interest, and that minimal interest cannot justify the burdens the provisions impose on voting rights. *See generally Crawford*, 553 U.S. at 191 ("However slight [a] burden [on voting] may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.") (controlling opinion) (citation and quotation marks omitted); *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 n.6 (4th Cir. 1995) ("[A] regulation which imposes only moderate burdens could well fail the *Anderson* balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational.").

115. **Right Church, Wrong Pew**. SB 216's policy of leaving counties with discretion not to consolidate their poll books at multi-precinct locations also does not stand up even to mild scrutiny. Where poll books are consolidated, no voter who presents to vote at the correct polling location is disenfranchised for casting a ballot in the wrong "precinct" and voter confusion is reduced. But the State has not mandated such consolidation. Instead, it has left in place a regime that imposes the severe burden of disenfranchisement on any voter who casts his or her ballot in the wrong line at a multi-precinct location and causes voter confusion. *See also* PFOF ¶ 88.

116. It is not clear why. No evidence was presented at trial of any material state interest that is served by leaving counties with discretion not to consolidate their poll books. And the Secretary of State's issuance of a proposed directive that would mandate the consolidation of poll books at multi-precinct locations, *see* PFOF ¶ 89, provides strong evidence that he agrees that the burdens imposed by the current regime outweigh its benefits. Thus, the policy of leaving

counties with discretion not to consolidate their poll books cannot survive the *Anderson-Burdick* test and it violates the Equal Protection Clause.

117. **Cumulative Impact**. While the burdens on voting described above provide more than sufficient grounds for invalidating each of the challenged provisions, it should be emphasized that the burdens these provisions impose on voting rights are even more severe when they are considered collectively. *See* PFOF ¶¶ 91-95. Consideration of this cumulative effect thus makes the case for finding that the provisions violate the Equal Protection Clause even stronger. *See Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014) ("[W]e evaluate the combined effect" of ballot access rules); *Wood v. Meadows*, 207 F.3d 708, 711-713 (4th Cir. 2000) (considering other statutory provisions when analyzing constitutionality of filing deadline).

## II. VOTING RIGHTS ACT

118. Section 2 of the VRA bars voting practices and procedures that deny *or abridge* the right to vote on account of race. 52 U.S.C. § 10301(a). To succeed in a vote-denial challenge under the VRA, a plaintiff must prove two elements. First, the challenged practice "must impose a discriminatory burden on members of a protected class, meaning that members of the protected class must have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *League of Women Voters*, 769 F.3d at 240 (citation and internal quotation marks omitted). Second, the burden on members of the protected class "must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Id.* at 240 (citation and quotation marks omitted); *see also Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). *See generally* 52 U.S.C. § 10301(b); Pls. Tr. Br. at 42-44. As set forth in Plaintiffs' Trial Brief, the case law discusses several principles that inform this analysis. *See* Pls. Tr. Br. at 43-44, 46-48.

119. **Senate Factors**. The Supreme Court has pointed to nine factors (known as the Senate Factors) that inform the "totality of the circumstances" inquiry required under Section 2, and "shed light on whether the two elements of a Section 2 claim are met." *League of Women Voters*, 769 F.3d at 240. *See generally Gingles*, 478 U.S. at 44-45. The Senate Factors are relevant "particularly with regard to the second element" of a Section 2 claim. *NAACP*, 768 F.3d at 554; *see also Veasey*, 796 F.3d at 505 ("[T]he Supreme Court has also endorsed factors ('the Senate Factors') enunciated by Congress to apprehend whether [a disparate] impact exists and whether it is a product of current or historical conditions of discrimination.") (citing *Gingles*, 478 U.S. at 44–45). *See generally* Pls. Tr. Br. at 44-45. Nearly all of these factors are present in Ohio.

120. *First*, the evidence presented at trial shows that Ohio has a history of official discrimination relating to the right of African Americans to register and vote (Senate Factor 1). *See* PX0107 (Minnite Rpt. at 16-17); PX0109 (Timberlake Rpt. at 36-38); *see also NAACP*, 768 F.3d at 557 (upholding district court's findings that "historically [o]fficial voting-related discrimination against racial/ethnic minorities was a cornerstone in Ohio") (quotation omitted).

121. *Second*, elections in Ohio are highly racially polarized (Senate Factor 2). African Americans in Ohio vote overwhelmingly for Democrats and Republicans tend to win a majority of the white vote. *See* PFOF ¶ 14; *see also NAACP*, 43 F. Supp. 3d at 849 (noting the "polarized nature of recent elections in Ohio"); *City of Euclid*, 580 F. Supp. 2d at 607 (finding that the City of Euclid had a pattern of racially polarized voting and that "[n]umerous candidates . . . were confronted by white voters who complained of the growing African-American population").

122. *Third*, Ohio has used voting practices or procedures that enhance the opportunity for discrimination against African Americans (Senate Factor 3). In particular, Ohio's permissive voter-challenge law has resulted in minorities being subject to intimidation and harassment at the

polls. *See* PFOF ¶ 15; *NAACP*, 768 F.3d at 557 ("More recently, Ohio has implemented voting practices that suppress minority political participation, such as poll watchers and voter ID laws— practices that fall within the ambit of Senate factor three.") (quotation omitted); *City of Euclid*, 580 F. Supp. 2d at 608 (City of Euclid's "system for councilmanic elections . . . ha[d] an enhancing discriminatory effect with respect to African-American participation"); *Boustani*, 460 F. Supp. 2d at 825, 827 (statute permitting election judges "unbridled discretion to challenge any voter's citizenship without any guidelines" was unconstitutional, as it created a "very real possibility of 'profiling' voters . . . on the basis of appearance, name, looks, accent or manner"); *Project Vote*, 455 F. Supp. 2d at 699, 703-704 (enjoining voter registration laws which effectively shut down voter registration drives in "low-and moderate-income, minority, and other disenfranchised communities" and "have the discriminatory effect of imposing an undue burden primarily on poor and/or elderly voter registration workers").

123.    *Fourth*, African Americans bear the effects of discrimination in education, employment, health, and other areas that hinder their ability to participate effectively in the political process (Senate Factor 5). *See* PFOF ¶¶ 9-12. In the *NAACP* case, the Sixth Circuit recognized these disparities and held that a showing under Senate Factor 5 had been made. 768 F.3d at 556. The record here shows that these disadvantages hinder African Americans' participation in the political process in myriad ways. Limited access to transportation makes it more difficult to vote and to register. *See, e.g.*, PFOF ¶ 11. Working in lower-income, hourly wage jobs makes it more difficult to vote on Election Day. *See, e.g.*, PX0109 (Timberlake Rpt. at10-15); 11/16/2015 Trial Tr. 55:14-56:4 (Turner). And, lower levels of educational attainment make it more difficult to navigate the political process. *See, e.g.*, PX0109 (Timberlake Rpt. at 24-29); 11/17/2015 Trial Tr. 212:20-213:5 (Taylor); 11/24/2015 Trial Tr. 134:25-135:13 (Beswick);

*see also City of Euclid*, 580 F. Supp. 2d at 609 ("the social science literature on voter participation makes clear that educational achievement is strongly and directly correlated with voter registration and turnout").

124.    *Fifth*, political campaigns in Ohio have been characterized by racial appeals (Senate Factor 6), such as the "Obama Phone Lady" ad and Joe the Plumber's article about wanting a white Republican president. PX0109 (Timberlake Rpt. at 24-45); 12/1/2015 Trial Tr. 200:23-201:16 (Trende); Similarly, the evidence shows that threats of prosecution for and allegations of voter fraud have been used to target minorities and suppress their turnout, including through the erection of "voter fraud" billboards. *See* PX0092; PX0107 (Minnite Rpt. at 11-15, 20); 11/30/2015 Trial Tr. 35:11-39:14 (Minnite); PFOF ¶¶ 19, 20; *see also Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1041 (D.S.D. 2004) (finding Senate factor 6 established based on "numerous articles about alleged voter fraud prior to the general election" targeting Native Americans). *See generally NAACP*, 43 F. Supp. 3d at 849 (finding evidence showed "several examples of subtle or direct racial appeals that have occurred in Ohio during recent elections").

125.    *Sixth*, African Americans have been elected to public office at lower rates than whites have (Senate Factor 7). *See* PFOF ¶ 13. No African American has ever been elected governor or to either of the state's U.S. Senate seats—the three most visible statewide positions. Nor has an African American ever been elected attorney general in Ohio. PFOF ¶ 13; *see also NAACP*, 43 F. Supp. 3d at 849 (finding that "that African Americans are significantly underrepresented, both historically and contemporarily, in the most important, visible and influential elected state posts") (quotation omitted).

126.    *Seventh*, elected officials have not been responsive to the particularized needs of African Americans (Senate Factor 8). The evidence shows that the state has repeatedly attempted

to roll back the very post-2004 election reforms that have facilitated higher African American political participation and that key policy makers ignored the disparate impact such measures would have. *See* PX0125 (Preisse Decl. ¶ 1); 12/2/2015 Trial Tr. 165:5-166:12 (Damschroder); PX0128 (Damschroder Rule 30(b)(6) Dep. Tr. 122:5-123:8); PX0109 (Timberlake Rpt. at 47-49). The state's lack of responsiveness is likewise demonstrated by the number of times court intervention has been required to prevent the enforcement of laws that would disproportionately impact African Americans. *See* Pls. Tr. Br. at 6 n.6. Similarly, the General Assembly has cut education funds, disproportionately impacting lower-income areas. 11/16/2015 Trial Tr. 52:3-25 (Turner) (discussing cuts to education funding in Cleveland that would impact African American communities). Moreover, the dramatic racial disparities described above—including the facts that Ohio cities are among the most residentially segregated and have some of the most segregated schools in the United States—provide strong evidence that elected officials are not meaningfully responding to issues impacting African Americans in particular.

127.    *Eighth*, the policies underlying the provisions at issue are tenuous (Senate Factor 9). The justifications supplied for the challenged policies are either weak or, upon examination of the evidence, do not appear to be materially affected by the policies. *See* PFOF ¶¶ 20, 58, 60-62, 71, 80, 84, 99, 106, 110, 112.

128.    **The Challenged Provisions**. Both elements of a Section 2 vote-denial claim have been established for all of the provisions that Plaintiffs challenge under the VRA.[4] With respect to the first element, the facts establish that the following provisions disproportionately burden African Americans: the elimination of Golden Week (both through the elimination of same-day registration and the reduction the early voting period); the one-location-per-county rule for early voting; the reduction in the required number of DREs; the new restrictions on absentee ballot

---

[4] Plaintiffs do not challenge SB 216's failure to mandate consolidated poll books under the VRA.

mailings; the new informational requirements for absentee and provisional ballot forms; the reduction in the cure period for voters who fail to provide proof of identity on Election Day; and the rule prohibiting poll workers in most circumstances from completing the information required on the provisional ballot affirmation form on behalf of voters. *See* PFOF ¶¶ 52-95; *accord NAACP*, 768 F.3d at 555 ("[T]he disproportionate burdens SB 238 . . . place[s] on African Americans, combined with their lower-socioeconomic status in Ohio, operate[s] to give African American voters less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.") (internal quotation marks omitted); *NAACP*, 43 F. Supp. 3d at 850 ("The elimination of Golden Week's same-day registration will also impact African Americans as . . . they tend to disproportionately make up the groups that benefit the most from same-day registration: the poor and the homeless."); *Obama for Am. v. Husted*, 888 F. Supp. 2d 897, 906 (S.D. Ohio 2012) ("[M]inority and working class voters will be disproportionately affected by the restrictions on in-person early voting."), *aff'd*, 697 F.3d 423 (6th Cir. 2012). *See generally League of Women Voters*, 769 F.3d at 241-42 ("The fact that a practice or law eliminates voting opportunities that used to exist under prior law that African Americans disproportionately used is . . . relevant to an assessment of whether, under the current system, African Americans have an equal opportunity to participate in the political process as compared to other voters.").

129.    Consistent with the evidence demonstrating that these provisions individually impose disproportionate burdens on African Americans, the decline in African-American turnout in Ohio from 2010 to 2014 exceeded the decline in white turnout in Ohio from 2010 to 2014. *See* PFOF ¶ 48. Thus, the evidence is consistent with the conclusion that the challenged provisions have the effect of reducing the ability of African Americans relative to other members of the

electorate in Ohio—and thus exacerbate the gap in opportunity between African Americans and other voters—to participate in the political process and to elect representatives of their choice. *See also* Pls. Tr. Br. at 48-55. *See generally League of Women Voters*, 769 F.3d at 240.

130. The second element of a vote-denial claim under the VRA is also met for each of the provisions at issue—that is, the disproportionate burdens described above are "in part . . . caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class," *League of Women Voters*, 769 F.3d at 240 (citation and quotation marks omitted). African Americans in Ohio face "severe and persistent racial disparities" in socioeconomic status, 11/17/2015 Trial Tr. 182:20-23 (Timberlake), and, as set forth above, each of the potentially relevant Senate Factors applies here. *See* COL ¶¶ 119-127. This overwhelming showing as to the Senate Factors is powerful— even conclusive—evidence that the disproportionate burdens the challenged provisions impose on African Americans are caused by or linked to the ongoing effects of discrimination. *See NAACP*, 768 F.3d at 554 (Senate factors are relevant "particularly with regard to the second element" of a Section 2 claim); *see also Veasey*, 796 F.3d at 505.

131. Moreover, the connections between the burdens on voting at issue and the ongoing effects of Ohio's history of discrimination are self-evident. For example, African Americans' disproportionate likelihood not to have access to a vehicle, to be employed in hourly wage jobs, and to cast ballots in person (due in part to distrust of the electoral system), *see* PFOF ¶¶ 10, 11, 21, mean that the elimination of same-day registration and the resulting need to register and to cast a ballot in two separate steps will be especially burdensome for African Americans. *Accord NAACP*, 768 F.3d at 557 ("African Americans' lower-socioeconomic status in turn plays a key role in explaining why the disproportionate impact of SB 238 . . . burdens

African Americans' voting opportunities."). These same disparities indicate that African Americans are much more likely than whites to be burdened by the one-location-per-county rule for early voting. Similarly, African Americans' lower rates of residential stability and educational attainment, *see* PFOF ¶¶ 12, 79, 126, result in African Americans' being more likely than the rest of the electorate to cast provisional ballots and to be impacted by laws that burden provisional voting, and to be burdened by laws that increase the amount of information that must be provided in order to cast a ballot, *see* PFOF ¶¶ 83, 111-112. Laws that increase wait times to vote in person are also sure to impose a disproportionate burden on African Americans due to African Americans' relative preference for in-person voting.

132.     There is, in short, no doubt that the disparate burdens imposed by the challenged provisions are caused by or linked to the ongoing effects of the history of discrimination against African Americans in Ohio. Plaintiffs have satisfied both elements of a vote-denial claim for all of the provisions they challenge under the VRA, and those provisions must be invalidated.

## III.     INTENTIONAL RACE DISCRIMINATION

133.     The standards for assessing whether the challenged provisions were enacted with the intent to discriminate on the basis of race are set forth in Plaintiffs' Trial Brief and Plaintiffs Evidentiary Brief. *See* Pls. Tr. Br. at 65-66; Pls. Evid. Br. at 41-49. In Ohio, Democratic successes in 2008 and 2012 and overwhelming African-American support for Democratic candidates, *see* PFOF ¶¶ 15, 22-23, created a strong incentive for Republicans to suppress the vote of African Americans. The use of voter suppression as a political tactic, unfortunately, is not unusual. *See* PX0107 (Minnite Rpt. at 20) ("Drawing on my prior research, I . . . conclude that American political parties compete as much by demobilizing voters as by mobilizing them, and that it is black Americans who are usually singled out as the targets of demobilization."). And, in fact, state actors have repeatedly attempted to roll back the very post-2004 reforms that

facilitated African-American participation, motivated by a desire to suppress this Democratic constituency. *See* PFOF ¶¶ 17, 22-27; PX0125 (Preisse Decl. ¶ 1); 12/2/2015 Trial Tr. 147:18-148:3, 148:25-150:9, 165:5-166:12 (Damschroder); 11/16/2015 Trial Tr. 59:8-60:24 (Turner); PX0097; PX0098; *see also* Pls. Tr. Br. at 12-17.

134.     The evidence also establishes that the challenged provisions disproportionately burden African-American voters, *see* PFOF ¶¶ 52-95, and that there was evidence of this before the General Assembly, *see* Pls. Tr. Br. at 19-25. The justifications presented for the challenged provisions were tenuous. *See* PFOF ¶ 127; *see also* PX0107 (Minnite Rpt. at 20) ("While proponents of electoral policies that reduce voter access to the ballot purportedly believe that such policies are justified as fraud prevention measures, in the absence of evidence of a problem with voter fraud, I conclude, given historical patterns and evidence and the context for party competition, that such policies actually serve as a form of voter suppression."). The General Assembly departed from its usual procedural practices in eliminating Golden Week. SB 238 was introduced only eight days before it passed the Senate; only two hearings were held, in the day before the vote; and discussion on the bill was cut off in the House. *See* 11/20/13 Sen. Tr. at 9 (Sen. Gentile); 2/26/14 House Tr. at 59 (Rep. Heard). And, remarkably, supporters of SB 205 openly discussed the impact that the bill would have on "urban" counties. *See* Pls. Tr. Br. at 41-49; Pls. Tr. Br. at 19-25. *See generally Vill. of Arlington Heights*, 429 U.S. at 268 ("The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.").

135.     Taken together, this evidence demonstrates that the challenged provisions were enacted (or kept in place) for the purpose, at least in part, of suppressing the African-American

vote. *See generally Vill. of Arlington Heights*, 429 U.S. at 265 (Plaintiffs are not required "to prove that the challenged action rested *solely* on racially discriminatory purposes.") (emphasis added). They are accordingly unconstitutional under the 14th and 15th Amendments.

## IV. PARTISAN FENCING

136.    The case law pertinent to Plaintiffs' partisan fencing claim is discussed in Plaintiffs' Trial Brief. *See* Pls. Tr. Br. at 68-69. As explained above, the electoral environment in Ohio has been highly competitive, PFOF ¶¶ 15, 22-23, 133, providing Republicans with a strong incentive to suppress the vote of Democrats. In addition, the process for eliminating Golden Week was rushed; the justifications offered for the challenged provisions are tenuous; and the legislative history includes express references to "urban" (i.e., Democratic and disproportionately African American) counties. *See* PFOF ¶ 134, Pls. Evid. Br. at 41-49; Pls. Tr. Br. at 19-25. Taken together, these facts show that the challenged provisions were enacted with the intent to suppress the vote of Democratic voters.

## V. STANDING

137.    A plaintiff has standing where he has suffered or will suffer a concrete, particularized injury that is (1) actual or imminent; (2) "fairly traceable to the challenged action of the defendant"; and (3) likely to be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). An organization may bring suit either on its own behalf or on behalf of its members or constituents." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 344-345 (1977) (constituency); *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (members); *Veasey v. Perry*, 29 F. Supp. 3d 896, 904 (S.D. Tex. 2014) (constituency). Where injunctive relief is sought, "only one plaintiff with standing is required." *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008).

138. **ODP, CCDP, and MCDP Have Standing on All Claims**. An organization suffers an Article III injury when it must divert resources from its usual activities to lessen the harm caused by an act that causes injury to the organization's mission or members. *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("[T]he consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (finding NAACP injured based on diversion of resources from regular activities to educate and assist voters in complying with photo ID law); *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir. 2008) (organizations "made a sufficient showing that they will suffer a concrete injury [where they] reasonably anticipate that they will have to divert personnel and time to educating volunteers and voters on compliance with [voting law]."). Consistent with this principle, courts have found that, because the Democratic Party has a direct and particular interest in the outcome of elections, it satisfies Article III's standing requirements when it diverts resources to ameliorate the effects of a challenged law. *Crawford*, 472 F.3d at 951 ("[T]he new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."); *see also N.C. State Conf. of NAACP v. McCrory*, 997 F. Supp. 2d 322, 342 (M.D.N.C. 2014) (recognizing political parties have a cognizable interest in outcomes of elections), *aff'd in part, rev'd in part on other grounds*, *League of Women Voters*, 769 F.3d 224, *cert. denied*, 135 S. Ct. 1735 (2015). As the Sixth Circuit explained in *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014), "[i]f a . . . political party can marshal its forces more effectively by winning its lawsuit, that ought to be enough for Article III."

139. The record in this case makes it clear that ODP, CCDP, and MDP have standing. As discussed *supra*, in Ohio African Americans, Latinos, and young voters are overwhelmingly Democrats and, in turn, vote overwhelmingly for Democratic candidates. Therefore, ODP, CCDP, and MDP *must* turn out these populations to successfully elect their candidates. Yet, it is precisely these voters who are most burdened by the challenged laws. And, in turn, ODP, CCDP, and MDP have had to expend additional resources to ameliorate the effects of the challenged provisions—i.e., their depressant effect on Democratic turnout due to the burdens they place on Democratic voters. PFOF ¶¶ 31-39. These are resources that could be spent on educating voters about their candidates and platforms in an effort to ensure their electoral success. PFOF ¶¶ 31-39. Thus, ODP, CCDP, and MDP have standing to sue as the challenged provisions directly injure them; those injuries are fairly traceable to the State of Ohio; and the remedy will redress their injuries.[5]

140. Further, the record also supports ODP's, CCDP's, and MDP's representation of African-American, Hispanic, and young voters. These groups are "key constituencies" for these Democratic organizations, a fact that is borne out not only through their own testimony, but also through expert testimony. PFOF ¶ 14. Article III as well as the VRA recognize the ability of an organization to bring an action on behalf of its members and constituents in a representative capacity. *See Hunt*, 432 U.S. at 345 (finding associational standing on behalf of constituency); *Friends for Ferrell Parkway*, 282 F.3d at 319-20 (finding associational standing on behalf of

---

[5] These organizations have also raised intentional discrimination claims, arguing that the challenged provisions were enacted with the intent of harming Democrats and suppressing the Democratic vote. *See* discussion *supra* at 65. The Democratic Party Plaintiffs' central purpose is supporting, promoting, and helping elect Democrats as well as ensuring that Democrats have the ability to elect the candidates of their choice. Thus, any policy that intentionally discriminates against Democrats necessarily discriminates against these organizations and they are directly injured. Accordingly, they also have standing to sue on these grounds.

members); *Veasey*, 29 F. Supp. 3d at 904 (finding associational standing on behalf of constituency); *see also* S. Rep. 94-295, 39-40, 1975 U.S.C.C.A.N. 774, 806-07 ("[a]n 'aggrieved person'" include[es] "an individual" or "an organization representing the interests of injured persons"). Further, courts have recognized the ability of the Democratic Party to do that with respect to minority groups. *See Crawford*, 553 U.S. at 189 n.7 (expressly affirming the Seventh Circuit's standing finding in *Crawford v. Marion Cnty. Election Bd.*, and stating that it "agree[d]" that the Democratic Party had standing in a case involving Equal Protection and VRA claims); *see also Veasey*, 29 F. Supp. 3d at 906 (citing *Crawford* as a case in which an organization—the Democratic Party—had been permitted to enforce Section 2 of the VRA on behalf of minorities). Thus, the Democratic Party Plaintiffs also have standing to bring their challenges in a representative capacity.

141. **Rev. Butcher and Carol Biehle Have Standing**. The record demonstrates that Rev. Butcher also has standing to challenge S.B. 238 because, as a result of the law, he has suffered and will continue to suffer an imminent injury to his ability to register voters. Harm to a plaintiff's interest in registering voters confers standing. *McCrory*, 997 F. Supp. 2d at 341; *see also Coal for Sensible & Humane Solutions v. Wamser*, 771 F.2d 395, 398-99 (8th Cir. 1985) (stating organizational plaintiff had standing, but only "on the basis of" its individual members, who were injured by "the Board's refusal to appoint [them] as deputy registration officials . . . *preventing them from registering new voters*") (emphasis added); *cf. People Organized for Welfare & Emp't Rights (P.O.W.E.R.) v. Thompson*, 727 F.2d 167, 170 (7th Cir. 1984) (explaining it "might be a persuasive basis for standing if P.O.W.E.R. had been trying to advance its goal [of improving the lot of the poor and unemployed] by registering new voters itself" that "[a]nyone who prevented it from doing that would have injured it"). Here, Rev. Butcher has

testified that his own voter registration efforts have been and in 2016 will be harmed by the elimination of Golden Week. PFOF ¶¶ 40-41. He has standing to sue.

142.     Ms. Biehle has standing to challenge Ohio's policy to grant counties discretion as to use consolidated poll books. This policy will imminently injure her as a voter who votes in a multi-precinct location and could vote in the right church but the wrong pew, and as a poll worker who assists voters in a multi-precinct location.

## VI.     LACHES

143.     Defendants contend that two of Plaintiffs' claims are barred by laches: 1) the challenge to the elimination of Golden Week; and 2) the challenge to the limitation of one EIP location per county. *See* Defs.' Tr. Br. at 68. The applicability of these defenses in a challenge under the Constitution and VRA is doubtful. *See Wauchope v. U.S. Dep't of State*, 985 F.2d 1407, 1411-12 (9th Cir. 1993); *Allen v. Carmen*, 578 F. Supp. 951, 963 (D.D.C. 1983); *Bishop v. Lomenzo*, 350 F. Supp. 576, 579, 581 (E.D.N.Y. 1972). These claims are without merit. "Where a plaintiff seeks solely equitable relief, his action may be barred by the equitable defense of laches if (1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant was prejudiced by this delay." *ACLU v. Taft*, 385 F.3d 641, 647 (6th Cir. 2004).  Neither of these elements are met here.

144.     Plaintiffs' Golden Week claim was being litigated by different plaintiffs and different counsel in the *NAACP* case. It appeared that the constitutionality of the elimination of Golden Week would be resolved in that case. *See especially NAACP*, 43 F. Supp. 3d at 843 (granting preliminary injunction). This case was filed less than a month after the *NAACP* case settled. Thus, Plaintiffs did not delay unreasonably. And, Defendants have made no showing of prejudice with respect to the Golden Week claim, nor is there reason to believe they could.

145.    With respect to the challenge to the limitation on early voting locations, Defendants have again made no showing of prejudice. Moreover, early voting has changed substantially since its inception. As noted in the Amended Complaint, the one-location-per-county rule has become more burdensome with the elimination of discretion for counties to set their early voting schedules. *See* Am. Cmpl. ¶ 6 ("Now that this discretion has been eliminated, there is no way to remedy the discriminatory impact of the one-location-per-county rule."); *id*. ¶¶ 96-105. Early voting has also increased substantially over time, making it more important and increasing the likelihood of long lines. And, new restrictions on absentee ballot mailings are likely to increase strain on early voting, as explained above. The timing of Plaintiffs' challenge is not unreasonable.

## VII.    RELIEF

146.    In light of the foregoing, the challenged provisions must be enjoined. Counties are permitted, at their discretion, to open more than one early voting location. Poll books at multi-precinct polling locations must be consolidated.

Dated: December 22, 2015                                    Respectfully submitted,

/s/ *Bruce V. Spiva*
**Bruce V. Spiva***
**Trial Attorney**
**Marc E. Elias***
**Rhett P. Martin***
**Amanda R. Callais***
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone:202-654-6200
Facsimile:202-654-6211
MElias@perkinscoie.com
BSpiva@perkinscoie.com
EFrost@perskinscoie.com
RMartin@perkinscoie.com

**Joshua L. Kaul\***
PERKINS COIE LLP
1 East Main Street
Suite 201
Madison, WI53703-5118
Telephone:(608) 663-7499
Facsimile:(608) 663-7499
JKaul@perkinscoie.com

**Donald J. McTigue (0022849)**
**J. Corey Colombo (0072398)**
MCTIGUE MCGINNIS & COLOMBO LLC
545 East Town Street
Columbus, OH43215
Telephone:(614) 263-7000
Facsimile:(614) 263-7078
dmctigue@electionlawgroup.com
ccolombo@electionlawgroup.com

*Attorneys for Plaintiffs Ohio Democratic
Party, Democratic Party of Cuyahoga
County, Montgomery County Democratic
Party, Jordan Isern, Carol Biehle, and
Bruce Butcher*

\*Admitted *Pro Hac Vice*

# CERTIFICATE OF SERVICE

I hereby certify that on this date I served a copy of the foregoing by transmitting a copy to all counsel with an e-mail address of record, who have appeared and consent to electronic service in this action and any consolidated actions.

This the 22nd day of December, 2015.

/s/ *Bruce V. Spiva*
Bruce V. Spiva