UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

The Ohio Organizing
Collaborative, et al.,[1]

     Plaintiffs,                     Case No. 2:15–cv–1802

     v.                           Judge Michael H. Watson

Jon Husted, et al.,               Magistrate Judge King

     Defendants.

## OPINION AND ORDER

Plaintiffs moved, *in limine*, to exclude the testimony of two of Defendants' expert witnesses pursuant to Federal Rule of Evidence 702. ECF Nos. 75 & 76. At trial, the Court permitted Defendants to proffer the expert testimony, reserving ruling on its admissibility until after trial. For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motions.

## I.    ANALYSIS

The admissibility of expert witness testimony is governed by Federal Rule of Evidence 702, which provides:

---

[1] Plaintiffs amended their complaint to substitute The Ohio Organizing Collaborative with the Ohio Democratic Party ("ODP"), the Democratic Party of Cuyahoga County ("DPCC"), and the Montgomery County Democratic Party ("MCDP"). Am. Compl., ECF No. 41.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

This rule reflects the well-established judicial precedent that expert testimony must be both relevant and reliable and that district courts must act as "gatekeepers" in determining the admissibility of such testimony. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007) (discussing *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

The proponent of expert testimony must establish its admissibility by a preponderance of proof. *Nelson v. Tenn. Gas Pipeline, Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10). Whether to admit expert testimony is within the district court's discretion. *Johnson*, 484 F.3d at 429 (citation omitted). Notably, "[t]he 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial." *Deal v. Hamilton Cnty. Bd. of Edu.*, 392 F.3d 840, 852 (6th Cir. 2004); *United States v. Demjanjuk*, 367 F.3d 623, 633 (6th Cir. 2004) (citation omitted) (a court's discretion in

admitting expert testimony is "particularly broad in a bench trial."); *see also Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 635 (6th Cir. 2000) ("[D]istrict courts conducting bench trials have substantial flexibility in admitting proffered expert testimony at the front end, and then deciding for themselves during the course of trial whether the evidence meets the requirements of *Kumho Tire Co.* and *Daubert* and deserves to be credited.") (citations omitted) (Gilman, J., dissenting).

Plaintiffs moved, *in limine*, to exclude the testimony of two of Defendants' expert witnesses pursuant to Federal Rule of Evidence 702: (1) Dr. M.V. Hood, III ("Dr. Hood") and (2) Sean P. Trende ("Trende"). ECF Nos. 75 & 76. At trial, the Court permitted Defendants to proffer the expert testimony, reserving ruling on its admissibility until after trial. Having now heard the expert testimony and reviewed the reports, the Court grants in part and denies in part Plaintiffs' motions.

### A. Dr. Hood

Dr. Hood authored an initial report in which he discusses changes to Ohio's early-in-person ("EIP") voting procedures, the provision of direct recording electronic voting machines ("DRE machines"), the administration of multi-precinct voting locations, and the changes to administrative procedures regarding provisional and absentee ballots. *See* DX 15 at 2. Dr. Hood also authored a rebuttal report in response to a report produced by one of Plaintiffs' experts, Dr. Jeffrey Timberlake. DX 18. At trial, the Court admitted Dr. Hood as an expert in

political science, public policy related to election laws, election administration, voter fraud, and voter behavior.  Tr. Trans. 12, ECF No. 99.

Plaintiffs did not object to Dr. Hood's admission as an expert, but they seek to exclude his testimony and reports on the ground that his methodology and opinions are unreliable.

In evaluating the reliability of expert testimony, courts consider a non-exhaustive list of factors, including:

> (1) whether a "theory or technique . . . can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) whether, with respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community.

*Johnson*, 484 F.3d at 429 (citing *Daubert*, 509 U.S. at 592–94).  These factors do not constitute a definitive checklist; rather, "'the gatekeeping inquiry must be tied to the facts of a particular case,' depending on 'the nature of the issue, the expert's particular expertise, and the subject of his testimony.'"  *Id*. at 430 (citations omitted).  Indeed, district courts enjoy the same broad latitude in deciding *how* to determine reliability as they do in making their ultimate reliability determination.  *Kumho*, 526 U.S. at 142 (citations omitted).  Thus, while the above-listed factors may be pertinent in certain cases, in cases involving non-scientific expert testimony, the relevant reliability concerns may instead focus upon the expert's personal knowledge or experience.  *See id*. at 150; *Nelson*, 243 F.3d at 251 ("In *Kumho*, the Court reiterated that the factors mentioned in

*Daubert* were neither definitive, nor exhaustive, and may or may not be pertinent to the assessment in any particular case." (citing *Kumho*, 26 U.S. at 141)).

Additionally, Federal Rule of Evidence 703 permits an expert to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. Moreover, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." *Id*.

### 1. Subjective View of Ohio's Voting Laws

Plaintiffs first seek to exclude Dr. Hood's testimony on the ground that his reports contain his unsupported subjective opinions of Ohio's voting laws. Citing to certain examples, Plaintiffs argue that these unsupported opinions fail to consider the burdens on voters, are not testable, have not been peer reviewed, and fail to include an error rate. As such, Plaintiffs submit, these opinions are not within Dr. Hood's specialized knowledge.

The Court declines to prohibit Dr. Hood's testimony in its entirety on this ground. As Defendants point out, Dr. Hood bases his opinions on quantitative and qualitative analyses as well as his experience as a political scientist. First, with the exception of the North Carolina and Georgia case studies addressed below, Plaintiffs do not appear to challenge the admissibility of Dr. Hood's qualitative analyses. Second, Dr. Hood confirmed that qualitative analysis is "important in political science" and that relying on qualitative data is an accepted methodology in the field. Tr. Trans. 25–26, ECF No. 99; *see also* Hood Dep.

159, 201, ECF No. 75-5. The inability to test opinions based on qualitative data and the lack of peer review does not automatically render them unreliable, especially in cases such as this one where the nature of the expert testimony is not normally subject to the type of scientific testing initially contemplated by *Daubert*. *See* Fed. R. Evid. 702, advisory committee notes (recognizing that "[s]ome types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others."); *First Tennessee Bank Nat'l Assoc. v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001). Therefore, to the extent Dr. Hood's opinions are the result of qualitative analysis, the Court does not automatically exclude them as unreliable. Last, given Dr. Hood's experience, the Court cannot find that the entirety of his reports or testimony is outside of his expertise.[2]

Nevertheless, the Court will consider Plaintiffs' concerns when evaluating Dr. Hood's opinions in its analysis of Plaintiffs' claims. Specifically, to the extent any of Dr. Hood's opinions are based solely or primarily on his experience in the

---

[2] Dr. Hood is a tenured professor of political science at the University of Georgia, where he has been a member of the faculty since 1999 and, among other things, teaches a graduate-level class in election administration. Tr. Trans. 5–6, ECF No. 99. His research concentrates on the area of election administration, voting behavior, and racial politics, and he publishes in the area of election administration, having authored, *inter alia*, one peer reviewed article on early voting and peer reviewed work on voter ID laws and voter fraud. *Id*. at 5, 7–8, 125. He has previously testified as an expert in cases where he provided an opinion about the public policy implications of election laws, including *North Carolina State Conference of the N.A.A.C.P. v. McCrory*, No. 1:13–cv–658 (M.D.N.C.). *Id*. at 11–12.

field, the Court will consider them only if they satisfy Rule 702's requirements for offering such opinions. *See* Fed. R. Evid. 702, advisory committee's note. Additionally, the Court will not rely on any opinions that constitute unsupported conclusory opinions as to the reasonableness of the challenged laws. Further, in determining the relevance and weight of specific opinions, the Court considers the extent to which they address the burdens of Ohio's laws on voters. Cross-examination was the proper avenue for addressing these concerns, and indeed, Plaintiffs vigorously cross-examined Dr. Hood on the bases for his subjective opinions.

### 2. Anecdotes in Declarations by Local Officials

Plaintiffs next seek to exclude Dr. Hood's testimony regarding portions of his reports that rely on the declarations of elections officials.

Plaintiffs first argue that Dr. Hood's analyses based on the declarations consist of merely restating and blindly adopting the unsupported, *ipse dixit* statements of non-expert elections officials. They emphasize that the declarants were selected by defense counsel, that Dr. Hood never personally questioned the declarants or developed the questions asked of them, that he did not conduct any follow-up interviews with the declarants, and that he failed to confirm their declarations with hard data. Merely restating such declarations, Plaintiffs argue, does not constitute a discernable accepted methodology. In addition, they argue that the declarations are hearsay and are inadmissible under Rule 703 because

they do not constitute the type of information upon which experts in the field would reasonably rely.

Plaintiffs' argument is not well taken. First, Defendants have presented evidence suggesting that Dr. Hood's consideration of the declarations is an accepted methodology in political science. Dr. Hood testified that his consideration of declarations is a form of qualitative data analysis, that the use of qualitative data is an accepted practice in political science, and that statements of elections officials are an accepted form of qualitative data in political science work. Tr. Trans. 23, 26, ECF No. 99; Hood Dep. 159, 201, ECF No. 75-5. Absent any evidence to the contrary, the Court declines to hold that Dr. Hood's use of the declarations as part of his qualitative analysis was improper.[3]

Second, although the declarations constitute hearsay, the record contains some evidence that experts in the field would reasonably rely on such declarations in forming opinions on election laws. Again, Dr. Hood confirmed that statements of election officials are an accepted form of qualitative data in political science work, and he confirmed that he has previously relied on statements of election officials in his research related to public policy and voting

---

[3] In reaching this conclusion, the Court is mindful of authority in this Circuit that experts are generally not permitted to base their testimony on the opinions of others not qualified or present at trial. *See, e.g.*, *Mikes Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 409 (6th Cir. 2006) (recognizing that the Sixth Circuit has so held); *Stokes v. Xerox Corp.*, No. 05–71683, 2008 WL 275672, at *6–7 (E.D. Mich. Jan. 28, 2008) (excluding expert testimony based on the non-expert report of a non-expert witness). That authority, however, is based on a Sixth Circuit decision issued before the promulgation of Rules 702 and 703. *See Taylor v. B. Heller & Co.*, 364 F.2d 608, 613 (6th Cir. 1966) (holding that expert's reliance on the opinions of others not qualified as experts or present at trial violated Ohio law and Federal Rule of Civil Procedure 43(a)).

laws. Tr. Trans. 23, ECF No. 99. The Court does not find it unreasonable that the observations and opinions of those administering elections are relevant to a qualitative assessment of voting procedures. *See id.* at 18 (it was important to Dr. Hood to obtain information from elections officials because they "are the individuals who are literally implementing the election law and a lot of times you can learn things from talking to individuals who are implementing a law that you're not going to get by simply reading the election code . . . ."). Accordingly, Dr. Hood's reliance on the declarations is not prohibited by Rule 703, and the Court declines to find Dr. Hood's reports or testimony unreliable on this ground.

Nevertheless, as explained in greater detail in its Findings of Fact and Conclusions of Law, the Court is cognizant of Plaintiffs' concerns with Dr. Hood's reliance on the declarations. For example, the Court recognizes that some of the statements upon which Dr. Hood relies constitute the opinions of elections officials as opposed to verifiable facts; that while the declarations are sworn statements, they were prepared for purposes of litigation; and that not all declarants were available for cross-examination at trial. Further, the Court is cognizant of Plaintiffs' vigorous cross-examination of Dr. Hood, which elicited testimony regarding the political affiliations of the declarants, Dr. Hood's lack of input in the selection of the declarants or the questions asked of them, and Dr. Hood's failure to verify the information provided. Tr. Trans. 118–22, ECF No. 99. The Court considers these factors when evaluating the weight and credibility of Dr. Hood's opinions. *See Allied Erecting and Dismantling Co., Inc. v. U.S. Steel*

*Corp.*, No. 4:12–cv–1390, 2015 WL 1530648, at *14 (N.D. Ohio April 6, 2015) (finding that challenge to reliability of expert testimony based on the expert's restatement of the opinions of other individuals relates to evaluation of weight of expert testimony, not admissibility). Moreover, the mere repetition of an individual's statement in an expert report does not render the statement expert testimony, and the Court will therefore rely only on Dr. Hood's independent opinions based on the information contained in the declarations rather than on the information itself.

### 3. Case Studies

Plaintiffs next challenge the reliability of Dr. Hood's North Carolina and Georgia case studies.

Dr. Hood's case studies primarily provide quantitative data and statistical analysis regarding voter turnout in the 2010 midterm and 2014 general elections in North Carolina and Georgia. Based on those studies, he concludes that "[d]espite reductions in the early in-person voting periods in these states and the elimination of same-day registration, black early voting turnout in North Carolina and Georgia . . . actually increased in subsequent election cycles." DX 15 at 31.

The only way that Dr. Hood appears to relate these case studies to Ohio in his report is through the following conclusions:

> A reduction in the early voting period in North Carolina far greater than the reduction experienced in Ohio (and concomitant elimination of SDR), failed to produce any negative effects on electors following implementation in the 2014 general. This conclusion holds for the electorate at large and for black voters in particular.

. . .

> This example is instructive given the fact that under a much higher standard and where the burden of proof lay with Georgia, the Department of Justice permitted an alteration to the State's early voting law which was more stringent than that being litigated in the current case in Ohio.

. . .

> In this regard then Ohio's elimination of SDR is certainly not outside the mainstream.  Additional evidence brought to bear on the question of shortening the early-in-person voting period and eliminating SDR in North Carolina and Georgia also failed to show any disparate impact on turnout in general, or for black voters in particular.

Hood Decl. 29–30, 41, ECF No. 75-3.  Dr. Hood relates these case studies to Ohio in his testimony by opining that the case studies are helpful in understanding the impact of changing Ohio's laws because of the similarities between the three states' laws and the fact that, unlike Ohio, North Carolina and Georgia provide statistics on early voting use by race.  Tr. Trans. 64, ECF No. 99; DX 15 at 29–30, 41.

Plaintiffs argue that in his analysis of voting trends in North Carolina and Georgia, Dr. Hood "provides only simplistic historical calculations and figures without providing the controls necessary to apply [the] results to the prospective effect of the laws being challenged on Ohio's voters."  Mot. 8, ECF No. 75.  They specifically point to both his failure to account for the differences in the nature of midterm and general elections in North Carolina and Georgia and the differences between those states and Ohio.  They further note that the case studies are not testable, have not been peer reviewed, and have no calculable error rate.

Plaintiffs' argument is not well taken. Dr. Hood's failure to account for certain controls in his case studies does not change the fact that his studies and opinions have a reasonable factual basis—the quantitative analysis of data regarding voter turnout and registration. *See United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) ("Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis."). Plaintiffs' challenge to Dr. Hood's failure to account for various controls in his case studies therefore implicates the accuracy and credibility of those studies, as well as their relevance to the impact of *Ohio's laws* on voter turnout, but not their reliability. *C.f. In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–32 (6th Cir. 2008). Plaintiffs appropriately examined Dr. Hood's failure to account for various controls on cross-examination, and the Court will consider that testimony in evaluating the weight of Dr. Hood's opinions. Tr. Trans. 149–55, ECF No. 99. Moreover, as stated above, considerations of testing, peer review, and error rate are not determinative of admissibility.

### 4. DRE Machines

Plaintiffs last seek the exclusion of Dr. Hood's testimony regarding the formula for providing DRE machines—specifically that the change to the formula can be logically justified and makes intuitive sense—on the grounds that his

opinion is cursory and based only on his subjective views and the election official testimony on which he improperly relied.

Defendants respond that Dr. Hood's experience and expertise in election administration is a reliable basis for his opinion and that he properly relied on the declarations for the same reasons explained above.

Experience alone, or experience in conjunction with other knowledge, skill, training, or education, may provide a sufficient foundation for expert testimony. Fed. R. Evid. 702, advisory committee's note; *Dickenson v. Cardiac and Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 980 (6th Cir. 2004). "In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, advisory committee's note. Nevertheless, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Id.*; *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005).

Here, Defendants point to the fact that Dr. Hood is qualified as an expert in election administration, teaches graduate-level classes, conducts research in that area, is published in peer-review journals, and attends conferences related to election sciences. Hood Dep. 92–93, ECF No. 75-5; *see also* DX 15 at 1.

While this evidence may establish that Dr. Hood has sufficient experience in election administration to qualify him as an expert in that area, the evidence does not demonstrate how that experience leads to his conclusion that the DRE formula can be logically justified, why that experience is a sufficient basis for his opinion, and how that experience is reliably applied to the facts used to arrive at his conclusion. Nor did Dr. Hood offer any testimony to that effect. Accordingly, his opinion that the formula makes logical and intuitive sense constitutes an *ipse dixit* assertion that the Court cannot accept as expert testimony.

## B. Trende

Trende authored an initial report in which he attempts to place the challenged laws in a national context and examine whether there is sufficient evidence to support a causal link between the changes in Ohio's voting laws and any anticipated changes in African American, as compared to white, voter participation. DX 14; Tr. Trans. 49–50, ECF No. 103. Trende also authored a rebuttal report in response to a report produced by Plaintiffs' expert, Dr. Jeffrey Timberlake. DX 17.

Plaintiffs seek to exclude Trende's reports and testimony on the grounds that he lacks the requisite experience to testify as an expert and that his methodology is unreliable.

### 1. Whether Trende is Qualified to Testify as an Expert

Plaintiffs first argue in their motion *in limine* that Trende lacks the requisite experience to testify as an expert in this case. After hearing Trende's

qualifications at trial, the Court orally admitted him as an expert, over Plaintiffs'
objection, in the fields of campaigns and elections, voter behavior, voter turnout,
demographic trends, and political history. Tr. Trans. 49, ECF No. 103. Given
Plaintiffs' motion *in limine*, the Court outlines its justifications for doing so here.

Rule 702 permits courts to qualify a witness as an expert based on his or
her knowledge, skill, experience, training, or education. Fed. R. Evid. 702.
"Although a witness is not a qualified expert simply because he self-identifies as
such, [courts] take a liberal view of what 'knowledge, skill, experience, training, or
education' is sufficient to satisfy the requirement." *Bradley v. Ameristep, Inc.*,
800 F.3d 205, 208–98 (6th Cir. 2015) (citation omitted). The issue "is not the
qualifications of a witness in the abstract, but whether those qualifications
provide a foundation for a witness to answer a specific question.'" *Rose v. Truck
Centers, Inc.*, 388 F. App'x 528, 533 (6th Cir. 2010) (citation omitted).

Trende, who holds a B.A. in history and political science, an M.A. in
political science, and a J.D., has been studying and following United States
elections for almost twenty years. Trende Decl. ¶¶ 6–9, ECF No. 76-3. He has
been a Senior Elections analyst at RealClearPolitics since 2009 and a Senior
Columnist for Crystal Ball since January 2014. *Id*. ¶¶ 10, 13.

RealClearPolitics is "one of the most heavily trafficked political websites in
the world" and "serves as a one-stop shop for political analysis for all sides of the
political spectrum." *Id*. ¶ 11. The website aggregates news information to pair
points of view on controversies and also produces original analyses of elections,

campaigns, and politics.  Tr. Trans. 42, ECF No. 103.  It has an office in
Washington, D.C. and is widely cited in various news outlets and media.  *Id.*

Trende's primary responsibilities with RealClearPolitics consist of tracking,
analyzing, and writing about elections, and as part of his responsibilities, he has
studied and written extensively about demographic trends in the country and
voter turnout and voting behavior.  Trende Decl. ¶ 12, ECF No. 76-3; Tr. Trans.
43–44, ECF No 103.  Trende described himself as "the right-hand man for the
CEO" and described his job as "basically to try to know everything there is to
know about the elections" so that he may be able to communicate that
information to the CEO.  Tr. Trans. 43, ECF No. 103.

Larry Sabato's Crystal Ball is a website associated with the Center for
Politics.  *Id.* at 44.  The website, which Trende describes as "more academic in
tone," includes articles analyzing elections.  *Id.*  Trende writes for the website,
describing his purpose as writing about complex statistical ideas in a way that the
average person could understand.  *Id.* at 45; Trende Decl. ¶ 14, ECF No. 76-3.

Additionally, Trende has written chapters in and co-authored political
books, spoken on demographic and election issues at various institutions and on
various news outlets, and has authored expert reports in three other election-
related cases.  Tr. Trans. 45–48, ECF No. 103; Trende Decl. ¶¶ 15–23, ECF No.
76-3.  Notably, he testified in *N.A.A.C.P. v. McCrory* and authored an expert
report in *Ohio State Conference of N.A.A.C.P. v. Husted*, No. 14–cv–404 (S.D.
Ohio).  Tr. Trans. 48, ECF No. 103.

Despite this experience, Plaintiffs maintain that Trende is not qualified to testify as an expert regarding the likely impacts of the voting laws at issue in this case.

They first take issue with Trende's lack of education in political science and training in statistical analysis. They point out that Trende does not have a PhD and is not a political scientist and that while his reports rely heavily on statistical analysis, including bivariate regression analysis, his training in statistics is limited to two semesters of coursework in graduate school. Tr. Trans. 117, ECF No. 103.

But education is not alone determinative; a witness may also be qualified as an expert in a particular area by his experience. *See* Fed. R. Evid. 702, advisory committee's notes ("Nothing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony."). "Whether a proposed expert's experience is sufficient to qualify the expert to offer an opinion on a particular subject depends on the nature and extent of that experience." *United States v. Cunningham*, 679 F.3d 355, 379 (6th Cir. 2012) (expressing doubt as to the soundness of excluding expert testimony on the basis that the witness did not qualify as an expert but affirming the exclusion on other grounds).

As mentioned above, Trende has been studying and following United States elections for almost twenty years. He uses statistical analyses, such as regression analysis, in his day-to-day work. Trende NC Trial Trans. 82, ECF No.

76-7. After hearing Trende's testimony, the Court finds this experience sufficient to qualify him as an expert in the areas listed above. In so finding, the Court notes Trende's lack of peer-reviewed articles in political science or elections and the fact that he has not previously examined the specific issues in this case does not disqualify him as an expert. *See Barreto*, 268 F.3d at 333–34 (lack of familiarity with specific topics goes to weight, not admissibility) (citing cases); *Palatka v. Savage Arms, Inc.*, 535 F. App'x 448, 455 (6th Cir. 2013) ("The scope of his expertise may cut against the weight given to his opinion, but it does not affect its admissibility."). The Court emphasizes, however, that although these considerations do not warrant the exclusion of Trende as an expert, they factor heavily into the Court's consideration of the amount of weight to afford his opinions.

### 2. Whether Trende's Methodology is Reliable

Plaintiffs next argue that even if Trende is qualified as an expert, the Court should exclude his reports and testimony because his methodology is unreliable. Plaintiffs specifically identify six problematic aspects of his reports.[4]

### a. Reliance on Conversations

Plaintiffs first contend that Trende's reliance upon informal conversations with secretaries of state or boards of elections is improper, arguing that the conversations constitute inadmissible hearsay and are not the type of information

---

[4] Plaintiffs' general relevance objection is addressed concurrent with the Court's discussion of the specific challenged portions of Trende's reports.

upon which experts in the field would reasonably rely. The Court declines to exclude Trende's reports or testimony on this ground.

Trende testified that when he was unable to obtain information about a state's early voting laws from states' statutes, he would call the state boards of elections or the Secretary of State's offices, usually speaking to an attorney or someone in charge of the early vote center. Tr. Trans. 56–57, ECF No. 103; DX 14 at ¶ 31. Trende confirmed that he would rely on such sources of information in his professional work when examining campaigns and elections. Tr. Trans. 57, ECF No. 103. This comports with Dr. Hood's testimony that statements of elections officials are reasonably relied upon in similar fields. Tr. Trans. 23, ECF No. 99. Accordingly, although the content of those conversations is hearsay, there is some evidence that the content constitutes the type of information upon which experts in the field would reasonably rely. Absent any evidence to the contrary, the Court finds that Trende's reliance on the conversations was permissible under Rule 703 and therefore declines to find his methodology unreliable on this ground.[5]

---

[5] While the Court recognizes the concerns that the individuals with whom Trende spoke are unidentified and that there are no records or notes of the conversations, the Court notes that the conversations at issue appear to be limited to determining a state's early voting period where it was otherwise unclear from the state's statutes or government websites. *See* Tr. Trans. 56–57, ECF No. 103; DX 14 at ¶ 31. Further, Plaintiffs do not allege that Trende was given any incorrect information during these conversations.

### b. Maps

Plaintiffs next challenge Trende's inclusion in his initial report of maps that purport to illustrate the racial and political makeup of Ohio precincts and the locations of early voting centers within those precincts. *See* DX 14 at ¶¶ 114–56. Trende included these maps to demonstrate that early voting centers tend to be placed closer to non-white and Democratic voters than to white and Republican voters. DX 14 at ¶¶ 111–12. He concludes that the maps "largely speak for themselves, and demonstrate the relatively convenient location of early voting centers to non-white voters." *Id.* ¶ 114.

Trende generated the maps using "Dave's Redistricting App," which he states is "an online utility that has been used in expert reports by Dr. Steven Ansolabehere," and he maintains that the maps "illustrate accurate data." *Id.* ¶ 112. He describes the application as follows:

> [B]asically what this programmer has done is downloaded the data from the census FTP site and generated the precincts in maps. You can use it to draw your own congressional districts or statehouse districts to see how the partisanship would change. But it also provides a visual depiction of what the counties look like racially and politically.

Tr. Trans. 75, ECF No. 103. The maps' depictions of racial makeup are based on 2010 census data, and the maps depicting partisan makeup are based on 2008 election data. Tr. Trans. 167, ECF No. 103 (stating that the 2008 data was the only available data in the application but opining that the data has not

changed significantly because there was not a massive partisan realignment in 2012).

In response to the question of whether the application is something that he would rely on in performing his ordinary professional duties in examining various geographic trends, Trende stated:

> Everything I've seen in it is consistent with other sources. I believe the maps depicted here are similar to the ones that Doctors Roscigno and Timberlake employed in their expert reports. They might have used a different software but the result is the same. They're consistent with my understanding, living in Ohio, of how the racial breakdown of the cities are and they're consistent with the Census stuff that I've spot-checked on. So I have every reason to believe they're reliable.

Tr. Trans. 75–76, ECF No. 103. Plaintiffs argue that Trende failed to demonstrate how he determined that the application contained accurate data or provide any information about the parameters he used to produce the maps. Plaintiffs also argue that Trende's analysis of the maps is minimal and based entirely on his subjective view of what the maps illustrate.

Plaintiffs' argument is well taken. In light of Trende's testimony that the application allows for the manipulation of districts, his failure to establish the parameters he used to produce the maps is problematic. Moreover, Trende's testimony that the maps are consistent with his personal understanding of the racial breakdown of the cities as well as census information that he has spot-checked is insufficient to establish the reliability of the methodology used to create the maps.

Even if the Court admitted the maps, the Court would accord them, as well as Trende's opinion of what they visually demonstrate, little weight. While Trende offers them to demonstrate the relatively convenient locations for early voting centers to non-white voters, they do not account for the population density of the precincts or the myriad of other factors relating to convenience, and they provide no mechanism by which to determine the actual distances between the EIP voting center and the locations on the map. They are therefore of little help in evaluating the convenience of the locations of EIP voting centers to various groups or to determining whether the limitation of one EIP voting center per county disproportionately burdens those groups.

### c. Figures and Tables

Third, Plaintiffs seek to exclude a number of figures and tables and accompanying commentary included in Trende's initial report. They assert that he failed to provide details of how the data used in the figures and tables was collected or why it is reliable and that the commentary on these figures and tables merely summarizes the data contained therein. The Court addresses each of the challenged figures and tables in turn.

Figures 1–3 depict the length of early voting periods and the actual number of early voting days by state. DX 14 at ¶¶ 34, 43, 62. Tables 1 and 2 depict ratios of population to voting centers for certain counties in states other than Ohio. *Id.* ¶¶ 70, 72. Table 3 depicts the results of a regression analysis that Trende ran for each state in which he tested the relationship between the

populations in various counties and the number of early voting centers therein. *Id.* ¶¶ 78–79. Table 4 represents the number of early voting sites that certain other states would need to add to meet the population-per-county standard that Trende interpreted Plaintiffs to advocate for in this case. *Id.* ¶ 84. Tables 5–7 depict the number of early voting hours by state. *Id.* ¶¶ 91, 93–94. Table 8 depicts the number of early voting sites that states that have yet to introduce early voting would be required to open under the population-per-county standard. *See id.* ¶ 95. Table 9 compares the popularity of Election Day registration ("EDR")/same day registration ("SDR") by state. *Id.* ¶ 103. Table 10 depicts the use of EDR/SDR by state. *Id.* ¶ 108. Table 16 compares the ratio of DRE machines to county population for various states. *Id.* ¶ 171. The Court excludes as irrelevant each of these tables and figures, with the exception of any information related to Ohio depicted therein. *See* Findings of Fact and Conclusions of Law 33, 97, ECF No. 117 (explaining that a comparison of Ohio's voting system to those of other states is irrelevant to the *Anderson/Burdick* and Voting Rights Act analyses).

In Tables 11 and 12, Trende used census bureau data to calculate average distances between voting centers and different demographic populations in Ohio counties. *Id.* ¶ 157; Tr. Trans. 80, ECF No. 103.[6] Relatedly, Tables 13–15 attempt to depict the likely effect of opening additional early voting centers by

---

[6] Trende provided a corrected version of these tables in his rebuttal report. DX 17 at ¶ 83, Tables 9–10.

comparing the distances between voting centers and different demographic populations in Ohio counties under different scenarios of early voting location placement. DX 14 at ¶¶ 159, 161, 163; Tr. Trans. 174, ECF No. 82, 103.[7] Plaintiffs are correct that Trende failed to explain in his report what data he used to create these tables, the source of that data, or the methodology he applied, but he clarified his data sources and methodology during his testimony, which the Court finds sufficient to establish the reliability of his methods. Tr. Trans. 80–86, ECF No. 103.

Table 17 compares the changes in African American participation since 1988 in states that do not employ early voting to African American participation in Ohio. DX 14 at ¶ 247. The source of the data used in this table is not entirely clear, but it appears to be CPS data. *See id.* ¶ 240. As neither the parties nor the Court relies on this table in their findings of fact or conclusions of law, the Court need not address its admissibility.

Figures 44 and 45 depict data regarding North Carolina voters. While Trende implies that the data for Figure 44 was obtained during his work in *N.A.A.C.P. v. McCrory*, he does not identify the source of the data, let alone establish how he collected it, or testify as to its reliability. Accordingly, the Court will exclude Table 44. Trende does state that he obtained the data depicted in Figure 45 from the North Carolina state Board of Elections. *Id.* ¶ 206. Figure 45

---

[7] Trende provided a corrected version of these tables in his rebuttal report. DX 17 at ¶ 83, tables 11–13.

merely depicts that data in graph form, and the Court has no reason to doubt the data's reliability.

Plaintiffs' request to exclude Paragraphs 6–21 of Trende's rebuttal report, which identify errors in the data used in Table 1 of Dr. Timberlake's initial report, is moot, as Dr. Timberlake submitted two errata in which he corrected the errors Trende identified. *See* PX 111; PX 112.

### d. Judgment Calls

Plaintiffs next challenge the reliability of Trende's initial report in light of the subjective judgment calls he made in his data and analysis. A review of the judgment calls cited by Plaintiffs does not cast serious doubt on the reliability of the methodologies in which they were incorporated. *See* DX 14 at ¶¶ 31, 38, 44, 173.

### e. North Carolina Control Group

Finally, Plaintiffs take issue with Trende's discussion of North Carolina as a "control group" for his analysis of whether the reduction in early voting and same day registration will burden Ohio voters' ability to cast ballots. *See* DX 14 at ¶¶ 203–10. By using North Carolina as a control, Plaintiffs argue, Trende failed to account for numerous variables between North Carolina's elections in 2010, 2012, and 2014, as well as the prospective difference between North Carolina's elections and the 2016 election in Ohio. Similar to Dr. Hood's failure to account for certain controls in his case studies, Trende's failure to do so here does not change the fact that his opinions have a reasonable factual basis—the

quantitative analysis of data regarding voter turnout and registration. *See United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) ("Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis."). Plaintiffs' challenge to Trende's failure to account for various controls in his analysis therefore implicates the accuracy and credibility of that analysis, as well as its relevance to the impact of *Ohio's laws* on voter turnout, but not its reliability. *Cf. In re Scrap Metal*, 527 F.3d at 529–32. Plaintiffs appropriately examined Trende's failure to account for various controls on cross-examination, and the Court considers that testimony in evaluating the weight of his opinions. Tr. Trans. 194–97, ECF No. 103.

## II.     CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motions, ECF Nos. 75 & 76.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**